**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 26-1114 (and consolidated cases)**

# United States Court of Appeals For the District of Columbia Circuit

WASTE-TO-ENERGY ASSOCIATION,
Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY
Respondent.

On Petition for Judicial Review of Final Agency Action of the United States Environmental Protection Agency, 91 Fed. Reg. 11802 (March 10, 2026)

## OPENING BRIEF OF PETITIONERS

DAVID M. FRIEDLAND
NICOLE J. WAXMAN
1900 N Street NW, Suite 100
Washington, DC 20036
dfriedland@bdlaw.com
nwaxman@bdlaw.com
(202) 789-6000

*Counsel for Waste-To-Energy Association*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner Waste-to-Energy Association certifies as follows:

### A. Parties

#### 1. Petitioners

The following parties appear as Petitioners:

No. 26-1114: Waste-to-Energy Association ("WTEA").

No. 26-1113: East Yard Communities for Environmental Justice, Florida Rising, Ironbound Community Corporation, Sierra Club, and South Baltimore Community Land Trust.

#### 2. Respondent

The following parties appear as Respondents:

No. 26-1114: United States Environmental Protection Agency ("EPA").

No. 26-1113: EPA and Lee M. Zeldin, in his official capacity as Administrator of EPA.

#### 3. Intervenors

The following parties appear as Intervenors:

No. 26-1114: Petitioner Intervenors: None at present.

No. 26-1114: Respondent Intervenors: Ironbound Community Corporation, East Yard Communities for Environmental Justice, Florida Rising, Minnesota

Environmental Justice Table, Sierra Club, and South Baltimore Community Land Trust.

No. 26-1113: Petitioner Intervenors: None at present.

No. 26-1113: Respondent Intervenors: Waste-To-Energy Association, the City and County of Honolulu, City of Huntsville Solid Waste Disposal Authority, ecoMaine, Kent County Department of Public Works, Lancaster County Solid Waste Management Authority, Solid Waste Authority of Palm Beach County, Spokane Regional Solid Waste System, and York County Solid Waste and Refuse Authority.

**4. Amici**

Amici Curiae in support of Petitioners: None at present.

Amici Curiae in support of Respondents: None at present.

**B. Rule Under Review**

These consolidated petitions seek judicial review of EPA's final rule, Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Large Municipal Waste Combustors, 91 Fed. Reg. 11802 (Mar. 10, 2026). The final rule constitutes the agency action under review.

**C. Related Cases**

This case, *Waste-to-Energy Association v. EPA*, No. 26-1114, was consolidated with *Ironbound Community Corporation v. EPA*, No. 26-1113, by

order of this Court dated May 12, 2026. These consolidated cases have otherwise not been before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, petitioner Waste-To-Energy Association states that it has no parent corporation and has issued no stock.

Dated: November 9, 2026

Respectfully Submitted,

*/s/ David M. Friedland*

David M. Friedland
Nicole J. Waxman
1900 N Street NW, Suite 100
Washington, DC 20036
dfriedland@bdlaw.com
nwaxman@bdlaw.com
(202) 789-6000

*Counsel for Waste-To-Energy Association*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

A. Parties ............ i

1. Petitioners ............ i

2. Respondent ............ i

3. Intervenors ............ i

4. Amici ............ ii

B. Rulings Under Review ............ ii

C. Related Cases ............ ii

CORPORATE DISCLOSURE STATEMENT ............ iii

TABLE OF CONTENTS ............ iv

TABLE OF AUTHORITIES ............ vii

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ............ xii

INTRODUCTION ............ 1

JURISDICTION ............ 2

STATUTES AND REGULATIONS ............ 2

STATEMENT OF ISSUES ............ 2

STANDING ............ 3

STANDARD OF REVIEW ............ 4

STATEMENT OF THE CASE ............ 5

A. Setting and Revising Emission Standards Under Section 129 ............ 6

B. The 1995 and 2006 Rules and EPA's Voluntary Remand ............ 8

C. The Current LMWC Rule....10

1. Revisions to $NO_x$ Emission Standards....10

2. Inclusion of Warmup, Startup, and Shutdown Data in Carbon Monoxide, Sulfur Dioxide, and $NO_x$ Averaging Periods....13

SUMMARY OF ARGUMENT....15

ARGUMENT....16

I. EPA's 50-PPM $NO_x$ STANDARD VIOLATES SECTION 129 OF THE CLEAN AIR ACT AS APPLIED TO MODIFIED UNITS....16

A. EPA Failed to Identify an "Adequately Demonstrated" Control Technology for Modified Units....17

1. EPA Did Not Demonstrate that SCR Is Feasible for Modified Units....17

2. EPA Did Not Identify Non-SCR Technologies Capable of Meeting 50-ppm....20

B. The 50-ppm $NO_x$ Standard is Not "Achievable" for Modified Units....24

1. EPA's Own Analysis Demonstrates that the Rule is not "Achievable" for Modified Units....24

2. EPA's Failure to Address Modified Units Contradicts its Approach in Other Rulemakings....29

C. EPA's Failure to Address Modified Units was Arbitrary and Capricious....30

1. EPA Failed to Meaningfully Respond to Commenter Concerns....30

2. EPA Did Not Adequately Consider Costs to Modified Units....33

II. EPA'S INCLUSION OF WARMUP, STARTUP, AND SHUTDOWN WITHOUT MODIFYING APPLICABLE AVERAGING BLOCKS IS ARBITRARY AND CAPRICIOUS....34

A. EPA Failed to Demonstrate that the Standards Remain Achievable When Existing Averaging Blocks Include Warmup, Startup, and Shutdown Emissions....35

B. EPA Failed to Account for Unique Emissions Profiles During Warmup...43

CONCLUSION...45

CERTIFICATE OF COMPLIANCE...46

CERTIFICATE OF SERVICE...47

ADDENDUM, Statutory and Regulatory Provisions and Supporting Declarations (Filed as a Separate Attachment)

# TABLE OF AUTHORITIES

***Cases***

*Am. Fuel and Petrochemical Mfrs. v. EPA*,
3 F.4th 373 (D.C. Cir. 2021)....................................................................4

*Davis Cnty. Solid Waste Mgmt. v. EPA*,
101 F.3d 1395 (D.C. Cir. 1996)...........................................................6, 8

*Davis Cnty. Solid Waste Mgmt. v. EPA*,
108 F.3d 1454 (D.C. Cir. 1997)...............................................................8

*Essex Chem. Corp. v. Ruckelshaus*,
486 F.2d 427 (D.C. Cir. 1973)........................................... 7, 22, 33, 43

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................................3

*Lignite Energy Council v. EPA*,
198 F.3d 930 (D.C. Cir. 1999)........................................ 22, 23, 28, 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..................................................................................4

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................................3

*Med. Waste Inst. & Energy Recovery Council v. EPA*,
645 F.3d 420 (D.C. Cir. 2011)...............................................................33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).......................................................................... 30, 45

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
734 F.3d 1115 (D.C. Cir. 2013)...............................................................4

*Nat'l Lime Ass'n v. EPA*,
627 F.2d 416 (D.C. Cir. 1980)................................ 4, 7, 24, 25, 36, 41

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 4, 45

*Portland Cement Ass'n v. EPA*,
665 F.3d 177 (D.C. Cir. 2011) .......... 26, 26

*Portland Cement Ass'n v. Ruckelshaus*,
486 F.2d 375 (D.C. Cir. 1973) .......... 22, 32

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) .......... 24

*Sierra Club v. EPA*,
551 F.3d 1019 (D.C. Cir. 2008) .......... 40

***Federal Statutes***

42 U.S.C. § 7401 .......... 1

42 U.S.C. § 7411(a)(1) .......... 7, 16, 17

42 U.S.C. § 7411(b)(1)(B) .......... 16

42 U.S.C. § 7412(d)(6) .......... 18

42 U.S.C. § 7429(a)(1) .......... 5, 6, 32

42 U.S.C. § 7429(a)(1)(B) .......... 6

42 U.S.C. § 7429(a)(2) .......... 5, 6, 7, 30

42 U.S.C. § 7429(a)(5) .......... 5, 6, 17

42 U.S.C. § 7429(g)(2) .......... 5, 19, 20

42 U.S.C. § 7429(g)(3) .......... 5

42 U.S.C. § 7607(b) .......... 2

42 U.S.C. § 7607(d)(9)(A) .......... 4

***Federal Regulations***


40 C.F.R. § 60.2 ....5

40 C.F.R. § 60.15 ....5

40 C.F.R. § 60.58b(a)(1) ....13

40 C.F.R. § 60.58b(h)(6) ....13

40 C.F.R. § 60.58b(i) ....13

40 C.F.R. § 60.5885 ....13

40 C.F.R. § 60.5900 ....14

40 C.F.R. § 60.5900(a) ....34

40 C.F.R. § 60.5935(a) ....34

40 C.F.R. § 60.5940 .... 13, 14

40 C.F.R. § 60.6145 .... 14, 35, 42

40 C.F.R. § 60.6685 ....35

40 C.F.R. pt. 60, subpt. Cb, tbls. 1–2 (2025) ....9

60 Fed. Reg. 65387 (Dec. 19, 1995) ....8

62 Fed. Reg. 45116 (Aug. 25, 1997) ....9

63 Fed. Reg. 49442 (Sept. 16, 1998) ....28

71 Fed. Reg. 27324 (May 10, 2006) .... 7, 8, 9, 36

76 Fed. Reg. 15704 (Mar. 21, 2011) ....7

85 Fed. Reg. 54178 (Aug. 31, 2020) ....7

89 Fed. Reg. 4243 (Jan.23, 2024) .......... 11, 19, 30

91 Fed. Reg. 1910 (Jan. 15, 2026) .......... 29

91 Fed. Reg. 11802 (Mar. 10, 2026).... 1, 6, 9, 10, 11, 12, 13, 19, 20, 21, 22, 26, 31, 33, 36, 40, 41

***Other Authorities***

American Society of Mechanical Engineers, *Comments on Proposed Large Municipal Waste Combustor Rule* (Mar. 25, 2024)......... 14, 37, 42, 43

Covanta Lake II, Inc. Startup-Shutdown-Malfunction Emission Limit Project, Permit No. 0690046-017-AC .......... 41, 42

Eastern Research Group, Inc., *Site Visit Report: Palm Beach Renewable Energy Park* (Apr. 2017) .......... 11, 12, 18

EPA, *Clean Air Act Section 129(a)(5) 5-Year Review for the Large Municipal Waste Combustor Source Category* (Sept. 18, 2023) ........... 17, 20

EPA, *Compliance Cost Analyses for Proposed Large MWC Rule Amendments* (Sept. 18, 2023) .......... 18

EPA, *Large Municipal Waste Combustor Startup, Shutdown, and Malfunction (SSM) Discussion* (Jan. 25, 2017) .......... 36, 38, 43

EPA, *MACT Floor Calculations for Large Municipal Waste Combustor Units* (Sept. 13, 2023) .......... 10

EPA, *Municipal Waste Combustion: Background Information Document for Promulgated Standards and Guidelines—Public Comments and Responses* (Oct. 1995) .......... 39

EPA, *Regulatory Impact Analysis for Large Municipal Waste Combustors* (Mar. 2026) .......... 32

EPA, *Summary of Public Comments and Responses on Proposed Rule* (Mar. 2026) .......... 18, 40, 41, 44

H.R. Rep. No. 91-1146 (1970) ........ 21

Lancaster County Solid Waste Management Authority, *Comments on EPA's Proposed Large Municipal Waste Combustor Rule* (Mar. 22, 2024) ........ 31

Local Government Coalition for Renewable Energy, *Comments on Proposed Large Municipal Waste Combustor Rule* (Mar. 25, 2024) ... 12, 14, 27, 30, 36, 39, 43

Ozone Transport Commission, *Comments on Proposed Large Municipal Waste Combustor Rule* (Mar. 25, 2024) ........ 30, 31

Palm Beach Solid Waste Authority*, Comments on Proposed Large Municipal Waste Combustor Rule* (Mar. 25, 2024) ........ 26

Waste-To-Energy Association, *Comments to Standards of Performance for New Stationary Sources & Emissions Guidelines for Existing Sources for Large Municipal Waste Combustors* (Mar. 25, 2024) ... 3, 14, 30, 36, 43, 44

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| CEMS | Continuous Emissions Monitoring System |
| EPA | Environmental Protection Agency |
| LMWC | Large Municipal Waste Combustor |
| MACT | Maximum Achievable Control Technology |
| $NO_x$ | Nitrogen Oxides |
| SCR | Selective Catalytic Reduction |
| SSM | Startup/shutdown/malfunction |
| ppm | Parts per million |
| WTEA | Waste-To-Energy Association |

## INTRODUCTION

The Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, permits the Environmental Protection Agency ("EPA") to revise emission standards for large municipal waste combustors ("LMWCs"), but requires the Agency to demonstrate that those standards are achievable and that technology to meet the standards is adequately demonstrated, and to reasonably explain its decisions in light of the record before it. EPA failed to meet those obligations in two respects in the Rule challenged here. J.A.__(91 Fed. Reg. 11802 (Mar. 10, 2026) (the "Rule")).

First, EPA imposed a 50-parts-per-million ("ppm") nitrogen oxides ("$NO_x$") standard on modified and reconstructed LMWCs based on selective catalytic reduction ("SCR") technology installed at a newly constructed facility, despite EPA's own acknowledgment that retrofitting SCR at existing facilities is technically infeasible and prohibitively expensive. EPA identified no adequately demonstrated means for modified units to achieve the standard, failed to consider the costs of compliance, and disregarded significant differences between newly constructed and modified units.

Second, EPA retained the 4-hour block and 24-hour midnight-to-midnight compliance averages even though the Rule now requires periods of warmup, startup, and shutdown to be included in those same averaging blocks. Substantial record evidence shows that the otherwise achievable carbon monoxide, sulfur

dioxide, and $NO_x$ standards are unachievable using these retained averaging periods.

In each instance, EPA failed to reconcile the requirements it promulgated with the record before it and the governing law. The Court should vacate the challenged provisions and remand them to EPA.

## JURISDICTION

Petitioners timely petitioned for review of the Rule. This Court has jurisdiction pursuant to 42 U.S.C. § 7607(b).

## STATUTES AND REGULATIONS

Pursuant to Fed. R. App. P. 28(f), the pertinent statutory and regulatory provisions are included in the Addendum filed as a separate attachment to this brief.

## STATEMENT OF ISSUES

1. Whether the Rule's 50-ppm $NO_x$ standard violates the Clean Air Act and is arbitrary and capricious because it effectively requires installation of SCR pollution control technology for modified pre-existing LMWC despite EPA's conclusion that SCR is technically infeasible and cost prohibitive for pre-existing LMWCs, and failure to identify other control technology capable of meeting the limit.

2. Whether EPA acted arbitrarily and capriciously by maintaining the existing averaging periods for carbon monoxide, sulfur dioxide, and $NO_x$ without demonstrating that the resulting standards are achievable when including emissions from startup and shutdown, or adequately addressing contrary record evidence.
3. Whether EPA acted arbitrarily and capriciously by requiring warmup emissions to be included in those same averaging periods without adequately analyzing the achievability of the resulting emissions limits.

**STANDING**

Article III standing requires an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Petitioner Waste-To-Energy Association ("WTEA") is a trade association that represents owners and operators of LMWCs. J.A.__(WTEA, *Comments to Standards of Performance for New Stationary Sources & Emissions Guidelines for Existing Sources for Large Municipal Waste Combustors* 1 (March 25, 2024) ("WTEA Comments")). WTEA's members are directly regulated by the Rule. J.A.__(*Id.*); *Lujan*, 504 U.S. at 560–61; Declaration of Thomas Hogan ¶¶ 3–6; Declaration of Mark Santella ¶¶ 4–8; Declaration of Michael Van Brunt ¶¶ 3–7. Therefore, WTEA has associational standing. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S.

333, 342–45 (1977); *Am. Fuel and Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021). A favorable court decision vacating the provisions of the Rule challenged herein would redress Petitioner's foreseeable injuries.

**STANDARD OF REVIEW**

The Court is authorized to reverse an agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 42 U.S.C. § 7607(d)(9)(A). An agency's action is arbitrary or capricious if it is not reasonable and reasonably explained. *Ohio v. EPA*, 603 U.S. 279, 292 (2024). While a court may not substitute its judgment for that of the agency, it must ensure "that the agency 'has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choices made.'" *Id.* "An agency cannot simply ignore 'an important aspect of the problem.'" *Id.* at 293.

This Court must exercise its independent judgment in deciding whether EPA has acted within its statutory authority under Section 129 of the Clean Air Act. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). The Court must remand the rule for further consideration if EPA's factual analysis or decision making does not reasonably support the requirements adopted in the Rule. *See Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 431–33 (D.C. Cir. 1980); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1144–46 (D.C. Cir. 2013).

## STATEMENT OF THE CASE

Clean Air Act Section 129 requires EPA to establish technology-based new source performance standards for new solid waste incineration units and emission guidelines for existing solid waste incineration units, and to periodically review and revise those standards every five years if certain criteria are met. 42 U.S.C. § 7429(a)(1), (a)(5). Section 129 defines a "new solid waste incineration unit" to include not only brand-new units but also "modified solid waste incineration units" ("modified units") which are defined as units that undergo modifications after a standard's effectiveness date if either: (1) the cumulative cost of the modifications, over the life of the unit, exceeds 50 percent of the original cost of construction and installation of the unit; or (2) the modification is a physical change in, or change in the method of operation of, the unit which increases the amount of any air pollutant emitted by the unit. 42 U.S.C. § 7429(g)(2)–(3).[1] A unit that undertakes a qualifying modification must also comply with the more stringent standards for new units even though the unit is a physically existing facility and is not truly "new." *Id.* § 7429(a)(2). Section 129 required EPA to promulgate standards for

[1] EPA distinguishes between "modification" and "reconstruction" under Section 111. 40 C.F.R. §§ 60.2, 60.15. Section 129 includes both concepts in defining a "modified solid waste incineration unit." 42 U.S.C. § 7429(g)(3). For purposes of this brief, Petitioner uses the term "modified unit" to encompass units that have undergone a qualifying Section 129 modification, including a Section 111 reconstruction.

new and existing solid waste incineration units with the capacity to combust over 250 tons of municipal solid waste per day. *Id.* § 7429(a)(1)(B). Units of that size are referred to as LMWCs. *Davis Cnty. Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1403–04 (D.C. Cir. 1996).

**A. Setting and Revising Emission Standards Under Section 129**

Section 129 enumerates several distinct rulemaking obligations, including that EPA: (1) set standards for categories of solid waste incineration units; and (2) review those standards every five years and promulgate revisions if EPA's review demonstrates that certain criteria are met. 42 U.S.C. § 7429(a)(1), (a)(5). First, Section 129(a)(2) requires EPA to base initial emission standards on "the maximum degree of reduction in emissions" that EPA determines is "achievable for new or existing units in each category," taking into account cost and other impacts. *Id.* § 7429(a)(2). For new sources, these standards must be at least as stringent as the control that EPA determines is "achieved in practice by the best controlled similar unit." *Id.* These standards are commonly referred to as Maximum Achievable Control Technology ("MACT") standards.

Then, after a MACT standard is established, EPA is required to "review, and in accordance with [Sections 129 and 111], revise" those standards every five years. *Id.* § 7429(a)(5). Notably, as EPA enumerates in the Rule, a Section 129(a)(5) review does *not* require EPA to re-calculate a new MACT standard every

five years. J.A.__(91 Fed. Reg. at 11805–06). Instead, Section 129 references a different section of the Clean Air Act—Section 111—to set forth the process governing EPA's five-year review. J.A.__(*Id.*). Under Sections 111(b)(1)(B) and 129(a)(2), revisions must reflect "the degree of emission limitation achievable through the application of the best system of emission reduction" that has been "adequately demonstrated" by a source category, taking into account the costs, health, and environmental implications of doing so. 42 U.S.C. §§ 7411(a)(1), 7429(a)(2). EPA has consistently followed this interpretation in prior Section 129 rules. *See* J.A.__(71 Fed. Reg. 27324, 27327 (May 10, 2006) ("the 2006 Rule")) (the "natural reading" of Section 129(a)(5) is that EPA is to "conduct a periodic review to determine whether advances in technology warrant revisions to the standards"); *see also* J.A.__(76 Fed. Reg. 15704, 15708 (Mar. 21, 2011)); J.A.__(85 Fed. Reg. 54178, 54182–83 (Aug. 31, 2020)). In interpreting the Section 111 criteria, this Court has explained that the control technology system must be adequately demonstrated and the resulting emission standard must be achievable. *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 433 (D.C. Cir. 1973).

Section 129 allows EPA to set different standards for different classes, types, and sizes of solid waste incineration units, and in general, the standards must be "achievable" for a representative set of the regulated industry. 42 U.S.C. § 7429(a)(2); *Nat'l Lime Ass'n*, 627 F.2d at 432–33.

### B. The 1995 and 2006 Rules and EPA's Voluntary Remand

EPA first promulgated its MACT standards for the LMWC source category in 1995. J.A.__(60 Fed. Reg. 65387 (Dec. 19, 1995) ("1995 Rule")). The 1995 Rule set a $NO_x$ emission standard at 180-ppm for new units during their first year of operation, and 150-ppm after the first year of operation. J.A.__(*Id.* at 65393). The 1995 Rule also set $NO_x$ emission guidelines for certain existing units between 200 and 250-ppm depending on the type of unit. J.A.__(*Id.* at 65400). In 1996, this Court vacated the 1995 Rule in its entirety, and then, upon rehearing, left the 150–180-ppm $NO_x$ standard for new LMWCs and emission guidelines for existing LMWCs intact while invalidating other portions of the rule. *Davis Cnty. Solid Waste Mgmt.*, 101 F.3d at 1411; *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997).

In 2006, EPA completed its first Section 129(a)(5) five-year review of the standards and emission guidelines for new and existing LMWCs. J.A.__(71 Fed. Reg. at 27324). During its review, EPA properly applied Section 111 criteria and revised MACT standards for several pollutants but did not revise the $NO_x$ standard for new sources.

Environmental groups challenged the 2006 Rule, alleging that the MACT floor limits set in the original 1995 rulemaking were invalid, which rendered the review of those floors in 2006 similarly invalid. Petition for Review, *Sierra Club v.*

*EPA*, No. 06-1250 (D.C. Cir. July 7, 2006). Shortly thereafter, this Court issued several opinions relating to calculations of MACT floors under Section 129. Because the 2006 review did not recalculate the MACT floor and instead "relied on the 1995 rule as the foundation for its revisions," EPA moved to voluntarily remand its 2006 rules and examine whether it had calculated the 1995 MACT floor incorrectly. J.A.__(EPA's Motion for Voluntary Remand at 5, *Sierra Club v. EPA*, No. 06-1250 (D.C. Cir. Nov. 9, 2007)). In its motion, EPA stated its intention to re-analyze the 1995 MACT floors "under Section 129(a)(2)" in light of the intervening case law. J.A.__(*Id.* at 2). The Court granted EPA's motion and remanded the rule without vacatur—keeping the standards that were established in 1995 and revised in 2006 in place while EPA reevaluated the MACT floor. J.A.__(Order, *Sierra Club v.* EPA, No. 06-1250 (D.C. Cir. Feb. 15, 2008)). Accordingly, the $NO_x$ limit for new sources stayed at 150–180-ppm and remained there until the rulemaking that is the subject of this case.[2]

[2] The $NO_x$ emission guidelines for existing LMWCs, as amended in 1997 and 2006, established numerical limits of 180–250-ppm for most units and 165–230-ppm for units included in emissions-averaging plans, depending on combustor technology. *See* J.A.__(62 Fed. Reg. 45116, 45117–18, 45120 (Aug. 25, 1997)); J.A.__(71 Fed. Reg. at 27334; 40 C.F.R. pt. 60, subpt. Cb, tbls. 1–2 (2025)).

### C. The Current LMWC Rule

In this rulemaking, EPA addressed the voluntary remand of amendments to the LMWC standards that it promulgated in 2006 and recalculated the MACT floors. EPA simultaneously conducted a review of those MACT standards pursuant to Clean Air Act Section 129(a)(5) and set additional standards based on that review. In addition, EPA removed an exception for periods of startup, shutdown, and malfunction ("SSM"), and imposed the requirement that facilities include emissions data from periods of startup/shutdown and warmup when calculating emissions averages for compliance purposes.

#### 1. Revisions to $NO_x$ Emission Standards

EPA analyzed the $NO_x$ emission standard in two steps. First, under Section 129(a)(2), EPA recalculated the MACT floor and set the $NO_x$ emission standard for new sources at 140 or 150 ppm, depending on the specific type of combustor. J.A.__(91 Fed. Reg. at 11810 tbl. 6); J.A.__(EPA Memo, *MACT Floor Calculations for Large Municipal Waste Combustor Units* tbl. 1 (Sept. 13, 2023) (EPA-HQ-OAR-2017-0183-0015)). Second, EPA conducted a five-year review of those standards pursuant to Section 129(a)(5), applying the Section 111 review framework to determine whether a new technology is "adequately demonstrated" and a revised standard would be "achievable." EPA determined that a best-in-class control technology called SCR was "adequately demonstrated" for new LMWCs

and that a $NO_x$ emissions standard of 50 ppm—approximately one-third of the limit that EPA's updated MACT floor analysis identified—was "achievable" for new LMWCs using that technology. J.A.__(89 Fed. Reg. 4243, 4254–55 (Jan. 23, 2024)).

In its 129(a)(5) analysis, EPA did not identify a fleet of LMWCs demonstrating the performance on which it based the new standard. Instead, EPA based 50 ppm on the permitted limits at a single facility with three new LMWC units, the Palm Beach Renewable Energy Facility 2 (known as "REF 2"), which EPA determined is the "only facility currently using SCR technology with an air-to-air heat exchanger providing flue gas reheat prior to entering the SCR reactor." J.A.__(91 Fed. Reg. at 11816); *see generally* J.A.__(EPA Site Visit Report*, Palm Beach Renewable Energy Park* (Apr. 2017) ("Palm Beach Renewable Energy Site Report")). The LMWCs at REF 2 were constructed with SCR as part of their initial design configuration. *See* J.A.__(Palm Beach Renewable Energy Site Report at 7, 10). EPA identified an important caveat to its conclusion: the Agency determined that the SCR design supporting the 50-ppm standard can "only reasonably" be incorporated "**during construction of the unit**." J.A.__(91 Fed. Reg. at 11816 (emphasis added)). EPA further concluded that retrofitting SCR to existing

LMWCs would be "**technically infeasible and/or very costly**" where reheat would require use of a supplemental burner. J.A.__(*Id.* (emphasis added)).[3]

However, since modified units must meet the standard for new units, modified LMWCs must also meet 50 ppm for $NO_x$, despite EPA's conclusions that the technology demonstrated to achieve the 50-ppm emission limit is technically infeasible and unreasonably expensive when retrofitted at existing units. At the same time, EPA declined to finalize its proposed 110-ppm standard for existing units, determining that the control technology required to comply with 110 ppm was too costly when considering the correspondingly small reduction in emissions. J.A.__(91 Fed. Reg. at 11811).[4]

EPA did not analyze the technical feasibility or cost of the 50-ppm standard for a modified unit. Instead, in the Paperwork Reduction Act section of the Rule, EPA stated that it did not anticipate any new construction, reconstruction, or modification of LMWCs to occur during the next three years. J.A.__(*Id.*). This is a

---

[3] SCR cannot operate when flue gas temperatures are too low. J.A.__(Local Government Coalition for Renewable Energy, *Comments on Proposed Large Municipal Waste Combustor Rule* 30 (Mar. 25, 2024) (EPA-HQ-OAR-2017-0183-0102) ("Local Government Coalition Comments")). As a result, supplemental reheat of the flue gas is required for the SCR to function properly. J.A.__(Palm Beach Renewable Energy Site Report at 8 (describing that during the SCR process, flue gas is passed through a heat exchanger to bring the gas up to target temperature)). Therefore, supplemental reheat, typically provided via a supplemental burner, is nearly always required for SCR operation.

[4] The $NO_x$ standard for existing sources, depending on the combustor type, is 150–205 ppm. J.A.__(91 Fed. Reg. at 11885 tbl. 3).

curious statement for two reasons. First, the 50-ppm standard does not cease to apply after three years so the three-year time frame is arbitrary. Second, EPA did not cite to anything in the record for this statement, nor did it address commenter statements to the contrary.

### 2. Inclusion of Warmup, Startup, and Shutdown Data in Carbon Monoxide, Sulfur Dioxide, and $NO_x$ Averaging Periods

The Rule requires LMWCs to determine compliance with the emission limits for carbon monoxide using a 4-hour averaging period, and for sulfur dioxide and $NO_x$ using a 24-hour daily averaging period. J.A.__(*Id.* at 11852, 11858). Facilities must use CEMS data to derive average emission levels during the 4-hour or 24-hour blocks in order to assess compliance with the emission standard for each pollutant. J.A.__(*Id.* at 11842); 40 C.F.R. § 60.5940. This aspect of the Rule is not novel—the prior LMWC standards also required facilities to determine compliance with emission limits using 4-hour and 24-hour block averages. *See* 40 C.F.R. § 60.58b(h)(6)–(7), (i). However, the previous LMWC rule included a three-hour exemption for emissions during startup and shutdown periods. *Id.* § 60.58b(a)(1). In the Rule, EPA removed this exemption and required facilities to include startup and shutdown data in the averaging blocks used to determine compliance with the carbon monoxide, sulfur dioxide, and $NO_x$ limits, without considering whether these averaging periods were still reasonable without the

exemption. *Id.* § 60.5885 (operating requirements "apply at all times including periods of municipal waste combustor warmup, startup, shutdown, and malfunction"); *id.* § 60.5900 (same for emission limits).

The Rule also introduced a new transitory period, "warmup," which is the time of operation "from a cold start until waste is fed to the combustor," and required that it too be included in the averaging periods. *Id.* §§ 60.5940, 60.6145. Commenters provided data demonstrating substantial noncompliance with carbon monoxide, sulfur dioxide, and $NO_x$ standards when those standards included warmup, startup, and shutdown periods in the required 4-hour or 24-hour averaging blocks. J.A.__(The American Society of Mechanical Engineers, *Comments on Proposed Large Municipal Waste Combustor Rule* 5 (Mar. 25, 2024) (hereinafter "ASME Comments")); J.A.__(WTEA Comments, Attachment J at 3–5); J.A.__(Local Government Coalition Comments at 28). Commenters also submitted information regarding the unique nature of carbon monoxide emissions compared to other pollutants, and how the variability of transitory periods affects a unit's ability to achieve complete combustion, rendering compliance with carbon monoxide standards infeasible. J.A.__(ASME Comments at 5); J.A.__(WTEA Comments, Attachment J at 3–5); J.A.__(Local Government Coalition Comments at 28). Nonetheless, EPA finalized the standards as proposed.

## SUMMARY OF ARGUMENT

The Rule imposes two requirements that violate the Clean Air Act and are arbitrary and capricious. First, the 50-ppm $NO_x$ standard as applied to modified LMWC units violates the Clean Air Act. Section 129(a)(5) requires EPA to demonstrate that an emission standard is achievable through an adequately demonstrated control technology, taking costs into account. EPA failed to meet these requirements for modified LMWCs. EPA based its 50-ppm standard—a standard that is substantially more stringent than the 150–180-ppm limit under the 1995 rule—on SCR technology installed at one brand-new facility. At the same time, EPA acknowledged that SCR could only reasonably be incorporated during initial construction and that retrofitting existing units with SCR would be technically infeasible and prohibitively costly. EPA did not identify any other adequately demonstrated technology capable of achieving 50-ppm at modified units, nor did it analyze the costs or feasibility of those units meeting that standard. Instead, EPA relied on an unsupported and arbitrary assumption that no modifications would occur within three years, even though the standard applies in perpetuity, not for just three years. EPA could have and lawfully should have analyzed modified units and set a different standard for modified units as it has done in multiple other instances. It did not do so, and its failure to adequately

evaluate achievability for modified units violates the Clean Air Act and is arbitrary and capricious.

Second, EPA's retention of 4-hour block averaging periods for carbon monoxide and 24-hour block averaging periods for sulfur dioxide and $NO_x$ despite the new requirement to include emissions from during warmup, startup, and shutdown is arbitrary and capricious. Commenters submitted substantial data demonstrating that the Rule's limits are only achievable during such inherently variable operating conditions if longer averaging periods are used. EPA nevertheless added warmup, startup, and shutdown periods to the existing averaging periods, without demonstrating that the resulting standards are achievable or meaningfully responding to contrary evidence.

## ARGUMENT

### I. EPA'S 50-PPM $NO_X$ STANDARD VIOLATES SECTION 129 OF THE CLEAN AIR ACT AS APPLIED TO MODIFIED UNITS

EPA promulgated the 50-ppm $NO_x$ standard under its 5-year review authority (129(a)(5)), not under its calculation of the MACT standard (129(a)(2)). Therefore, EPA must meet the requirements of Section 129(a)(5) for the $NO_x$ standard to be lawful as applied to modified units, which it has failed to do.

EPA can only revise a Section 129/111 standard if it determines both that a technology is "adequately demonstrated" and that the resulting emission standard is "achievable." 42 U.S.C. § 7411(a)(1), (b)(1)(B). EPA failed to make both

determinations here. As a result, EPA's 50-ppm $NO_x$ standard as applied to modified units is unlawful under Sections 129 and 111. 42 U.S.C. §§ 7429(a)(5), 7411(a)(1).

### A. EPA Failed to Identify an "Adequately Demonstrated" Control Technology for Modified Units

EPA did not identify an "adequately demonstrated" technology that modified units can use to meet the 50-ppm $NO_x$ standard. In examining potential technologies, EPA conducted an analysis of: (1) SCR installed on the newest unit in the country, which EPA determined was infeasible unless installed during initial unit construction; and (2) control technologies that can be retrofitted onto existing units, which can only meet $NO_x$ emission limits far less stringent than 50-ppm. That analysis left an obvious gap: EPA identified no retrofit technology that would allow modified units to achieve the 50-ppm limit in any way, let alone in a cost-effective way.

#### 1. EPA Did Not Demonstrate that SCR Is Feasible for Modified Units

In evaluating technologies in use at LMWC units that were capable of meeting the 50-ppm standard, EPA only identified SCR. J.A.__(Memorandum, *Clean Air Act Section 129(a)(5) 5-Year Review for the Large Municipal Waste Combustor Source Category* 4 (Sept. 18, 2023) ("5-Year Review

Memorandum"));[5] *see also* J.A.__(EPA, *Summary of Public Comments and Responses on Proposed Rule* 88 (Mar. 2026) ("EPA Response to Comments")) (50-ppm limit is "based on the use of [SCR] with a heat exchanger.").

EPA examined SCR at the REF 2 unit, located at the Palm Beach Renewable Energy Park, which is "the most recently constructed [LMWC] facility in the United States." J.A.__(EPA, *Compliance Cost Analyses for Proposed Large MWC Rule Amendments* 2 (Sept. 18, 2023) (EPA-HQ-OAR-2017-0183-0014)). In its analysis, EPA described how REF 2 has installed a "proprietary air-to-air heat exchanger to reheat flue gas prior to entering the SCR reactor." J.A.__(*Id.*). In the memorandum memorializing its visit to the Palm Beach Renewable Energy Park, where REF 2 is located, EPA noted that "the primary technical challenge for retrofitting SCR would be its footprint requirements and the lack of space available in existing facilities that were not originally designed to accommodate this control

---

[5] In several instances in this memorandum and in the Rule, EPA appears to conflate a review of a Section 129 MACT standard undertaken under Section 129(a)(5) with the periodic review of a MACT standard promulgated under Section 112. Clean Air Act Section 112(d)(6) requires EPA to review and revise Section 112 standards "as necessary (taking into account development in practices, processes, and control technologies)." 42 U.S.C. § 7412(d)(6) ("Section 112(d)(6)"). This review is known as a "technology review" and is a separate statutory framework from the requirements of Section 129(a)(5) and, by reference, Section 111. The text of Section 111, which requires emission standards to be based on application of the best system of emission reduction that EPA determines has been adequately demonstrated, taking into account costs and non-air quality health and environmental impact and energy requirements, is different from that of Section 112(d)(6), and hence 112(d)(6) is inapplicable here.

device." J.A.__(Palm Beach Renewable Energy Site Report at 10). But EPA failed to reconcile these observations with its ultimate decision to subject modified units to the 50-ppm standard.

EPA stated that SCR for brand-new units was feasible "only" because SCR is applied "during construction of the unit." J.A.__(89 Fed. Reg. at 4255). EPA stated that "retrofitting SCRs to existing units would be technically infeasible and/or very costly if a supplemental burner is required to provide reheat." J.A.__(*Id.*). This supplemental reheat is necessary to the SCR process[6] and therefore EPA's conclusion that SCR design can "only be reasonably applied" in a cost-effective way when a facility is being built applies to all LMWCs. J.A.__(*Id.*). But modified units are, by definition, already built and operational. Further, it does not take an enormous overhaul for an existing unit to "modify" in a way that subjects it to the 50-ppm standard—an existing unit can be considered "modified" and subject to the 50-ppm standard if any physical or operational change increases the $NO_x$ emission rate, or if the cumulative cost of upgrades over the unit's lifetime (excluding routine maintenance) exceeds certain thresholds. 42 U.S.C. § 7429(g)(2)–(3). EPA has not identified any instance of SCR installed at a reconstructed or modified unit.

---

[6] *See supra* note 4.

EPA's own rationale thus establishes the precise distinction it failed to account for. EPA justified the reduction from 140-ppm to 50-ppm on the ground that a source "that ha[s] yet to commence construction" can be designed around SCR from the outset. J.A.__(91 Fed. Reg. at 11821). But a modified unit is not such a source. It is an already constructed and operating unit that subsequently undergoes qualifying changes. *See* 42 U.S.C. § 7429(g)(2)–(3). Congress's decision to classify such a unit as "new" for regulatory purposes does not eliminate EPA's obligation to evaluate constraints that those units have in retrofitting pollution-control systems. EPA cannot rely on the feasibility of incorporating SCR into the design of a new facility to establish that SCR can reasonably meet the same 50-ppm standard at modified units. EPA did not "adequately demonstrate" that SCR was feasible for a modified unit.

### 2. EPA Did Not Identify Non-SCR Technologies Capable of Meeting 50-ppm

EPA's analysis of control technologies available at existing facilities does not bridge this gap. EPA's existing source analysis identified no retrofit technology capable of achieving the proposed 110-ppm standard for existing sources—a standard over twice as high as the 50-ppm standard applied to modified units—in a cost-effective way. EPA examined feasibility and cost of two types of controls for existing unit retrofits: advanced selective noncatalytic reduction and low-$NO_x$ controls. J.A.__(5-Year Review Memorandum at 11). According to EPA, these

controls *could* be retrofitted onto an existing MWC to allow that unit to feasibly meet the proposed 110-ppm existing unit standard. J.A.__(*Id.*). However, EPA's analysis demonstrated that the costs associated with installation of either option would be approximately $411 million and would result in potential unit closures or cost increases that would impact municipalities that rely on LMWCs for disposal of municipal solid waste. J.A.__(91 Fed. Reg. at 11821). Because of these extraordinarily high costs of the control technology and minimal resulting emissions reductions, EPA opted not to finalize the 110-ppm standard for existing sources and maintained a 150–205-ppm $NO_x$ standard depending on the type of combustor. J.A.__(91 Fed. Reg. at 11819). Accordingly, neither of these controls are adequately demonstrated to achieve the much lower 50-ppm standard.

Finally, EPA's cursory references to other potential control options without any demonstration that these options can actually meet the 50-ppm standard are not sufficient. EPA stated that existing facility operators could "investigate" an SCR hybrid system in lieu of SCR. J.A.__(91 Fed. Reg. at 11819–20). However, at the same time, EPA stated that "limited information is available about application of these technologies, and no information is available about long-term performance of these controls applied to municipal waste combustors." J.A.__(*Id.*).

In creating Section 111, Congress stated that standards cannot be based on a control technology that is "purely theoretical or experimental." H.R. Rep. No. 91-

1146, at 10 (1970). EPA cannot establish adequate demonstration through "mere speculation or conjecture." *Lignite Energy Council v. EPA*, 198 F.3d 930, 934 (D.C. Cir. 1999) ("*Lignite Energy*"). While EPA is not required to identify and evaluate every possible control technology when setting a standard, or to prove that every regulated facility in existence can meet the new standard, EPA's projection of a technology's availability to meet a standard must be reasonable and "cannot be based on [a] 'crystal ball' inquiry." *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 391 (D.C. Cir. 1973). Additionally, where a standard becomes immediately effective, as the 50-ppm standard does upon a facility's qualifying modification, the question of a technology's feasibility "is partially dependent on . . . the time in which the technology will have to be available." *Id.* Here, EPA has not even identified a future technology that may be capable of allowing an existing but modified unit to meet 50-ppm, let alone one that would allow a facility to meet the standard as it applies right now. Therefore, EPA's conjecture is precisely the type of '"crystal ball' inquiry" this Court has previously found insufficient. *Id.*

Nor can EPA avoid this defect by reiterating that the new source performance standards do not formally require SCR. A performance standard need not prescribe a particular control technology, but EPA still must demonstrate that the numerical standard lies "within the realm of the adequately demonstrated system's efficiency." *Essex Chem. Corp.*, 486 F.2d at 433. EPA identified no

demonstrated alternative pathway by which a modified LMWC could achieve 50-ppm. To the contrary, EPA acknowledged that information concerning hybrid SCR systems is "limited" and that "no information is available about long-term performance of these controls applied to municipal waste combustors," merely suggesting that owners "may investigate" whether such a system is viable. J.A.__(91 Fed. Reg. at 11820). An invitation to investigate whether some other technology might work cannot establish that said technology is adequately demonstrated and proves that the technology is not readily available for use.

This Court's decision in *Lignite Energy* does not change that conclusion. *Lignite Energy*, 198 F.3d at 933. The *Lignite Energy* petitioners claimed that SCR was not "adequately demonstrated" for coal-fired industrial boilers, because, at the time of that rulemaking, SCR was a new technology and EPA did not have specific emissions data on SCR for those boilers. *Id.* at 933–34. Upholding the standard for coal-fired boilers, the Court concluded that "EPA may compensate for a shortage of data through the use of other qualitative methods, including the reasonable extrapolation of a technology's performance in other industries." *Id.* at 934. The Court found that EPA had met its burden through its analysis of the utility boilers, because utility boilers and industrial boilers have similar designs, and therefore SCR achievability for utility boilers could be reasonably extrapolated to apply to industrial boilers. *Id.* By contrast, in this case, EPA did not evaluate SCR

achievability for a modified LMWC unit **in any way**; it did not and could not refer to any analogous situation where SCR was used.

### B. The 50-ppm $NO_x$ Standard is Not "Achievable" for Modified Units

Upon selecting an adequately demonstrated technology, EPA must select an emissions level that is both achievable and representative of the best balance of economic, environmental, and energy considerations. *Sierra Club v. Costle*, 657 F.2d 298, 330 (D.C. Cir. 1981). EPA bears the burden of demonstrating that a standard is "achievable" under Section 111, and without this demonstration, a new source performance standard is unlawful. *Nat'l Lime Ass'n*, 627 F.2d at 430 ("[p]romulgation of [Section 111] standards based upon inadequate proof of achievability" would be unlawful). Even if EPA had identified a technology that would allow a modified source to meet a 50-ppm standard (which it did not), for the standard to be lawful, EPA would have had to show that it was achievable and satisfied the economic, environmental, and energy considerations set forth above for modified units. EPA did not do that. Indeed, its own analysis proves to the contrary.

#### 1. EPA's Own Analysis Demonstrates that the Rule is not "Achievable" for Modified Units

EPA must explain how a standard is "achievable under the range of relevant conditions which may affect the emissions to be regulated." *Id.* at 433. That

obligation extends to the full class of sources that EPA subjects to the 50-ppm standard—including modified units. *See id.* at 431–33.

EPA cannot establish a modified LMWC's ability to achieve the 50-ppm new source standard solely by analyzing one newly constructed facility specifically designed to accommodate SCR. In *National Lime*, the Court remanded a Section 111 standard because EPA had not adequately demonstrated the standard's achievability "for the industry as a whole." *Id.* at 431. There, the Court found that the test data EPA relied on "fail[ed] to consider the representativeness along various relevant parameters of the data." *Id.* at 433. One parameter, the Court noted, is whether the standard reflects industry-wide achievability considering "the range of variable factors found relevant to the standards' achievability." *Id.* Surely, whether a source is designed to accommodate stringent controls (a true "new" source) or is operational and required to retrofit with stringent controls later (a modified source) is a "parameter of the data" that is "relevant" to the achievability of the standard. *See id.* But EPA did not conduct any analysis of whether the standard was achievable for a modified unit, and therefore it did not meet its burden under the Clean Air Act. *Id.*

*Portland Cement* shows what Section 111 requires where EPA applies a new-source standard to modified older equipment and highlights what is missing here. There, EPA had investigated whether it should revise the $NO_x$ emissions limit

for modified kilns. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 190 (D.C. Cir. 2011). In doing so, EPA relied on "detailed studies" demonstrating that older kilns could avoid increasing emissions and remain in compliance through "a variety of different controls." *Id*. EPA evaluated actual industry data showing that the strong industry trend was to replace, rather than modify, old kilns. *Id.* As a result, the scenario where a modification would occur was essentially nonexistent, and the Court found EPA's analysis reasonable. *Id.*

Here, EPA did the opposite. It identified no study evaluating how an existing LMWC could be modified to accommodate SCR, identified no alternative demonstrated control capable of reliably achieving 50-ppm at such a unit, and concluded that retrofitting an existing unit with SCR would be "technically infeasible and/or very costly." J.A.__(91 Fed. Reg. at 11816). EPA therefore failed to perform the very modified source analysis that supported its conclusion in *Portland Cement*.

EPA had every reason to undertake such an analysis for modified units. Multiple commenters on the proposed rule rejected EPA's analysis describing the feasibility of using SCR to meet the $NO_x$ standard for new sources, and those concerns are compounded for modified units. As one commenter noted, "EPA's assumption that the proposed limits can be achieved by implementing minor adjustments to operations and/or small capital investments is flawed in that EPA

fails to recognize that combustion/boiler and Air Pollution Control[] equipment are complex integrated engineering systems" where "[c]hanges made to one portion will affect the other downstream systems." J.A.__(Palm Beach Solid Waste Authority, *Comments on Proposed Large Municipal Waste Combustor Rule* 12 (Mar. 25, 2024) (EPA-HQ-OAR-2017-0183)). That commenter specifically noted that even the state-of-the-art REF 2 facility would be required to increase reagent flow to meet the reduced $NO_x$ limits, which would stress existing systems and require them to operate "above their design limits" and incur additional costs. J.A.__(*Id.* at 13). As that commenter noted, such operation is "a recipe for disaster." J.A.__(*Id.*). A local government coalition raised similar concerns, highlighting that "the reagents necessary for compliance with the proposed sulfur dioxide and $NO_x$ limits can have antagonistic reactions" which can cause SCR to function improperly. J.A.__(Local Government Coalition Comments at 30). Therefore, even if SCR were feasible to install, EPA had data demonstrating that it might not actually work in practice, even for brand-new units, to achieve the standard without substantial adverse impacts. EPA ignored these comments and finalized the standard anyway, without considering whether these comments warrant a different standard for modified units.

*Lignite Energy* is similarly distinguishable here. There, an industry coalition challenged EPA's lowering of the $NO_x$ emission standards from utility and

industrial boilers on several grounds. The coalition argued that EPA did not demonstrate the achievability of the new standards for boilers burning high-sulfur coals. *Lignite Energy*, 198 F.3d at 933. However, the Court upheld EPA's standard because EPA had specifically "collected continuous emissions monitoring data on two high-sulfur coal-fired utility boilers that show[s] that the . . . standard was achievable, and supplemented this study with similar evidence from foreign utility boilers." *Id.* Here, unlike in *Lignite*, EPA did not conduct its own analysis, examine other studies, or even mention disparate impacts on modified LMWCs in its achievability evaluation.

Notably, in the rulemaking at issue in *Lignite*, EPA expressly addressed commenter concerns related to achievability of the standards by modified units and **finalized a different standard for modified units**. J.A.__(63 Fed. Reg. 49442, 49448 (Sept. 16, 1998)). Specifically, EPA proposed an output-based $NO_x$ standard based on a representative efficiency rate range. J.A.__(*Id.*). After commenters expressed concerns that this standard was not achievable for modified units, EPA acknowledged that existing units are likely to operate at the lower end of that efficiency rate range, which would make it more difficult and costly for modified units to meet the output-based standard. J.A.__(*Id.*). EPA ultimately opted to impose an input-based standard specifically for modified units, which would make the standard easier for modified units to achieve. J.A.__(*Id.*). EPA could have

taken a similar approach here and promulgated a separate standard that was achievable for modified units. But it did not.

### 2. EPA's Failure to Address Modified Units Contradicts its Approach in Other Rulemakings

EPA's failure to examine modified units and adopt an alternative standard for modified units contradicts its long-standing recognition of the challenges that modified units face in complying with new source standards. In EPA's recent promulgation of new source performance standards for stationary combustion turbines, EPA agreed with commenters that "the costs of retrofitting combustion turbines with SCR is significantly higher than for new turbines" and finalized separate "best system of emission reduction" standards for such turbines. J.A.__(91 Fed. Reg. 1910, 1949–50 (Jan. 15, 2026)) (adopting a 5-ppm standard for certain new gas-fired turbines based on combustion controls with SCR, and a standard of 15 to 25 ppm for modified or reconstructed turbines based on non-SCR technology). So, there is no question that EPA can promulgate different emission standards for modified units than for new or existing units, and that EPA has previously done so in order to promulgate an achievable—and therefore lawful—standard for modified units. Given EPA's conclusions that SCR retrofits are infeasible, EPA should have created a different standard for modified units. Alternatively, EPA has the discretion to create subcategories of solid waste

incineration units and could have created a separate subcategory to address the differences between modified and brand-new LMWCs. 42 U.S.C. § 7429(a)(2).

### C. EPA's Failure to Address Modified Units was Arbitrary and Capricious

EPA's failure to address the impact of the 50-ppm standard on modified units was arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).

#### 1. EPA Failed to Meaningfully Respond to Commenter Concerns

EPA was on notice that its analysis of modified MWCs was insufficient but failed to address this gap in its Rule. EPA did not examine modified units at all. In the Federal Register notice announcing the proposed rule, EPA stated, without citation or explanation, that it did not "anticipate any construction of new units or [new source performance standard]-triggering reconstruction or modifications of existing units within the next 3 years." J.A.__(89 Fed. Reg. at 4265). Several commenters submitted information to the contrary. For example, WTEA specifically raised that the $NO_x$ standard would have implications for "expanded" facilities. J.A.__(WTEA Comments at 10). These concerns were not theoretical—several local government commenters raised concerns about applicability of the standards to planned or future facility construction. One commenter noted that there have been "several expansions of existing plants such as in Lee County and

Hillsborough County, FL." J.A.__(Local Government Coalition Comments, Attachment 2 at 9). Another local government commenter expressed "serious concerns" that the emission limits for new units would disrupt future facility expansions necessary to meet the region's solid waste management obligations. J.A.__(Lancaster County Solid Waste Management Authority, *Comments on EPA's Proposed Large Municipal Waste Combustor Rule* 5 (Mar. 22, 2024) (EPA-HQ-OAR-2017-0183)). Further, the Ozone Transport Commission conducted its own analysis of the tons per year of $NO_x$ that could be reduced with additional controls. J.A.__(Ozone Transp. Comm'n, *Comments on Proposed Large Municipal Waste Combustor Rule* (Mar. 25, 2024) (EPA-HQ-OAR-2017-0183-0087)). In doing so, they described how they excluded two Wheelabrator LMWCs located in Massachusetts, because the 30-day $NO_x$ limit "was not assumed to be achieved without major modifications of the existing MWCs." J.A.__(*Id.* at 9). The Commission's analysis further concluded that the "older tail end design and short furnace" of those units "limits the ability to install additional cost-effective $NO_x$ controls." J.A.__(*Id.*). Accordingly, EPA was on notice that some facilities may undergo changes, that those changes could trigger the modification criteria, and that those facilities may have limited ability to comply with the 50-ppm $NO_x$ standard.

Instead of addressing these comments and analyzing the standard's implications for modified units, EPA ignored them, and in the Federal Register notice announcing the Rule, regurgitated its one-sentence conclusion that it did not anticipate any standard-triggering modifications "within the next 3 years." J.A.__(91 Fed. Reg. at 11829). The problems with this statement are obvious. First, the standards apply beyond three years—they apply in perpetuity. *See generally* 42 U.S.C. § 7429(a)(1). EPA's own Regulatory Impact Analysis evaluates the Rule's impacts on a twenty-year horizon. *See generally* J.A.__(EPA, *Regulatory Impact Analysis for Large Municipal Waste Combustors* 0-8 (Mar. 2026)). Basing any conclusions on a three-year time horizon without a rational basis for doing so fails to accurately assess the standard's impacts and is arbitrary and capricious. An existing LMWC that modifies in four years still becomes subject to the 50-ppm new source standard. Second, EPA did not cite anything in the rulemaking record in support of its claim that there will be no modified units within the next three years and ignored comments to the contrary. EPA has a "continuing duty to take a 'hard look' at the problems involved in its regulatory task," and failed to do so here. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d at 394. EPA assumed in the face of contrary evidence that no facility would undergo a qualifying modification and imposed a permanent standard on modified units while hypothesizing that such units would not exist. This is the essence of arbitrary rulemaking.

### 2. EPA Did Not Adequately Consider Costs to Modified Units

EPA's cost analysis suffers from the same defect. EPA is required to consider the costs of compliance when conducting its five-year review. *Med. Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 426 (D.C. Cir. 2011) (noting that a "beyond-the-floor" MACT standard and a 129(a)(5) revision "require consideration of the costs"). But EPA has not demonstrated that SCR can control $NO_x$ from modified units "without becoming exorbitantly costly," largely because it has not demonstrated anything at all for modified units. *Essex Chem. Corp.*, 486 F.2d at 433 ("[a]n adequately demonstrated system is one which has been shown to be reasonably reliable, reasonably efficient, and which can . . . serve the interests of pollution control without becoming exorbitantly costly in an economic or environmental way"). EPA's failure to consider costs for modified units is arbitrary and capricious.

EPA declined to require existing units to meet even the far less stringent 110-ppm level after determining that the associated $411.6 million in capital expenditures could threaten unit closures and municipalities' ability to continue using LMWCs. J.A.__(91 Fed. Reg. at 11820–21). EPA distinguished those costs from the costs associated with new units only on the basis that it "does not see this situation for large MWC sources that have yet to commence construction," because those facilities can incorporate SCR during their initial design. J.A.__(*Id.* at

11821). That rationale says nothing about modified units which, unlike brand new sources, are subject to the same retrofit constraints EPA found significant for existing units. Yet EPA never calculated the cost of achieving 50-ppm at such a unit.

## II. EPA'S INCLUSION OF WARMUP, STARTUP, AND SHUTDOWN WITHOUT MODIFYING APPLICABLE AVERAGING BLOCKS IS ARBITRARY AND CAPRICIOUS

Under the Rule, emissions that occur during startup and shutdown periods, along with a newly regulated transitory period EPA calls "warmup," must be included in a unit's average emissions calculations without exception. 40 C.F.R. §§ 60.5900(a), 60.5935(a). Units must incorporate the emissions from these variable operating periods into their compliance calculations using the previously required 4-hour and 24-hour block averaging periods. But because of the inherent variability in emissions during these periods, the inclusion of startup, shutdown, and warmup periods into the existing averaging blocks makes the LMWC emission limits for carbon monoxide, sulfur dioxide, and $NO_x$ substantially more stringent and unachievable in practice. EPA neither evaluated whether facilities would be able to achieve those limits when the existing averaging blocks included warmup, startup, and shutdown periods nor adequately addressed record evidence demonstrating otherwise.

In practice, these short and rigid averaging periods can cause facilities to be characterized as operating in noncompliance, despite there being no impact on human health or the environment. The Rule's averaging periods track preset 4-hour and 24-hour block intervals: for the 4-hour carbon monoxide standards, the first block runs from midnight to 4:00 AM and the blocks continue in four-hour intervals thereafter; for the sulfur dioxide and $NO_x$ standards, the 24-hour block is an entire calendar day, from midnight to midnight. 40 C.F.R. §§ 60.6145, 60.6685. Because of these rigid time frames, a unit that begins warmup at 10 PM will have only two hours of data for its entire averaging period. As a result, a high-emissions hour or two that would normally be averaged out over a longer period and comply with the limits could, under the current block averages, constitute a violation of the standard. While this would normally not present an issue with a unit's ability to comply with a reasonable standard when using longer averaging periods, EPA's inclusion of warmup, startup, and shutdown into the existing averaging blocks has made this aspect of the Rule unachievable.

### A. EPA Failed to Demonstrate that the Standards Remain Achievable When Existing Averaging Blocks Include Warmup, Startup, and Shutdown Emissions

EPA failed to demonstrate that the limits are achievable when emissions from warmup, startup, and shutdown are accounted for in the averaging periods and refused to address substantial record evidence indicating that the new

standards are not achievable in those circumstances. In requiring warmup, startup, and shutdown emissions data to be included in the existing averaging blocks, EPA essentially imposed new emission standards without revising the numeric limits, or the blocks themselves, to account for the additional requirements.

One egregious example of EPA's failure to analyze achievability is the carbon monoxide standard, which is measured on a 4-hour block average for most combustor types. Prior to the Rule, carbon monoxide emissions during warmup, startup, and shutdown were not included in the 4-hour block. *See* J.A.__(71 Fed. Reg. 27324, 27326, 27337–38 (May 10, 2006)). Requiring the inclusion of warmup, startup, and shutdown emissions creates substantial compliance challenges because, during startup and shutdown, it is difficult to control the variables that affect a unit's overall amount of combustion. J.A.__(EPA, *Large Municipal Waste Combustor Startup, Shutdown, and Malfunction (SSM) Discussion*, Attachment 1 at 11 (Jan. 25, 2017) (EPA-HQ-OAR-2017-0183-0002) ("EPA, LMWC Discussion")); J.A.__(Local Government Coalition Comments at 28); J.A.__(WTEA Comments, Attachment J at 3–5). As a result, carbon monoxide emissions during these time periods can be extremely variable. EPA was required to account for that variability in its Rule if it was going to include these emissions in the averaging period but did not do so. *See Nat'l Lime Ass'n*, 627 F.2d at 436–37.

EPA's primary rationale to support the achievability of the carbon monoxide limit when accounting for startup and shutdown is that warmup and startup period emissions from natural gas or distillate oil, which most units use to warmup, would generally have lower emissions than when the unit begins combusting solid waste. J.A.__(91 Fed. Reg. at 11821). This rationale does not hold up. First, the use of these auxiliary fuels during warmup (discussed *infra* Section II.B) does not translate into lower emissions variability during startup or shutdown, when a facility is typically burning waste or a waste-fuel mixture. Second, EPA's analysis relies on emissions tests for pollutants other than carbon monoxide and does not reference carbon monoxide data at all. J.A.__(ASME Comments at 5). While the impact of natural gas or distillate oil may change emissions for certain other pollutants, this observation does not hold true for carbon monoxide. As explained in comments submitted by the American Society of Mechanical Engineers:

> Natural gas and distillate fuel oil have little or no sulfur, chlorine and trace metals and generate very little particulate resulting in emission levels significantly lower than during normal operation on a completely different fuel, i.e. [solid waste]. EPA should not make that same conclusion for the CEMS-based [carbon monoxide] limit given the significant [carbon monoxide] variability experienced during these transient periods. We did not observe how EPA concluded that [units] can meet the [carbon monoxide] limits during these transient periods without analyzing how the inclusion of [carbon monoxide] data . . . during warm up and, startup and shutdown periods impacts the ability of [units] to comply with the [carbon monoxide] limits.

J.A.__(*Id.*). In other words, regardless of what fuel is used, an LMWC unit will still struggle to achieve complete combustion and comply with the carbon monoxide limits.

There is ample data in the record that demonstrates the lack of achievability. ASME analyzed data from five representative LMWCs to evaluate whether facilities can comply with the existing 100-ppm carbon monoxide limit via 4-hour block averages for each startup and shutdown period. ASME concluded that, over 208 startup and shutdown periods, carbon monoxide CEMS data from all five units demonstrated a violation of the standard 33 times. J.A.__(*Id.*). This represents a compliance rate of only 84 percent—indicating that, even when warmup remains excluded, compliance with the standard is not achievable when startup and shutdown emissions are included.

Similarly, WTEA, under its prior name the Energy Recovery Council, submitted data to EPA showing 338 carbon monoxide exceedances across 17 units after including warmup, startup, and shutdown periods. J.A.__(EPA, LMWC Discussion, Attachment 1 at 15). If the averaging data excluded these periods, there was only one exceedance. J.A.__(*Id.*). These data demonstrate that including transitory operating periods fundamentally changes facilities' ability to achieve the existing numerical limits.

These concerns were reiterated by several commenters, and EPA summarized the numerous commenter concerns as follows:

- One commenter "noted that carbon monoxide is the pollutant most affected by [transitory periods], and currently carbon monoxide is only controlled using good combustion practices rather than using an air pollution control device;"
- One commenter stated that "carbon monoxide is most easily impacted by short[-]term events because it has a short averaging period" and that "carbon monoxide is controlled using good combustion control measures and that adjustments are not always able to impact carbon monoxide emissions quickly enough to avoid a violation;"
- Multiple commenters "remarked on the significant carbon monoxide variability experienced during [] transient periods," and referred to the noncompliance data from the American Society of Mechanical Engineers' comment;
- One commenter "disagreed with the EPA's assertion that emissions during startup and shutdown periods are typically lower than emissions during normal operations and claimed that data in the

regulatory docket and the EPA's own prior statements support the opposite conclusion;"[7]

- Another commenter stated "that the EPA must still evaluate data from startup/shutdown operations to determine how to account for variation in emissions during those operating windows."

J.A.__(EPA Response to Comments at 103–04). However, EPA summarily concluded that none of the comments demonstrated that the proposed approach would be unachievable. J.A.__(91 Fed. Reg. at 11822). In doing so, EPA did not explain why the substantial emissions data submitted by commenters were insufficient or otherwise reconcile those data with its determination that the standards remained achievable. Nor does EPA's reliance on *Sierra Club v. EPA* resolve that deficiency. J.A.__(EPA Response to Comments at 105); 551 F.3d 1019 (D.C. Cir. 2008). To be clear, WTEA does not dispute that *Sierra Club* requires sources to comply with an emission limit or work practice during startup and shutdown periods. What WTEA does challenge is EPA's failure to support *this* standard—specifically, EPA's failure to analyze the achievability of the carbon

[7] In its comment, the Local Government Coalition for Renewable Energy reminded EPA of its "longstanding recognition that there is always the chance for uncontrollable instability during startup and shutdown, [so] these periods are not representative operating periods." J.A.__(Local Government Coalition Comments at 27, citing EPA, *Municipal Waste Combustion: Background Information Document for Promulgated Standards and Guidelines—Public Comments and Responses* 3-105 (Oct. 1995) (EPA-453/R-95-0136)).

monoxide, sulfur dioxide, and $NO_x$ standards when the 4-hour and 24-hour averaging blocks include startup and shutdown emissions. EPA's reliance on *Sierra Club* does not justify its decision to retain the existing averaging periods while expanding the emissions data included in those periods without any further analysis. EPA's obligation to establish continuously applicable standards does not necessarily require it to apply the same averaging methodology during every operating condition. EPA was still required to promulgate a standard that "provides some assurance of the achievability of the standard for the industry as a whole, given the range of variable factors found relevant to the standards' achievability." *Nat'l Lime Ass'n*, 627 F.2d at 433. It did not do so.

EPA's reliance on the Covanta Lake II facility is similarly misplaced. EPA identified Lake II as evidence "that sources are able to meet the limits during startup and shutdown" because that facility has a permit that includes "practically the same requirements" as what EPA finalized. J.A.__(EPA Response to Comments at 105). However, Lake II operates under significantly different compliance requirements than what facilities will need to comply with under the Rule. First, the Covanta Lake II permit and the Rule use different averaging periods: the Rule's 4-hour block average for carbon monoxide allows only one-sixth of the 24-hour time afforded by the Lake II permit, specifically for startup and shutdown. J.A.__(Covanta Lake II, Inc. Startup-Shutdown-Malfunction

Emission Limit Project, Permit No. 0690046-017-AC (hereinafter "Lake II Permit"), Condition A.2).[8] Second, the permit uses a prospective and retrospective full 24-hour averaging period tied to the beginning or end of the startup/warmup and shutdown period, respectively, while the Rule uses six defined 4-hour block averages for carbon monoxide and 24-hour block averages (midnight to midnight) for sulfur dioxide and $NO_x$. J.A.__(*Id.*); 40 C.F.R. § 60.6145 (defining "24-hour daily average"). This distinction is important because the Permit's 24-hour averaging period allows any emissions variability during to be averaged over a full, continuous 24 hours. Under the Rule's strict clock-based approach, if a unit begins warmup, startup, or shutdown late in day, there is very little time to account for the variability during these periods. *See* J.A.__(ASME Comments at 6). One single hour of emissions during these highly variable transitory periods could represent an entire compliance averaging period if that hour occurs at the end of a specified block. In contrast, under Lake II's current Permit, the Facility begins a 24-hour averaging period upon firing of auxiliary fuel, ensuring that any emissions variation during warmup, startup, and shutdown are averaged with the more predictable emissions during steady-state operation. J.A.__(Lake II Permit at Condition A.1). Thus, the Rule and the Covanta Lake II permit averaging periods

[8] While EPA cites the permit in the Final Rule, *see* J.A.__(91 Fed. Reg. at 11822 n. 100), Petitioner has been unable to locate the permit in the docket. The Permit is publicly available at https://perma.cc/ES8S-AD6G

are not "practically the same." EPA embraced aspects of the permit that supported its approach and ignored the rest.

Relying on data from one facility when that facility's permit averages are distinct from what is ultimately required by the Rule is not an adequate demonstration of achievability. EPA does not identify any example where compliance with the new standard has been achieved. "An achievable standard" cannot be "purely theoretical or experimental" and must be "within the realm of the adequately demonstrated system's efficiency." *Essex Chem. Corp.*, 486 F.2d at 433–34. Because EPA did not demonstrate that the carbon monoxide, sulfur dioxide, and $NO_x$ CEMS standards were achievable when the required averaging blocks include startup and shutdown, the achievability of the standards is entirely theoretical and therefore the finalized averaging blocks are unlawful.

### B. EPA Failed to Account for Unique Emissions Profiles During Warmup

The concerns outlined above for startup and shutdown are even more pronounced with EPA's decision to include warmup periods in its CEMS averages. During warmup, LMWC operators utilize auxiliary fuel to raise temperatures in a manner that protects the combustor components while achieving required minimum design operating temperatures. J.A.__(WTEA Comments, Attachment J at 4). In fact, during warmup, LMWC operators have limited ability to control or modify the combustion conditions that can drive carbon monoxide, sulfur dioxide,

or $NO_x$ levels in the flue gas, as the equipment is not designed to modulate at these low air-flow conditions. J.A.__(*Id.*); J.A.__(ASME Comments at 5). Because of these unique technical considerations, EPA itself has stated that "[a] major contributor to the number of exceedances without the SSM exclusion are warmup periods when only the auxiliary burner is operated and [waste] is not being combusted." J.A.__(EPA, LMWC Discussion, Attachment 1 at 15); *see also* J.A.__(Local Government Coalition Comments at 28). WTEA noted its concern that "EPA determined that LMWCs could meet emission limits during warmup periods without reviewing a single data point for which to make that conclusion for any pollutant," including carbon monoxide, sulfur dioxide, and $NO_x$. J.A.__ (WTEA Comments, Attachment J at 3–4). Despite the evidence that including warmup in the existing averaging period blocks renders the applicable emission standard unachievable, EPA simply responded that it "[did] not have sufficient information" to establish a longer averaging period. J.A.__(EPA Response to Comments at 112).

EPA is not required to automatically accept the averaging period noncompliance data or Petitioner's analysis, but it is required to explain its treatment (or lack thereof) of the data in the record where that data impacts a central premise of the rule: compliance with emission limits. EPA was required to examine the data and articulate a satisfactory explanation for its choice to retain 4-

hour and 24-hour block averaging periods after incorporating data from periods of warmup and to provide a "rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (quoting *State Farm*, 463 U.S. at 43). It failed to do so. Therefore, the inclusion of warmup in averaging periods without addressing commenter concerns was arbitrary and capricious.

## CONCLUSION

The Court should vacate and remand the 50-ppm $NO_x$ standard as applied to modified units and the Rule's 4-hour and 24-hour averaging periods used to demonstrate compliance with the carbon monoxide, sulfur dioxide, and $NO_x$ standards.

Dated: November 9, 2026

Respectfully Submitted,

*/s/ David M. Friedland*
David M. Friedland
Nicole J. Waxman
1900 N Street NW, Suite 100
Washington, DC 20036
dfriedland@bdlaw.com
nwaxman@bdlaw.com
(202) 789-6000

*Counsel for Waste-To-Energy Association*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), (f) and (g) and Circuit Rule 32(e)(1), because it contains 9, 979 words, excluding exempted parts, according to the count of Microsoft Word 365.

I further certify that the foregoing brief also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in 14-point proportionally spaced Times New Roman font.

*/s/ David M. Friedland*
David M. Friedland
*Counsel for Waste-To-Energy Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2026, the foregoing Opening Brief of Petitioners was served electronically on all registered counsel through the Court's CM/ECF system.

*/s/ David M. Friedland*
David M. Friedland
*Counsel for Waste-To-Energy Association*