**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 26-1114 (and consolidated cases)**

# United States Court of Appeals For the District of Columbia Circuit

WASTE-TO-ENERGY ASSOCIATION,

PETITIONER,

V.

ENVIRONMENTAL PROTECTION AGENCY

RESPONDENT.

On Petition for Judicial Review of Final Agency Action of the United States Environmental Protection Agency, 91 Fed. Reg. 11802 (March 10, 2026)

## ADDENDUMS 1 AND 2 TO THE OPENING BRIEF OF PETITIONERS

DAVID M. FRIEDLAND
NICOLE J. WAXMAN
1900 N Street NW, Suite 100
Washington, DC 20036
dfriedland@bdlaw.com
nwaxman@bdlaw.com
(202) 789-6081

*Counsel for Waste-To-Energy Association*

# TABLE OF CONTENTS

## ADDENDUM 1

### *DECLARATIONS IN SUPPORT OF STANDING*

Declaration of Thomas Hogan……………………………………………ADD_001

Declaration of Mark Santella…………………………………………..ADD_003

Declaration of Michael Van Brunt……………………………………..ADD_006

## ADDENDUM 2

### *STATUTES*

42 U.S.C. § 7401……………………………………………………….ADD_008

42 U.S.C. § 7411(a)(1), (b)(1)(B)..……………………………………ADD_010

42 U.S.C. § 7412(d)(6)…..…………………………………………ADD_012

42 U.S.C. § 7429(a)(1), (a)(1)(B), (a)(2), (a)(5), (g)(2)–(3) …………..ADD_014

42 U.S.C. § 7607(b), (d)(9)(A)..………………………………………ADD_017

### *REGULATIONS*

40 C.F.R. § 60.2………………………………………………………..ADD_020

40 C.F.R. § 60.15……..………………………………………………ADD_024

40 C.F.R. § 60.58b(a)(1), (h)(6)–(7), (i) ………………………………ADD_026

40 C.F.R. §§ 60.5885, 60.5900(a), 60.5935(a), 60.5940,
60.6145, 60.6685……………………………………………………...ADD_054

40 C.F.R. pt. 60, subpt. Cb, Tables 1 and 2 (2025) …………………...ADD_083

91 Fed. Reg. 11810, Table 6 (Mar. 10, 2026)………………………...ADD_085

91 Fed. Reg. 11885, Table 3 (Mar. 10, 2026)………………………...ADD_087

# ADDENDUM 1

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| WASTE-TO-ENERGY ASSOCIATION,<br><br>*Petitioner*,<br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>*Respondent*. | Case No. 26-1114 (consolidated with No. 26-1113)<br><br>[ORAL ARGUMENT NOT YET SCHEDULED] |

**DECLARATION OF THOMAS HOGAN**

I, THOMAS HOGAN, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this declaration. All facts stated are within my personal knowledge and are true and correct.

1. I currently serve as the President of the Waste-To-Energy Association ("WTEA"). I have served in this role since 2022.
2. WTEA is a national trade organization that represents municipalities and companies that own and operate large municipal waste combustors. Municipal waste combustors (also known as waste-to-energy facilities) divert post-recycled, non-hazardous waste from landfills to reduce greenhouse gases emissions. Collectively, waste-to-energy facilities divert 94,000 tons of waste per day from landfills, representing seven percent of the country's waste stream. WTEA-member facilities produce enough renewable energy to power 2.3 million homes. In the United States, waste-to-energy is a $10 billion industry that employs more than 6,000 American workers.

3. WTEA-member facilities are directly regulated by the Final Large Municipal Waste Combustor Rule ("Final Rule"). *See* 91 Fed. Reg. 11,802, 11,804 (Mar. 10, 2026).

4. WTEA members own and operate the vast majority of the modern waste-to-energy facilities that operate nationwide. These facilities and their owners and operators will be subject to and regulated by the Final Rule.

5. The United States Environmental Protection Agency ("EPA") estimates that the Final Rule will cost regulated facilities $330 million. 91 Fed. Reg. 11,802, 11,804 (Mar. 10, 2026). WTEA's members will not incur some of these above-described costs if the challenged provisions of the Final Rule are vacated, in whole or in part.

6. I am familiar with the Petition for Review filed by WTEA in this matter seeking to review and remand portions of EPA's Final Rule. Because the Final Rule, if allowed to stand, will potentially cause noncompliance and unnecessary costs, the petition for review is germane to WTEA's purpose.

7. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: November 6, 2026

THOMAS HOGAN

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| WASTE-TO-ENERGY ASSOCIATION,<br>*Petitioner*,<br>v.<br>U.S. ENVIRONMENTAL PROTECTION AGENCY<br>*Respondent*. | Case No. 26-1114 (consolidated with No. 26-1113)<br><br>[ORAL ARGUMENT NOT YET SCHEDULED] |

**DECLARATION OF MARK SANTELLA**

I, MARK SANTELLA, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this declaration. All facts stated are within my personal knowledge and are true and correct.

1. I am currently the Vice President of Engineering at WIN Waste Innovations ("WIN"). I have served in this role since 2015. I have been employed at WIN, formerly known as Wheelabrator Technologies, Inc., since 1989.
2. WIN owns and operates 27 large municipal waste combustors at 12 waste-to-energy facilities in the United States. These facilities are vital assets in local, county, and state sustainable solid waste management infrastructure.
3. WIN's waste-to-energy facilities annually divert 4.6 million tons of post-recycled waste from landfills, generate nearly 2.5 million megawatt-hours of renewable electricity, and recover 87,000 tons of metals for recycling. The facilities also avoid approximately 9.1 million tons of greenhouse gas emissions through avoided landfill methane emissions, displacement of fossil fuel-based electricity generation, and metals recycling.

4. The large municipal waste combustor units at these 13 facilities are directly regulated by the Final Rule. *See* 91 Fed. Reg. 11,802, 11,804 (Mar. 10, 2026).
5. Pursuant to the Final Rule, existing units at these facilities that are modified or reconstructed will be forced to comply with the new 50-ppm NOx standard. However, compliance with the 50-ppm standard at these facilities is technologically infeasible and cost-prohibitive.
6. The Final Rule also requires that compliance with carbon monoxide, sulfur dioxide, and nitrogen oxide standards be determined using 4-hour and 24-hour block averaging periods. These averaging periods do not account for the variability experienced during periods of warmup, startup, and shutdown. Some of WIN's large municipal waste combustor facilities may not be able to comply with the standards in the Final Rule using these averaging periods.
7. WIN's facilities may be unable to meet the standards described in paragraphs 5 and 6 above. Under the Final Rule, they will be at risk of noncompliance.
8. EPA estimates that the Final Rule will cost regulated facilities $330 million. 91 Fed. Reg. 11,802, 11,804 (Mar. 10, 2026). WIN will not incur some of these above-described costs if the aforementioned provisions of the Final Rule are vacated, in whole or in part.
9. WIN is a member of the Waste-To-Energy Association ("WTEA"). WTEA is a national trade organization that represents municipalities and companies that own and operate large municipal waste combustors.
10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: November 6, 2026

Mark Santella

Mark Santella

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| WASTE-TO-ENERGY ASSOCIATION,<br>*Petitioner*,<br>v.<br>U.S. ENVIRONMENTAL PROTECTION AGENCY<br>*Respondent*. | Case No. 26-1114 (consolidated with No. 26-1113)<br><br>[ORAL ARGUMENT NOT YET SCHEDULED] |

**DECLARATION OF MICHAEL VAN BRUNT**

I, MICHAEL E. VAN BRUNT, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this declaration. All facts stated are within my personal knowledge and are true and correct.

1. I am currently the Vice President of Environmental & Sustainability at Reworld Waste, LLC ("Reworld"). I have served in this role since 2021. I have been employed at Reworld, formerly known as Covanta, since 2008.
2. Reworld is the largest provider of municipal waste-to-energy services in the United States. Reworld owns or operates 30 large municipal waste combustor facilities that divert waste from landfills to generate renewable energy. These facilities convert the waste that remains after recycling into electricity for homes and businesses, and steam for export to industries.
3. These 30 large municipal waste combustor facilities are directly regulated by the Final Large Municipal Waste Combustor Rule ("Final Rule"). *See* 91 Fed. Reg. 11,802, 11,804 (Mar. 10, 2026).

4. Pursuant to the Final Rule, existing units at these facilities that are modified or reconstructed will be forced to comply with the new 50-ppm $NO_x$ standard. However, compliance with the 50-ppm standard at these facilities is technologically infeasible and cost-prohibitive.

5. The Final Rule also requires that compliance with carbon monoxide, sulfur dioxide, and $NO_x$ standards be determined using 4-hour and 24-hour block averaging periods. These averaging periods do not account for the variability experienced during periods of warmup, startup, and shutdown. Some of Reworld's large municipal waste combustor facilities may not be able to comply with the standards in the Final Rule using these averaging periods.

6. Reworld's facilities may be unable to meet the standards discussed in paragraphs 4 and 5 above. Under the Final Rule, they will be at risk of noncompliance.

7. The United States Environmental Protection Agency ("EPA") estimates that the Final Rule will cost regulated facilities $330 million. 91 Fed. Reg. 11,802, 11,804 (Mar. 10, 2026). Reworld will not incur some of these above-described costs if the aforementioned provisions of the Final Rule are vacated, in whole or in part.

8. Reworld is a member of the Waste-To-Energy Association ("WTEA"). WTEA is a national trade organization that represents municipalities and companies that own and operate large municipal waste combustors.

9. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: November 5, 2026

MICHAEL E. VAN BRUNT

# ADDENDUM 2

# UNITED STATES CODE

## TITLE 42 — THE PUBLIC HEALTH AND WELFARE

## CHAPTER 85 — AIR POLLUTION PREVENTION AND CONTROL

## SUBCHAPTER I — PROGRAMS AND ACTIVITIES

## 42 U.S.C. § 7401 — Congressional findings and declaration of purpose

Selected statutory provisions: (b) and (c).

# 42 U.S.C. § 7401 — Congressional findings and declaration of purpose

## (b) Declaration

The purposes of this subchapter are—

(1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;

(2) to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;

(3) to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and

(4) to encourage and assist the development and operation of regional air pollution prevention and control programs.

## (c) Pollution prevention

A primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention.

Source: Office of the Law Revision Counsel, 42 U.S.C. § 7401 (text through Pub. L. 119-121, Oct. 9, 2026).

# UNITED STATES CODE

## TITLE 42 — THE PUBLIC HEALTH AND WELFARE

## CHAPTER 85 — AIR POLLUTION PREVENTION AND CONTROL

## SUBCHAPTER I — PROGRAMS AND ACTIVITIES

## 42 U.S.C. § 7411 — Standards of performance for new stationary sources

Selected statutory provisions: (a)(1) and (b)(1)(B).

## 42 U.S.C. § 7411 — Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term “standard of performance” means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

### (b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards

(1)(B) Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

Source: Office of the Law Revision Counsel, 42 U.S.C. § 7411 (text through Pub. L. 119-120, Oct. 7, 2026).

# UNITED STATES CODE

## Title 42 — The Public Health and Welfare

## Chapter 85 — Air Pollution Prevention and Control

## Subchapter I — Programs and Activities

## Part A — Air Quality and Emission Limitations

# § 7412. Hazardous air pollutants

## EXCERPT

## Subsection (d)(6) — Review and revision

Source: Office of the Law Revision Counsel, United States Code, 42 U.S.C. § 7412 (text through Public Law 119-121, Oct. 9, 2026).

# 42 U.S.C. § 7412 — Hazardous air pollutants

(d) Emission standards

(6) Review and revision

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

Source: 42 U.S.C. § 7412(d)(6), Office of the Law Revision Counsel, United States Code. This is a formatted excerpt, not a facsimile of the original U.S. Code pages.

# UNITED STATES CODE

## TITLE 42 — THE PUBLIC HEALTH AND WELFARE

## CHAPTER 85 — AIR POLLUTION PREVENTION AND CONTROL

## SUBCHAPTER I — PROGRAMS AND ACTIVITIES

## 42 U.S.C. § 7429 — Solid waste combustion

Selected statutory excerpt: subsections (a)(1), (a)(2), (a)(5), and (g)(2)–(3).

# 42 U.S.C. § 7429 — Solid waste combustion

## (a) New source performance standards

### (1) In general

(A) The Administrator shall establish performance standards and other requirements pursuant to section 7411 of this title and this section for each category of solid waste incineration units. Such standards shall include emissions limitations and other requirements applicable to new units and guidelines (under section 7411(d) of this title and this section) and other requirements applicable to existing units.

(B) Standards under section 7411 of this title and this section applicable to solid waste incineration units with capacity greater than 250 tons per day combusting municipal waste shall be promulgated not later than 12 months after November 15, 1990. Nothing in this subparagraph shall alter any schedule for the promulgation of standards applicable to such units under section 7411 of this title pursuant to any settlement and consent decree entered by the Administrator before November 15, 1990: Provided, That, such standards are subsequently modified pursuant to the schedule established in this subparagraph to include each of the requirements of this section.

(C) Standards under section 7411 of this title and this section applicable to solid waste incineration units with capacity equal to or less than 250 tons per day combusting municipal waste and units combusting hospital waste, medical waste and infectious waste shall be promulgated not later than 24 months after November 15, 1990.

(D) Standards under section 7411 of this title and this section applicable to solid waste incineration units combusting commercial or industrial waste shall be proposed not later than 36 months after November 15, 1990, and promulgated not later than 48 months after November 15, 1990.

(E) Not later than 18 months after November 15, 1990, the Administrator shall publish a schedule for the promulgation of standards under section 7411 of this title and this section applicable to other categories of solid waste incineration units.

### (2) Emissions standard

Standards applicable to solid waste incineration units promulgated under section 7411 of this title and this section shall reflect the maximum degree of reduction in emissions of air pollutants listed under section (a)(4) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing units in each category.

The Administrator may distinguish among classes, types (including mass-burn, refuse-derived fuel, modular and other types of units), and sizes of units within a category in establishing such

standards.

The degree of reduction in emissions that is deemed achievable for new units in a category shall not be less stringent than the emissions control that is achieved in practice by the best controlled similar unit, as determined by the Administrator. Emissions standards for existing units in a category may be less stringent than standards for new units in the same category but shall not be less stringent than the average emissions limitation achieved by the best performing 12 percent of units in the category (excluding units which first met lowest achievable emissions rates 18 months before the date such standards are proposed or 30 months before the date such standards are promulgated, whichever is later).

### (5) Review and revision

Not later than 5 years following the initial promulgation of any performance standards and other requirements under this section and section 7411 of this title applicable to a category of solid waste incineration units, and at 5 year intervals thereafter, the Administrator shall review, and in accordance with this section and section 7411 of this title, revise such standards and requirements.

### (g) Definitions

For purposes of section 306 of the Clean Air Act Amendments of 1990 and this section only—

### (2) New solid waste incineration unit

The term “new solid waste incineration unit” means a solid waste incineration unit the construction of which is commenced after the Administrator proposes requirements under this section establishing emissions standards or other requirements which would be applicable to such unit or a modified solid waste incineration unit.

### (3) Modified solid waste incineration unit

The term “modified solid waste incineration unit” means a solid waste incineration unit at which modifications have occurred after the effective date of a standard under subsection (a) if (A) the cumulative cost of the modifications, over the life of the unit, exceed 50 per centum of the original cost of construction and installation of the unit (not including the cost of any land purchased in connection with such construction or installation) updated to current costs, or (B) the modification is a physical change in or change in the method of operation of the unit which increases the amount of any air pollutant emitted by the unit for which standards have been established under this section or section 7411 of this title.

Source: 42 U.S.C. § 7429, statutory text as reproduced by Cornell Legal Information Institute, https://www.law.cornell.edu/uscode/text/42/7429. Selected subsections only; intervening provisions omitted.

# UNITED STATES CODE

## TITLE 42 — THE PUBLIC HEALTH AND WELFARE

## CHAPTER 85 — AIR POLLUTION PREVENTION AND CONTROL

## SUBCHAPTER III — GENERAL PROVISIONS

## 42 U.S.C. § 7607 — Administrative proceedings and judicial review

Selected statutory excerpt: subsection (b) and subsection (d)(9)(A).

## 42 U.S.C. § 7607 — Administrative proceedings and judicial review

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title, any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia.

A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.

Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.

Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(d) Rulemaking**

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

Source: 42 U.S.C. § 7607 (selected provisions); Legal Information Institute, Cornell Law School, https://www.law.cornell.edu/uscode/text/42/7607. Intervening statutory text omitted.

40 C.F.R. § 60.2

# § 60.2 Definitions.

Effective: May 16, 2007
Currentness

The terms used in this part are defined in the Act or in this section as follows:

Act means the Clean Air Act (42 U.S.C. 7401 et seq.)

Administrator means the Administrator of the Environmental Protection Agency or his authorized representative.

Affected facility means, with reference to a stationary source, any apparatus to which a standard is applicable.

Alternative method means any method of sampling and analyzing for an air pollutant which is not a reference or equivalent method but which has been demonstrated to the Administrator's satisfaction to, in specific cases, produce results adequate for his determination of compliance.

Approved permit program means a State permit program approved by the Administrator as meeting the requirements of part 70 of this chapter or a Federal permit program established in this chapter pursuant to Title V of the Act (42 U.S.C. 7661).

Capital expenditure means an expenditure for a physical or operational change to an existing facility which exceeds the product of the applicable “annual asset guideline repair allowance percentage” specified in the latest edition of Internal Revenue Service (IRS) Publication 534 and the existing facility's basis, as defined by section 1012 of the Internal Revenue Code. However, the total expenditure for a physical or operational change to an existing facility must not be reduced by any “excluded additions” as defined in IRS Publication 534, as would be done for tax purposes.

Clean coal technology demonstration project means a project using funds appropriated under the heading ‘Department of Energy–Clean Coal Technology’, up to a total amount of $2,500,000,000 for commercial demonstrations of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency.

Commenced means, with respect to the definition of new source in section 111(a)(2) of the Act, that an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification.

Construction means fabrication, erection, or installation of an affected facility.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-1113 Document #2202646 Filed: 11/09/2026 Page 25 of 95

Continuous monitoring system means the total equipment, required under the emission monitoring sections in applicable subparts, used to sample and condition (if applicable), to analyze, and to provide a permanent record of emissions or process parameters.

Electric utility steam generating unit means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

Equivalent method means any method of sampling and analyzing for an air pollutant which has been demonstrated to the Administrator's satisfaction to have a consistent and quantitatively known relationship to the reference method, under specified conditions.

Excess Emissions and Monitoring Systems Performance Report is a report that must be submitted periodically by a source in order to provide data on its compliance with stated emission limits and operating parameters, and on the performance of its monitoring systems.

Existing facility means, with reference to a stationary source, any apparatus of the type for which a standard is promulgated in this part, and the construction or modification of which was commenced before the date of proposal of that standard; or any apparatus which could be altered in such a way as to be of that type.

Force majeure means, for purposes of § 60.8, an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents the owner or operator from complying with the regulatory requirement to conduct performance tests within the specified timeframe despite the affected facility's best efforts to fulfill the obligation. Examples of such events are acts of nature, acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility.

Isokinetic sampling means sampling in which the linear velocity of the gas entering the sampling nozzle is equal to that of the undisturbed gas stream at the sample point.

Issuance of a part 70 permit will occur, if the State is the permitting authority, in accordance with the requirements of part 70 of this chapter and the applicable, approved State permit program. When the EPA is the permitting authority, issuance of a Title V permit occurs immediately after the EPA takes final action on the final permit.

Malfunction means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

Modification means any physical change in, or change in the method of operation of, an existing facility which increases the amount of any air pollutant (to which a standard applies) emitted into the atmosphere by that facility or which results in the emission of any air pollutant (to which a standard applies) into the atmosphere not previously emitted.

Monitoring device means the total equipment, required under the monitoring of operations sections in applicable subparts, used to measure and record (if applicable) process parameters.

Nitrogen oxides means all oxides of nitrogen except nitrous oxide, as measured by test methods set forth in this part.

One-hour period means any 60–minute period commencing on the hour.

(Page 25 of Total)
WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Opacity means the degree to which emissions reduce the transmission of light and obscure the view of an object in the background.

Owner or operator means any person who owns, leases, operates, controls, or supervises an affected facility or a stationary source of which an affected facility is a part.

Part 70 permit means any permit issued, renewed, or revised pursuant to part 70 of this chapter.

Particulate matter means any finely divided solid or liquid material, other than uncombined water, as measured by the reference methods specified under each applicable subpart, or an equivalent or alternative method.

Permit program means a comprehensive State operating permit system established pursuant to title V of the Act (42 U.S.C. 7661) and regulations codified in part 70 of this chapter and applicable State regulations, or a comprehensive Federal operating permit system established pursuant to title V of the Act and regulations codified in this chapter.

Permitting authority means:

(1) The State air pollution control agency, local agency, other State agency, or other agency authorized by the Administrator to carry out a permit program under part 70 of this chapter; or

(2) The Administrator, in the case of EPA-implemented permit programs under title V of the Act (42 U.S.C. 7661).

Proportional sampling means sampling at a rate that produces a constant ratio of sampling rate to stack gas flow rate.

Reactivation of a very clean coal-fired electric utility steam generating unit means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(1) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(2) Was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(3) Is equipped with low-$NO_X$ burners prior to the time of commencement of operations following reactivation; and

(4) Is otherwise in compliance with the requirements of the Clean Air Act.

Reference method means any method of sampling and analyzing for an air pollutant as specified in the applicable subpart.

Repowering means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990. Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Run means the net period of time during which an emission sample is collected. Unless otherwise specified, a run may be either intermittent or continuous within the limits of good engineering practice.

Shutdown means the cessation of operation of an affected facility for any purpose.

Six-minute period means any one of the 10 equal parts of a one-hour period.

Standard means a standard of performance proposed or promulgated under this part.

Standard conditions means a temperature of 293 K (68°F) and a pressure of 101.3 kilopascals (29.92 in Hg).

Startup means the setting in operation of an affected facility for any purpose.

State means all non-Federal authorities, including local agencies, interstate associations, and State-wide programs, that have delegated authority to implement: (1) The provisions of this part; and/or (2) the permit program established under part 70 of this chapter. The term State shall have its conventional meaning where clear from the context.

Stationary source means any building, structure, facility, or installation which emits or may emit any air pollutant.

Title V permit means any permit issued, renewed, or revised pursuant to Federal or State regulations established to implement title V of the Act (42 U.S.C. 7661). A title V permit issued by a State permitting authority is called a part 70 permit in this part.

Volatile Organic Compound means any organic compound which participates in atmospheric photochemical reactions; or which is measured by a reference method, an equivalent method, an alternative method, or which is determined by procedures specified under any subpart.

**Credits**

[44 FR 55173, Sept. 25, 1979, as amended at 45 FR 5617, Jan. 23, 1980; 45 FR 85415, Dec. 24, 1980; 54 FR 6662, Feb. 14, 1989; 55 FR 51382, Dec. 13, 1990; 57 FR 32338, July 21, 1992; 59 FR 12427, March 16, 1994; 72 FR 27442, May 16, 2007]

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Notes of Decisions (25)

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart A. General Provisions

40 C.F.R. § 60.15

# § 60.15 Reconstruction.

Currentness

(a) An existing facility, upon reconstruction, becomes an affected facility, irrespective of any change in emission rate.

(b) "Reconstruction" means the replacement of components of an existing facility to such an extent that:

(1) The fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable entirely new facility, and

(2) It is technologically and economically feasible to meet the applicable standards set forth in this part.

(c) "Fixed capital cost" means the capital needed to provide all the depreciable components.

(d) If an owner or operator of an existing facility proposes to replace components, and the fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable entirely new facility, he shall notify the Administrator of the proposed replacements. The notice must be postmarked 60 days (or as soon as practicable) before construction of the replacements is commenced and must include the following information:

(1) Name and address of the owner or operator.

(2) The location of the existing facility.

(3) A brief description of the existing facility and the components which are to be replaced.

(4) A description of the existing air pollution control equipment and the proposed air pollution control equipment.

(5) An estimate of the fixed capital cost of the replacements and of constructing a comparable entirely new facility.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(6) The estimated life of the existing facility after the replacements.

(7) A discussion of any economic or technical limitations the facility may have in complying with the applicable standards of performance after the proposed replacements.

(e) The Administrator will determine, within 30 days of the receipt of the notice required by paragraph (d) of this section and any additional information he may reasonably require, whether the proposed replacement constitutes reconstruction.

(f) The Administrator's determination under paragraph (e) shall be based on:

(1) The fixed capital cost of the replacements in comparison to the fixed capital cost that would be required to construct a comparable entirely new facility;

(2) The estimated life of the facility after the replacements compared to the life of a comparable entirely new facility;

(3) The extent to which the components being replaced cause or contribute to the emissions from the facility; and

(4) Any economic or technical limitations on compliance with applicable standards of performance which are inherent in the proposed replacements.

(g) Individual subparts of this part may include specific provisions which refine and delimit the concept of reconstruction set forth in this section.

**Credits**
[40 FR 58420, Dec. 16, 1975]

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Notes of Decisions (3)

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-1113 Document #2202646 Filed: 11/09/2026 Page 30 of 95

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart EB. Standards of Performance for Large Municipal Waste Combustors for Which Construction is Commenced After September 20, 1994 or for Which Modification or Reconstruction is Commenced After June 19, 1996 (Refs & Annos)

40 C.F.R. § 60.58b

# § 60.58b Compliance and performance testing.

Effective: November 6, 2006
Currentness

(a) The provisions for startup, shutdown, and malfunction are provided in paragraphs (a)(1) and (a)(2) of this section.

(1) Except as provided by § 60.56b, the standards under this subpart apply at all times except during periods of startup, shutdown, and malfunction. Duration of startup, shutdown, or malfunction periods are limited to 3 hours per occurrence, except as provided in paragraph (a)(1)(iii) of this section. During periods of startup, shutdown, or malfunction, monitoring data shall be dismissed or excluded from compliance calculations, but shall be recorded and reported in accordance with the provisions of 40 CFR 60.59b(d)(7).

(i) The startup period commences when the affected facility begins the continuous burning of municipal solid waste and does not include any warmup period when the affected facility is combusting fossil fuel or other nonmunicipal solid waste fuel, and no municipal solid waste is being fed to the combustor.

(ii) Continuous burning is the continuous, semicontinuous, or batch feeding of municipal solid waste for purposes of waste disposal, energy production, or providing heat to the combustion system in preparation for waste disposal or energy production. The use of municipal solid waste solely to provide thermal protection of the grate or hearth during the startup period when municipal solid waste is not being fed to the grate is not considered to be continuous burning.

(iii) For the purpose of compliance with the carbon monoxide emission limits in § 60.53b(a), if a loss of boiler water level control (e.g., boiler waterwall tube failure) or a loss of combustion air control (e.g., loss of combustion air fan, induced draft fan, combustion grate bar failure) is determined to be a malfunction, the duration of the malfunction period is limited to 15 hours per occurrence. During such periods of malfunction, monitoring data shall be dismissed or excluded from compliance calculations, but shall be recorded and reported in accordance with the provisions of § 60.59b(d)(7).

(2) The opacity limits for air curtain incinerators specified in § 60.56b apply at all times as specified under § 60.56b except during periods of malfunction. Duration of malfunction periods are limited to 3 hours per occurrence.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(b) The owner or operator of an affected facility shall install, calibrate, maintain, and operate a continuous emission monitoring system for measuring the oxygen or carbon dioxide content of the flue gas at each location where carbon monoxide, sulfur dioxide, nitrogen oxides emissions, or particulate matter (if the owner or operator elects to continuously monitor emissions under paragraph (n) of this section) are monitored and record the output of the system and shall comply with the test procedures and test methods specified in paragraphs (b)(1) through (b)(8) of this section.

(1) The span value of the oxygen (or 20 percent carbon dioxide) monitor shall be 25 percent oxygen (or 20 percent carbon dioxide).

(2) The monitor shall be installed, evaluated, and operated in accordance with § 60.13 of subpart A of this part.

(3) The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the affected facility, as specified under § 60.8 of subpart A of this part.

(4) The monitor shall conform to Performance Specification 3 in appendix B of this part except for section 2.3 (relative accuracy requirement).

(5) The quality assurance procedures of appendix F of this part except for section 5.1.1 (relative accuracy test audit) shall apply to the monitor.

(6) If carbon dioxide is selected for use in diluent corrections, the relationship between oxygen and carbon dioxide levels shall be established during the initial performance test according to the procedures and methods specified in paragraphs (b)(6)(i) through (b)(6)(iv) of this section. This relationship may be reestablished during performance compliance tests.

(i) The fuel factor equation in Method 3B shall be used to determine the relationship between oxygen and carbon dioxide at a sampling location. Method 3, 3A, or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used to determine the oxygen concentration at the same location as the carbon dioxide monitor.

(ii) Samples shall be taken for at least 30 minutes in each hour.

(iii) Each sample shall represent a 1–hour average.

(iv) A minimum of three runs shall be performed.

(7) The relationship between carbon dioxide and oxygen concentrations that is established in accordance with paragraph (b)(6) of this section shall be submitted to EPA as part of the initial performance test report and, if applicable, as part of the annual test report if the relationship is reestablished during the annual performance test.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(8) During a loss of boiler water level control or loss of combustion air control malfunction period as specified in paragraph (a)(1)(iii) of this section, a diluent cap of 14 percent for oxygen or 5 percent for carbon dioxide may be used in the emissions calculations for sulfur dioxide and nitrogen oxides.

(c) Except as provided in paragraph (c)(10) of this section, the procedures and test methods specified in paragraphs (c)(1) through (c)(11) of this section shall be used to determine compliance with the emission limits for particulate matter and opacity under § 60.52b(a)(1) and (a)(2).

(1) The EPA Reference Method 1 shall be used to select sampling site and number of traverse points.

(2) The EPA Reference Method 3, 3A or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used for gas analysis.

(3) EPA Reference Method 5 shall be used for determining compliance with the particulate matter emission limit. The minimum sample volume shall be 1.7 cubic meters. The probe and filter holder heating systems in the sample train shall be set to provide a gas temperature no greater than 160 °C. An oxygen or carbon dioxide measurement shall be obtained simultaneously with each Method 5 run.

(4) The owner or operator of an affected facility may request that compliance with the particulate matter emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(5) As specified under § 60.8 of subpart A of this part, all performance tests shall consist of three test runs. The average of the particulate matter emission concentrations from the three test runs is used to determine compliance.

(6) In accordance with paragraphs (c)(7) and (c)(11) of this section, EPA Reference Method 9 shall be used for determining compliance with the opacity limit except as provided under § 60.11(e) of subpart A of this part.

(7) The owner or operator of an affected facility shall conduct an initial performance test for particulate matter emissions and opacity as required under § 60.8 of subpart A of this part.

(8) The owner or operator of an affected facility shall install, calibrate, maintain, and operate a continuous opacity monitoring system for measuring opacity and shall follow the methods and procedures specified in paragraphs (c)(8)(i) through (c)(8)(iv) of this section.

(i) The output of the continuous opacity monitoring system shall be recorded on a 6–minute average basis.

(ii) The continuous opacity monitoring system shall be installed, evaluated, and operated in accordance with § 60.13 of subpart A of this part.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(iii) The continuous opacity monitoring system shall conform to Performance Specification 1 in appendix B of this part.

(iv) The initial performance evaluation shall be completed no later than 180 days after the date of the initial startup of the municipal waste combustor unit, as specified under § 60.8 of subpart A of this part.

(9) Following the date that the initial performance test for particulate matter is completed or is required to be completed under § 60.8 of subpart A of this part for an affected facility, the owner or operator shall conduct a performance test for particulate matter on a calendar year basis (no less than 9 calendar months and no more than 15 calendar months following the previous performance test; and must complete five performance tests in each 5–year calendar period).

(10) In place of particulate matter testing with EPA Reference Method 5, an owner or operator may elect to install, calibrate, maintain, and operate a continuous emission monitoring system for monitoring particulate matter emissions discharged to the atmosphere and record the output of the system. The owner or operator of an affected facility who elects to continuously monitor particulate matter emissions instead of conducting performance testing using EPA Method 5 shall install, calibrate, maintain, and operate a continuous emission monitoring system and shall comply with the requirements specified in paragraphs (c)(10)(i) through (c)(10)(xiv) of this section. The owner or operator who elects to continuously monitor particulate matter emissions instead of conducting performance testing using EPA Method 5 is not required to complete performance testing for particulate matter as specified in paragraph (c)(9) of this section and is not required to continuously monitor opacity as specified in paragraph (c)(8) of this section.

(i) Notify the Administrator one month before starting use of the system.

(ii) Notify the Administrator one month before stopping use of the system.

(iii) The monitor shall be installed, evaluated, and operated in accordance with § 60.13 of subpart A of this part.

(iv) The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the affected facility, as specified under § 60.8 of subpart A of this part or within 180 days of notification to the Administrator of use of the continuous monitoring system if the owner or operator was previously determining compliance by Method 5 performance tests, whichever is later.

(v) The owner or operator of an affected facility may request that compliance with the particulate matter emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(vi) The owner or operator of an affected facility shall conduct an initial performance test for particulate matter emissions as required under § 60.8 of subpart A of this part. Compliance with the particulate matter emission limit shall be determined by using the continuous emission monitoring system specified in paragraph (c)(10) of this section to measure particulate matter and calculating a 24–hour block arithmetic average emission concentration using EPA Reference Method 19, section 12.4.1.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(vii) Compliance with the particulate matter emission limit shall be determined based on the 24–hour daily (block) average of the hourly arithmetic average emission concentrations using continuous emission monitoring system outlet data.

(viii) After April 28, 2008, at a minimum, valid continuous monitoring system hourly averages shall be obtained as specified in paragraphs (c)(10)(viii)(A) and (c)(10)(viii)(B) for at least 90 percent of the operating hours per calendar quarter and 95 percent of the operating hours per calendar year that the affected facility is combusting municipal solid waste.

(A) At least two data points per hour shall be used to calculate each 1–hour arithmetic average.

(B) Each particulate matter 1–hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1–hour arithmetic average of the oxygen (or carbon dioxide) continuous emission monitoring system data.

(ix) The 1–hour arithmetic averages required under paragraph (c)(10)(vii) of this section shall be expressed in milligrams per dry standard cubic meter corrected to 7 percent oxygen (dry basis) and shall be used to calculate the 24–hour daily arithmetic average emission concentrations. The 1–hour arithmetic averages shall be calculated using the data points required under § 60.13(e)(2) of subpart A of this part.

(x) All valid continuous emission monitoring system data shall be used in calculating average emission concentrations even if the minimum continuous emission monitoring system data requirements of paragraph (c)(10)(viii) of this section are not met.

(xi) The continuous emission monitoring system shall be operated according to Performance Specification 11 in appendix B of this part.

(xii) During each relative accuracy test run of the continuous emission monitoring system required by Performance Specification 11 in appendix B of this part, particulate matter and oxygen (or carbon dioxide) data shall be collected concurrently (or within a 30- to 60–minute period) by both the continuous emission monitors and the test methods specified in paragraphs (c)(10)(xii)(A) and (c)(10)(xii)(B) of this section.

(A) For particulate matter, EPA Reference Method 5 shall be used.

(B) For oxygen (or carbon dioxide), EPA Reference Method 3, 3A, or 3B, as applicable shall be used.

(xiii) Quarterly accuracy determinations and daily calibration drift tests shall be performed in accordance with procedure 2 in appendix F of this part.

(xiv) When particulate matter emissions data are not obtained because of continuous emission monitoring system breakdowns, repairs, calibration checks, and zero and span adjustments, emissions data shall be obtained by using other monitoring systems as approved by the Administrator or EPA Reference Method 19 to provide, as necessary, valid


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

emissions data for a minimum of 90 percent of the hours per calendar quarter and 95 percent of the hours per calendar year that the affected facility is operated and combusting municipal solid waste.

(11) Following the date that the initial performance test for opacity is completed or is required to be completed under § 60.8 of subpart A of this part for an affected facility, the owner or operator shall conduct a performance test for opacity on an annual basis (no less than 9 calendar months and no more than 15 calendar months following the previous performance test; and must complete five performance tests in each 5–year calendar period) using the test method specified in paragraph (c)(6) of this section.

(d) The procedures and test methods specified in paragraphs (d)(1) and (d)(2) of this section shall be used to determine compliance with the emission limits for cadmium, lead, and mercury under § 60.52b(a).

(1) The procedures and test methods specified in paragraphs (d)(1)(i) through (d)(1)(ix) of this section shall be used to determine compliance with the emission limits for cadmium and lead under § 60.52b(a) (3) and (4).

(i) The EPA Reference Method 1 shall be used for determining the location and number of sampling points.

(ii) The EPA Reference Method 3, 3A, or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used for flue gas analysis.

(iii) The EPA Reference Method 29 shall be used for determining compliance with the cadmium and lead emission limits.

(iv) An oxygen or carbon dioxide measurement shall be obtained simultaneously with each Method 29 test run for cadmium and lead required under paragraph (d)(1)(iii) of this section.

(v) The owner or operator of an affected facility may request that compliance with the cadmium or lead emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(vi) All performance tests shall consist of a minimum of three test runs conducted under representative full load operating conditions. The average of the cadmium or lead emission concentrations from three test runs or more shall be used to determine compliance.

(vii) Following the date of the initial performance test or the date on which the initial performance test is required to be completed under § 60.8 of subpart A of this part, the owner or operator of an affected facility shall conduct a performance test for compliance with the emission limits for cadmium and lead on a calendar year basis (no less than 9 calendar months and no more than 15 calendar months following the previous performance test; and must complete five performance tests in each 5–year calendar period).

(viii), (ix) [Reserved]


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(2) The procedures and test methods specified in paragraphs (d)(2)(i) through (d)(2)(xi) of this section shall be used to determine compliance with the mercury emission limit under § 60.52b(a)(5).

(i) The EPA Reference Method 1 shall be used for determining the location and number of sampling points.

(ii) The EPA Reference Method 3, 3A, or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used for flue gas analysis.

(iii) The EPA Reference Method 29 or as an alternative ASTM D6784–02 shall be used to determine the mercury emission concentration. The minimum sample volume when using Method 29 as an alternative ASTM D6784–02 for mercury shall be 1.7 cubic meters.

(iv) An oxygen (or carbon dioxide) measurement shall be obtained simultaneously with each Method 29 or as an alternative ASTM D6784–02 test run for mercury required under paragraph (d)(2)(iii) of this section.

(v) The percent reduction in the potential mercury emissions (% $P_{Hg}$) is computed using equation 1:

$$\left(\%P_{Hg}\right)=\left(\frac{E_i - E_o}{E_i}\right)\times 100 \qquad (1)$$

where:

% $P_{Hg}$ = percent reduction of the potential mercury emissions achieved.

$E_i$ = potential mercury emission concentration measured at the control device inlet, corrected to 7 percent oxygen (dry basis).

$E_o$ = controlled mercury emission concentration measured at the mercury control device outlet, corrected to 7 percent oxygen (dry basis).

(vi) All performance tests shall consist of a minimum of three test runs conducted under representative full load operating conditions. The average of the mercury emission concentrations or percent reductions from three test runs or more is used to determine compliance.

(vii) The owner or operator of an affected facility may request that compliance with the mercury emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(viii) The owner or operator of an affected facility shall conduct an initial performance test for mercury emissions as required under § 60.8 of subpart A of this part.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(ix) Following the date that the initial performance test for mercury is completed or is required to be completed under § 60.8 of subpart A of this part, the owner or operator of an affected facility shall conduct a performance test for mercury emissions on a calendar year basis (no less than 9 calendar months and no more than 15 calendar months from the previous performance test; and must complete five performance tests in each 5–year calendar period).

(x) [Reserved]

(xi) The owner or operator of an affected facility where activated carbon injection is used to comply with the mercury emission limit shall follow the procedures specified in paragraph (m) of this section for measuring and calculating carbon usage.

(3) In place of cadmium and lead testing with EPA Reference Method 29 as an alternative ASTM D6784–02, an owner or operator may elect to install, calibrate, maintain, and operate a continuous emission monitoring system for monitoring cadmium and lead emissions discharged to the atmosphere and record the output of the system according to the provisions of paragraphs (n) and (o) of this section.

(4) In place of mercury testing with EPA Reference Method 29 or as an alternative ASTM D6784–02, an owner or operator may elect to install, calibrate, maintain, and operate a continuous emission monitoring system or a continuous automated sampling system for monitoring mercury emissions discharged to the atmosphere and record the output of the system according to the provisions of paragraphs (n) and (o) of this section, or paragraphs (p) and (q) of this section, as appropriate. The owner or operator who elects to continuously monitor mercury in place of mercury testing with EPA Reference Method 29 or as an alternative ASTM D6784–02 is not required to complete performance testing for mercury as specified in paragraph (d)(2)(ix) of this section.

(e) The procedures and test methods specified in paragraphs (e)(1) through (e)(14) of this section shall be used for determining compliance with the sulfur dioxide emission limit under § 60.52b(b)(1).

(1) The EPA Reference Method 19, section 4.3, shall be used to calculate the daily geometric average sulfur dioxide emission concentration.

(2) The EPA Reference Method 19, section 5.4, shall be used to determine the daily geometric average percent reduction in the potential sulfur dioxide emission concentration.

(3) The owner or operator of an affected facility may request that compliance with the sulfur dioxide emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(4) The owner or operator of an affected facility shall conduct an initial performance test for sulfur dioxide emissions as required under § 60.8 of subpart A of this part. Compliance with the sulfur dioxide emission limit (concentration or percent reduction) shall be determined by using the continuous emission monitoring system specified in paragraph (e)(5) of this section to measure sulfur dioxide and calculating a 24–hour daily geometric average emission concentration or a 24–hour daily geometric average percent reduction using EPA Reference Method 19, sections 4.3 and 5.4, as applicable.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(5) The owner or operator of an affected facility shall install, calibrate, maintain, and operate a continuous emission monitoring system for measuring sulfur dioxide emissions discharged to the atmosphere and record the output of the system.

(6) Following the date that the initial performance test for sulfur dioxide is completed or is required to be completed under § 60.8 of subpart A of this part, compliance with the sulfur dioxide emission limit shall be determined based on the 24–hour daily geometric average of the hourly arithmetic average emission concentrations using continuous emission monitoring system outlet data if compliance is based on an emission concentration, or continuous emission monitoring system inlet and outlet data if compliance is based on a percent reduction.

(7) At a minimum, valid continuous monitoring system hourly averages shall be obtained as specified in paragraphs (e)(7)(i) and (e)(7)(ii) for 90 percent of the operating hours per calendar quarter and 95 percent of the operating days per calendar year that the affected facility is combusting municipal solid waste.

(i) At least two data points per hour shall be used to calculate each 1–hour arithmetic average.

(ii) Each sulfur dioxide 1–hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1–hour arithmetic average of the oxygen (or carbon dioxide) continuous emission monitoring system data.

(8) The 1–hour arithmetic averages required under paragraph (e)(6) of this section shall be expressed in parts per million corrected to 7 percent oxygen (dry basis) and used to calculate the 24–hour daily geometric average emission concentrations and daily geometric average emission percent reductions. The 1–hour arithmetic averages shall be calculated using the data points required under § 60.13(e)(2) of subpart A of this part.

(9) All valid continuous emission monitoring system data shall be used in calculating average emission concentrations and percent reductions even if the minimum continuous emission monitoring system data requirements of paragraph (e)(7) of this section are not met.

(10) The procedures under § 60.13 of subpart A of this part shall be followed for installation, evaluation, and operation of the continuous emission monitoring system.

(11) The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the municipal waste combustor as specified under § 60.8 of subpart A of this part.

(12) The continuous emission monitoring system shall be operated according to Performance Specification 2 in appendix B of this part. For sources that have actual inlet emissions less than 100 parts per million dry volume, the relative accuracy criterion for inlet sulfur dioxide continuous emission monitoring systems should be no greater than 20 percent of the mean value of the reference method test data in terms of the units of the emission standard, or 5 parts per million dry volume absolute value of the mean difference between the reference method and the continuous emission monitoring systems, whichever is greater.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(i) During each relative accuracy test run of the continuous emission monitoring system required by Performance Specification 2 in appendix B of this part, sulfur dioxide and oxygen (or carbon dioxide) data shall be collected concurrently (or within a 30– to 60–minute period) by both the continuous emission monitors and the test methods specified in paragraphs (e)(12)(i)(A) and (e)(12)(i)(B) of this section.

(A) For sulfur dioxide, EPA Reference Method 6, 6A, or 6C, or as an alternative ASME PTC–19–10–1981—part 10, shall be used.

(B) For oxygen (or carbon dioxide), EPA Reference Method 3, 3A, or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used.

(ii) The span value of the continuous emissions monitoring system at the inlet to the sulfur dioxide control device shall be 125 percent of the maximum estimated hourly potential sulfur dioxide emissions of the municipal waste combustor unit. The span value of the continuous emission monitoring system at the outlet of the sulfur dioxide control device shall be 50 percent of the maximum estimated hourly potential sulfur dioxide emissions of the municipal waste combustor unit.

(13) Quarterly accuracy determinations and daily calibration drift tests shall be performed in accordance with procedure 1 in appendix F of this part.

(14) When sulfur dioxide emissions data are not obtained because of continuous emission monitoring system breakdowns, repairs, calibration checks, and/or zero and span adjustments, emissions data shall be obtained by using other monitoring systems as approved by EPA or EPA Reference Method 19 to provide, as necessary, valid emissions data for a minimum of 90 percent of the hours per calendar quarter and 95 percent of the hours per calendar year that the affected facility is operated and combusting municipal solid waste.

(f) The procedures and test methods specified in paragraphs (f)(1) through (f)(8) of this section shall be used for determining compliance with the hydrogen chloride emission limit under § 60.52b(b)(2).

(1) The EPA Reference Method 26 or 26A, as applicable, shall be used to determine the hydrogen chloride emission concentration. The minimum sampling time shall be 1 hour.

(2) An oxygen (or carbon dioxide) measurement shall be obtained simultaneously with each test run for hydrogen chloride required by paragraph (f)(1) of this section.

(3) The percent reduction in potential hydrogen chloride emissions (% $P_{HCl}$) is computed using equation 2:

$$(\%P_{HCl}) = \left(\frac{E_i - E_o}{E_i}\right) \times 100 \qquad (2)$$

where:


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

% $P_{HCl}$=percent reduction of the potential hydrogen chloride emissions achieved.

$E_i$=potential hydrogen chloride emission concentration measured at the control device inlet, corrected to 7 percent oxygen (dry basis).

$E_o$=controlled hydrogen chloride emission concentration measured at the control device outlet, corrected to 7 percent oxygen (dry basis).

(4) The owner or operator of an affected facility may request that compliance with the hydrogen chloride emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(5) As specified under § 60.8 of subpart A of this part, all performance tests shall consist of three test runs. The average of the hydrogen chloride emission concentrations or percent reductions from the three test runs is used to determine compliance.

(6) The owner or operator of an affected facility shall conduct an initial performance test for hydrogen chloride as required under § 60.8 of subpart A of this part.

(7) Following the date that the initial performance test for hydrogen chloride is completed or is required to be completed under § 60.8 of subpart A of this part, the owner or operator of an affected facility shall conduct a performance test for hydrogen chloride emissions on an annual basis (no more than 12 calendar months following the previous performance test).

(8) In place of hydrogen chloride testing with EPA Reference Method 26 or 26A, an owner or operator may elect to install, calibrate, maintain, and operate a continuous emission monitoring system for monitoring hydrogen chloride emissions discharged to the atmosphere and record the output of the system according to the provisions of paragraphs (n) and (o) of this section.

(g) The procedures and test methods specified in paragraphs (g)(1) through (g)(9) of this section shall be used to determine compliance with the limits for dioxin/furan emissions under § 60.52b(c).

(1) The EPA Reference Method 1 shall be used for determining the location and number of sampling points.

(2) The EPA Reference Method 3, 3A, or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used for flue gas analysis.

(3) The EPA Reference Method 23 shall be used for determining the dioxin/furan emission concentration.

(i) The minimum sample time shall be 4 hours per test run.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(ii) An oxygen (or carbon dioxide) measurement shall be obtained simultaneously with each Method 23 test run for dioxins/furans.

(4) The owner or operator of an affected facility shall conduct an initial performance test for dioxin/furan emissions in accordance with paragraph (g)(3) of this section, as required under § 60.8 of subpart A of this part.

(5) Following the date that the initial performance test for dioxins/furans is completed or is required to be completed under § 60.8 of subpart A of this part, the owner or operator of an affected facility shall conduct performance tests for dioxin/furan emissions in accordance with paragraph (g)(3) of this section, according to one of the schedules specified in paragraphs (g)(5)(i) through (g)(5)(iii) of this section.

(i) For affected facilities, performance tests shall be conducted on a calendar year basis (no less than 9 calendar months and no more than 15 calendar months following the previous performance test; and must complete five performance tests in each 5–year calendar period).

(ii) For the purpose of evaluating system performance to establish new operating parameter levels, testing new technology or control technologies, diagnostic testing, or related activities for the purpose of improving facility performance or advancing the state-of-the-art for controlling facility emissions, the owner or operator of an affected facility that qualifies for the performance testing schedule specified in paragraph (g)(5)(iii) of this section, may test one unit for dioxin/furan and apply the dioxin/furan operating parameters to similarly designed and equipped units on site by meeting the requirements specified in paragraphs (g)(5)(ii)(A) through (g)(5)(ii)(D) of this section.

(A) Follow the testing schedule established in paragraph (g)(5)(iii) of this section. For example, each year a different affected facility at the municipal waste combustor plant shall be tested, and the affected facilities at the plant shall be tested in sequence (e.g., unit 1, unit 2, unit 3, as applicable).

(B) Upon meeting the requirements in paragraph (g)(5)(iii) of this section for one affected facility, the owner or operator may elect to apply the average carbon mass feed rate and associated carbon injection system operating parameter levels for dioxin/furan as established in paragraph (m) of this section to similarly designed and equipped units on site.

(C) Upon testing each subsequent unit in accordance with the testing schedule established in paragraph (g)(5)(iii) of this section, the dioxin/furan and mercury emissions of the subsequent unit shall not exceed the dioxin/furan and mercury emissions measured in the most recent test of that unit prior to the revised operating parameter levels.

(D) The owner or operator of an affected facility that selects to follow the performance testing schedule specified in paragraph (g)(5)(iii) of this section and apply the carbon injection system operating parameters to similarly designed and equipped units on site shall follow the procedures specified in § 60.59b(g)(4) for reporting.

(iii) Where all performance tests over a 2–year period indicate that dioxin/furan emissions are less than or equal to 7 nanograms per dry standard cubic meter (total mass) for all affected facilities located within a municipal waste combustor plant, the owner or operator of the municipal waste combustor plant may elect to conduct annual performance tests for one


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

affected facility (i.e., unit) per year at the municipal waste combustor plant. At a minimum, a performance test for dioxin/furan emissions shall be conducted on a calendar year basis (no less than 9 calendar months and no more than 15 months following the previous performance test; and must complete five performance tests in each 5–year calendar period) for one affected facility at the municipal waste combustor plant. Each year a different affected facility at the municipal waste combustor plant shall be tested, and the affected facilities at the plant shall be tested in sequence (e.g., unit 1, unit 2, unit 3, as applicable). If each annual performance test continues to indicate a dioxin/furan emission level less than or equal to 7 nanograms per dry standard cubic meter (total mass), the owner or operator may continue conducting a performance test on only one affected facility per calendar year. If any annual performance test indicates either a dioxin/furan emission level greater than 7 nanograms per dry standard cubic meter (total mass), performance tests shall thereafter be conducted annually on all affected facilities at the plant until and unless all annual performance tests for all affected facilities at the plant over a 2–year period indicate a dioxin/furan emission level less than or equal to 7 nanograms per dry standard cubic meter (total mass).

(6) The owner or operator of an affected facility that selects to follow the performance testing schedule specified in paragraph (g)(5)(iii) of this section shall follow the procedures specified in § 60.59b(g)(4) for reporting the selection of this schedule.

(7) The owner or operator of an affected facility where activated carbon is used shall follow the procedures specified in paragraph (m) of this section for measuring and calculating the carbon usage rate.

(8) The owner or operator of an affected facility may request that compliance with the dioxin/furan emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(9) As specified under § 60.8 of subpart A of this part, all performance tests shall consist of three test runs. The average of the dioxin/furan emission concentrations from the three test runs is used to determine compliance.

(10) In place of dioxin/furan sampling and testing with EPA Reference Method 23, an owner or operator may elect to sample dioxin/furan by installing, calibrating, maintaining, and operating a continuous automated sampling system for monitoring dioxin/furan emissions discharged to the atmosphere, recording the output of the system, and analyzing the sample using EPA Method 23. This option to use a continuous automated sampling system takes effect on the date a final performance specification applicable to dioxin/furan from monitors is published in the Federal Register or the date of approval of a site-specific monitoring plan. The owner or operator of an affected facility who elects to continuously sample dioxin/furan emissions instead of sampling and testing using EPA Method 23 shall install, calibrate, maintain, and operate a continuous automated sampling system and shall comply with the requirements specified in paragraphs (p) and (q) of this section.

(h) The procedures and test methods specified in paragraphs (h)(1) through (h)(12) of this section shall be used to determine compliance with the nitrogen oxides emission limit for affected facilities under § 60.52b(d).

(1) The EPA Reference Method 19, section 4.1, shall be used for determining the daily arithmetic average nitrogen oxides emission concentration.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(2) The owner or operator of an affected facility may request that compliance with the nitrogen oxides emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(3) The owner or operator of an affected facility subject to the nitrogen oxides limit under § 60.52b(d) shall conduct an initial performance test for nitrogen oxides as required under § 60.8 of subpart A of this part. Compliance with the nitrogen oxides emission limit shall be determined by using the continuous emission monitoring system specified in paragraph (h)(4) of this section for measuring nitrogen oxides and calculating a 24–hour daily arithmetic average emission concentration using EPA Reference Method 19, section 4.1.

(4) The owner or operator of an affected facility subject to the nitrogen oxides emission limit under § 60.52b(d) shall install, calibrate, maintain, and operate a continuous emission monitoring system for measuring nitrogen oxides discharged to the atmosphere, and record the output of the system.

(5) Following the date that the initial performance test for nitrogen oxides is completed or is required to be completed under § 60.8 of subpart A of this part, compliance with the emission limit for nitrogen oxides required under § 60.52b(d) shall be determined based on the 24–hour daily arithmetic average of the hourly emission concentrations using continuous emission monitoring system outlet data.

(6) At a minimum, valid continuous emission monitoring system hourly averages shall be obtained as specified in paragraphs (h)(6)(i) and (h)(6)(ii) of this section for 90 percent of the operating hours per calendar quarter and for 95 percent of the operating hours per calendar year that the affected facility is combusting municipal solid waste.

(i) At least 2 data points per hour shall be used to calculate each 1–hour arithmetic average.

(ii) Each nitrogen oxides 1–hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1–hour arithmetic average of the oxygen (or carbon dioxide) continuous emission monitoring system data.

(7) The 1–hour arithmetic averages required by paragraph (h)(5) of this section shall be expressed in parts per million by volume (dry basis) and used to calculate the 24–hour daily arithmetic average concentrations. The 1–hour arithmetic averages shall be calculated using the data points required under § 60.13(e)(2) of subpart A of this part.

(8) All valid continuous emission monitoring system data must be used in calculating emission averages even if the minimum continuous emission monitoring system data requirements of paragraph (h)(6) of this section are not met.

(9) The procedures under § 60.13 of subpart A of this part shall be followed for installation, evaluation, and operation of the continuous emission monitoring system. The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the municipal waste combustor unit, as specified under § 60.8 of subpart A of this part.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(10) The owner or operator of an affected facility shall operate the continuous emission monitoring system according to Performance Specification 2 in appendix B of this part and shall follow the procedures and methods specified in paragraphs (h)(10)(i) and (h)(10)(ii) of this section.

(i) During each relative accuracy test run of the continuous emission monitoring system required by Performance Specification 2 of appendix B of this part, nitrogen oxides and oxygen (or carbon dioxide) data shall be collected concurrently (or within a 30– to 60–minute period) by both the continuous emission monitors and the test methods specified in paragraphs (h)(10)(i)(A) and (h)(10)(i)(B) of this section.

(A) For nitrogen oxides, EPA Reference Method 7, 7A, 7C, 7D, or 7E shall be used.

(B) For oxygen (or carbon dioxide), EPA Reference Method 3, 3A, or 3B, or as an alternative ASME PTC–19–10–1981—part 10, as applicable, shall be used.

(ii) The span value of the continuous emission monitoring system shall be 125 percent of the maximum estimated hourly potential nitrogen oxide emissions of the municipal waste combustor unit.

(11) Quarterly accuracy determinations and daily calibration drift tests shall be performed in accordance with procedure 1 in appendix F of this part.

(12) When nitrogen oxides continuous emission data are not obtained because of continuous emission monitoring system breakdowns, repairs, calibration checks, and zero and span adjustments, emissions data shall be obtained using other monitoring systems as approved by EPA or EPA Reference Method 19 to provide, as necessary, valid emissions data for a minimum of 90 percent of the hours per calendar quarter and 95 percent of the hours per calendar year the unit is operated and combusting municipal solid waste.

(i) The procedures specified in paragraphs (i)(1) through (i)(12) of this section shall be used for determining compliance with the operating requirements under § 60.53b.

(1) Compliance with the carbon monoxide emission limits in § 60.53b(a) shall be determined using a 4–hour block arithmetic average for all types of affected facilities except mass burn rotary waterwall municipal waste combustors and refuse-derived fuel stokers.

(2) For affected mass burn rotary waterwall municipal waste combustors and refuse-derived fuel stokers, compliance with the carbon monoxide emission limits in § 60.53b(a) shall be determined using a 24–hour daily arithmetic average.

(3) The owner or operator of an affected facility shall install, calibrate, maintain, and operate a continuous emission monitoring system for measuring carbon monoxide at the combustor outlet and record the output of the system and shall follow the procedures and methods specified in paragraphs (i)(3)(i) through (i)(3)(iii) of this section.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(i) The continuous emission monitoring system shall be operated according to Performance Specification 4A in appendix B of this part.

(ii) During each relative accuracy test run of the continuous emission monitoring system required by Performance Specification 4A in appendix B of this part, carbon monoxide and oxygen (or carbon dioxide) data shall be collected concurrently (or within a 30- to 60–minute period) by both the continuous emission monitors and the test methods specified in paragraphs (i)(3)(ii)(A) and (i)(3)(ii)(B) of this section. For affected facilities subject to the 100 parts per million dry volume carbon monoxide standard, the relative accuracy criterion of 5 parts per million dry volume is calculated as the absolute value of the mean difference between the reference method and continuous emission monitoring systems.

(A) For carbon monoxide, EPA Reference Method 10, 10A, or 10B shall be used.

(B) For oxygen (or carbon dioxide), EPA Reference Method 3, 3A, or 3B, or ASME PTC–19–10–1981—part 10 (incorporated by reference, see § 60.17 of subpart A of this part), as applicable, shall be used.

(iii) The span value of the continuous emission monitoring system shall be 125 percent of the maximum estimated hourly potential carbon monoxide emissions of the municipal waste combustor unit.

(4) The 4–hour block and 24–hour daily arithmetic averages specified in paragraphs (i)(1) and (i)(2) of this section shall be calculated from 1–hour arithmetic averages expressed in parts per million by volume corrected to 7 percent oxygen (dry basis). The 1–hour arithmetic averages shall be calculated using the data points generated by the continuous emission monitoring system. At least two data points shall be used to calculate each 1–hour arithmetic average.

(5) The owner or operator of an affected facility may request that compliance with the carbon monoxide emission limit be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(6) The procedures specified in paragraphs (i)(6)(i) through (i)(6)(v) of this section shall be used to determine compliance with load level requirements under § 60.53b(b).

(i) The owner or operator of an affected facility with steam generation capability shall install, calibrate, maintain, and operate a steam flow meter or a feedwater flow meter; measure steam (or feedwater) flow in kilograms per hour (or pounds per hour) on a continuous basis; and record the output of the monitor. Steam (or feedwater) flow shall be calculated in 4–hour block arithmetic averages.

(ii) The method included in the "American Society of Mechanical Engineers Power Test Codes: Test Code for Steam Generating Units, Power Test Code 4.1—1964 (R1991)" section 4 (incorporated by reference, see § 60.17 of subpart A of this part) shall be used for calculating the steam (or feedwater) flow required under paragraph (i)(6)(i) of this section. The recommendations in "American Society of Mechanical Engineers Interim Supplement 19.5 on Instruments and Apparatus: Application, part II of Fluid Meters, 6th edition (1971)," chapter 4 (incorporated by reference—see § 60.17 of subpart A of this part) shall be followed for design, construction, installation, calibration, and use of nozzles and orifices except as specified in (i)(6)(iii) of this section.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(iii) Measurement devices such as flow nozzles and orifices are not required to be recalibrated after they are installed.

(iv) All signal conversion elements associated with steam (or feedwater flow) measurements must be calibrated according to the manufacturer's instructions before each dioxin/furan performance test, and at least once per year.

(7) To determine compliance with the maximum particulate matter control device temperature requirements under § 60.53b(c), the owner or operator of an affected facility shall install, calibrate, maintain, and operate a device for measuring on a continuous basis the temperature of the flue gas stream at the inlet to each particulate matter control device utilized by the affected facility. Temperature shall be calculated in 4–hour block arithmetic averages.

(8) The maximum demonstrated municipal waste combustor unit load shall be determined during the initial performance test for dioxins/furans and each subsequent performance test during which compliance with the dioxin/furan emission limit specified in § 60.52b(c) is achieved. The maximum demonstrated municipal waste combustor unit load shall be the highest 4–hour arithmetic average load achieved during four consecutive hours during the most recent test during which compliance with the dioxin/furan emission limit was achieved. If a subsequent dioxin/furan performance test is being performed on only one affected facility at the MWC plant, as provided in paragraph (g)(5)(iii) of this section, the owner or operator may elect to apply the same maximum municipal waste combustor unit load from the tested facility for all the similarly designed and operated affected facilities at the MWC plant.

(9) For each particulate matter control device employed at the affected facility, the maximum demonstrated particulate matter control device temperature shall be determined during the initial performance test for dioxins/furans and each subsequent performance test during which compliance with the dioxin/furan emission limit specified in § 60.52b(c) is achieved. The maximum demonstrated particulate matter control device temperature shall be the highest 4–hour arithmetic average temperature achieved at the particulate matter control device inlet during four consecutive hours during the most recent test during which compliance with the dioxin/furan limit was achieved. If a subsequent dioxin/furan performance test is being performed on only one affected facility at the MWC plant, as provided in paragraph (g)(5)(iii) of this section, the owner or operator may elect to apply the same maximum particulate matter control device temperature from the tested facility for all the similarly designed and operated affected facilities at the MWC plant.

(10) At a minimum, valid continuous emission monitoring system hourly averages shall be obtained as specified in paragraphs (i)(10)(i) and (i)(10)(ii) of this section for at least 90 percent of the operating hours per calendar quarter and 95 percent of the operating hours per calendar year that the affected facility is combusting municipal solid waste.

(i) At least two data points per hour shall be used to calculate each 1–hour arithmetic average.

(ii) At a minimum, each carbon monoxide 1–hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1–hour arithmetic average of the oxygen (or carbon dioxide) continuous emission monitoring system data.

(11) All valid continuous emission monitoring system data must be used in calculating the parameters specified under paragraph (i) of this section even if the minimum data requirements of paragraph (i)(10) of this section are not met. When carbon monoxide continuous emission data are not obtained because of continuous emission monitoring system breakdowns, repairs, calibration checks, and zero and span adjustments, emissions data shall be obtained using other

monitoring systems as approved by EPA or EPA Reference Method 10 to provide, as necessary, the minimum valid emission data.

(12) Quarterly accuracy determinations and daily calibration drift tests for the carbon monoxide continuous emission monitoring system shall be performed in accordance with procedure 1 in appendix F of this part.

(j) The procedures specified in paragraphs (j)(1) and (j)(2) of this section shall be used for calculating municipal waste combustor unit capacity as defined under § 60.51b.

(1) For municipal waste combustor units capable of combusting municipal solid waste continuously for a 24–hour period, municipal waste combustor unit capacity shall be calculated based on 24 hours of operation at the maximum charging rate. The maximum charging rate shall be determined as specified in paragraphs (j)(1)(i) and (j)(1)(ii) of this section as applicable.

(i) For combustors that are designed based on heat capacity, the maximum charging rate shall be calculated based on the maximum design heat input capacity of the unit and a heating value of 12,800 kilojoules per kilogram for combustors firing refuse-derived fuel and a heating value of 10,500 kilojoules per kilogram for combustors firing municipal solid waste that is not refuse-derived fuel.

(ii) For combustors that are not designed based on heat capacity, the maximum charging rate shall be the maximum design charging rate.

(2) For batch feed municipal waste combustor units, municipal waste combustor unit capacity shall be calculated as the maximum design amount of municipal solid waste that can be charged per batch multiplied by the maximum number of batches that could be processed in a 24–hour period. The maximum number of batches that could be processed in a 24–hour period is calculated as 24 hours divided by the design number of hours required to process one batch of municipal solid waste, and may include fractional batches (e.g., if one batch requires 16 hours, then $^{24}/_{16}$, or 1.5 batches, could be combusted in a 24–hour period). For batch combustors that are designed based on heat capacity, the design heating value of 12,800 kilojoules per kilogram for combustors firing refuse-derived fuel and a heating value of 10,500 kilojoules per kilogram for combustors firing municipal solid waste that is not refuse-derived fuel shall be used in calculating the municipal waste combustor unit capacity in megagrams per day of municipal solid waste.

(k) The procedures specified in paragraphs (k)(1) through (k)(4) of this section shall be used for determining compliance with the fugitive ash emission limit under § 60.55b.

(1) The EPA Reference Method 22 shall be used for determining compliance with the fugitive ash emission limit under § 60.55b. The minimum observation time shall be a series of three 1–hour observations. The observation period shall include times when the facility is transferring ash from the municipal waste combustor unit to the area where ash is stored or loaded into containers or trucks.

(2) The average duration of visible emissions per hour shall be calculated from the three 1–hour observations. The average shall be used to determine compliance with § 60.55b.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(3) The owner or operator of an affected facility shall conduct an initial performance test for fugitive ash emissions as required under § 60.8 of subpart A of this part.

(4) Following the date that the initial performance test for fugitive ash emissions is completed or is required to be completed under § 60.8 of subpart A of this part for an affected facility, the owner or operator shall conduct a performance test for fugitive ash emissions on an annual basis (no more than 12 calendar months following the previous performance test).

(l) The procedures specified in paragraphs (l)(1) through (l)(3) of this section shall be used to determine compliance with the opacity limit for air curtain incinerators under § 60.56b.

(1) The EPA Reference Method 9 shall be used for determining compliance with the opacity limit.

(2) The owner or operator of the air curtain incinerator shall conduct an initial performance test for opacity as required under § 60.8 of subpart A of this part.

(3) Following the date that the initial performance test is completed or is required to be completed under § 60.8 of subpart A of this part, the owner or operator of the air curtain incinerator shall conduct a performance test for opacity on an annual basis (no more than 12 calendar months following the previous performance test).

(m) The owner or operator of an affected facility where activated carbon injection is used to comply with the mercury emission limit under § 60.52b(a)(5), and/or the dioxin/furan emission limits under § 60.52(b)(c), or the dioxin/furan emission level specified in paragraph (g)(5)(iii) of this section shall follow the procedures specified in paragraphs (m)(1) through (m)(4) of this section.

(1) During the performance tests for dioxins/furans and mercury, as applicable, the owner or operator shall estimate an average carbon mass feed rate based on carbon injection system operating parameters such as the screw feeder speed, hopper volume, hopper refill frequency, or other parameters appropriate to the feed system being employed, as specified in paragraphs (m)(1)(i) and (m)(1)(ii) of this section.

(i) An average carbon mass feed rate in kilograms per hour or pounds per hour shall be estimated during the initial performance test for mercury emissions and each subsequent performance test for mercury emissions.

(ii) An average carbon mass feed rate in kilograms per hour or pounds per hour shall be estimated during the initial performance test for dioxin/furan emissions and each subsequent performance test for dioxin/furan emissions. If a subsequent dioxin/furan performance test is being performed on only one affected facility at the MWC plant, as provided in paragraph (g)(5)(iii) of this section, the owner or operator may elect to apply the same estimated average carbon mass feed rate from the tested facility for all the similarly designed and operated affected facilities at the MWC plant.

(2) During operation of the affected facility, the carbon injection system operating parameter(s) that are the primary indicator(s) of the carbon mass feed rate (e.g., screw feeder setting) shall be averaged over a block 8–hour period, and the 8–


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

hour block average must equal or exceed the level(s) documented during the performance tests specified under paragraphs (m)(1)(i) and (m)(1)(ii) of this section, except as specified in paragraphs (m)(2)(i) and (m)(2)(ii) of this section.

(i) During the annual dioxin/furan or mercury performance test and the 2 weeks preceding the annual dioxin/furan or mercury performance test, no limit is applicable for average mass carbon feed rate if the provisions of paragraph (m)(2)(ii) of this section are met.

(ii) The limit for average mass carbon feed rate may be waived in accordance with permission granted by the Administrator for the purpose of evaluating system performance, testing new technology or control technologies, diagnostic testing, or related activities for the purpose of improving facility performance or advancing the state-of-the-art for controlling facility emissions.

(3) The owner or operator of an affected facility shall estimate the total carbon usage of the plant (kilograms or pounds) for each calendar quarter by two independent methods, according to the procedures in paragraphs (m)(3)(i) and (m)(3)(ii) of this section.

(i) The weight of carbon delivered to the plant.

(ii) Estimate the average carbon mass feed rate in kilograms per hour or pounds per hour for each hour of operation for each affected facility based on the parameters specified under paragraph (m)(1) of this section, and sum the results for all affected facilities at the plant for the total number of hours of operation during the calendar quarter.

(4) Pneumatic injection pressure or other carbon injection system operational indicator shall be used to provide additional verification of proper carbon injection system operation. The operational indicator shall provide an instantaneous visual and/or audible alarm to alert the operator of a potential interruption in the carbon feed that would not normally be indicated by direct monitoring of carbon mass feed rate (e.g., continuous weight loss feeder) or monitoring of the carbon system operating parameter(s) that are the indicator(s) of carbon mass feed rate (e.g., screw feeder speed). The carbon injection system operational indicator used to provide additional verification of carbon injection system operation, including basis for selecting the indicator and operator response to the indicator alarm, shall be included in section (e)(6) of the site-specific operating manual required under § 60.54b(e) of this subpart.

(n) In place of periodic manual testing of mercury, cadmium, lead, or hydrogen chloride with EPA Reference Method 26, 26A, 29, or as an alternative ASTM D6784–02 (as applicable), the owner or operator of an affected facility may elect to install, calibrate, maintain, and operate a continuous emission monitoring system for monitoring emissions discharged to the atmosphere and record the output of the system. The option to use a continuous emission monitoring system for mercury takes effect on the date of approval of the site-specific monitoring plan required in paragraph (n)(13) and (o) of this section. The option to use a continuous emission monitoring system for cadmium, lead, or hydrogen chloride takes effect on the date a final performance specification applicable to cadmium, lead, or hydrogen chloride monitor is published in the Federal Register or the date of approval of the site-specific monitoring plan required in paragraphs (n)(13) and (o) of this section. The owner or operator of an affected facility who elects to continuously monitor emissions instead of conducting manual performance testing shall install, calibrate, maintain, and operate a continuous emission monitoring system and shall comply with the requirements specified in paragraphs (n)(1) through (n)(13) of this section.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(1) Notify the Administrator one month before starting use of the system.

(2) Notify the Administrator one month before stopping use of the system.

(3) The monitor shall be installed, evaluated, and operated in accordance with § 60.13 of subpart A of this part.

(4) The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the affected facility, as specified under § 60.8 of subpart A of this part or within 180 days of notification to the Administrator of use of the continuous monitoring system if the owner or operator was previously determining compliance by Method 26, 26A, 29, or as an alternative ASTM D6784–02 (as applicable) performance tests, whichever is later.

(5) The owner or operator may request that compliance with the emission limits be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(6) The owner or operator shall conduct an initial performance test for emissions as required under § 60.8 of subpart A of this part. Compliance with the emission limits shall be determined by using the continuous emission monitoring system specified in paragraph (n) of this section to measure emissions and calculating a 24–hour block arithmetic average emission concentration using EPA Reference Method 19, section 12.4.1.

(7) Compliance with the emission limits shall be determined based on the 24–hour daily (block) average of the hourly arithmetic average emission concentrations using continuous emission monitoring system outlet data.

(8) Beginning on April 28, 2008 for mercury and on the date two years after final performance specifications for cadmium, lead or hydrogen chloride monitors are published in the Federal Register or the date two years after approval of a site-specific monitoring plan, valid continuous monitoring system hourly averages shall be obtained as specified in paragraphs (n)(8)(i) and (n)(8)(ii) of this section for at least 90 percent of the operating hours per calendar quarter and 95 percent of the operating hours per calendar year that the affected facility is combusting municipal solid waste.

(i) At least two data points per hour shall be used to calculate each 1–hour arithmetic average.

(ii) Each 1–hour arithmetic average shall be corrected to 7 percent oxygen on an hourly basis using the 1–hour arithmetic average of the oxygen (or carbon dioxide) continuous emission monitoring system data.

(9) The 1–hour arithmetic averages required under paragraph (n)(7) of this section shall be expressed in micrograms per dry standard cubic meter for mercury, cadmium, lead and parts per million dry volume for hydrogen chloride corrected to 7 percent oxygen (dry basis) and shall be used to calculate the 24–hour daily arithmetic (block) average emission concentrations. The 1–hour arithmetic averages shall be calculated using the data points required under § 60.13(e)(2) of subpart A of this part.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(10) All valid continuous emission monitoring system data shall be used in calculating average emission concentrations even if the minimum continuous emission monitoring system data requirements of paragraph (n)(8) of this section are not met.

(11) The continuous emission monitoring system shall be operated according to the performance specifications in paragraphs (n)(11)(i) through (n)(11)(iii) of this section or the approved site-specific monitoring plan.

(i) For mercury, Performance Specification 12A in appendix B of this part.

(ii) [Reserved]

(iii) [Reserved]

(12) During each relative accuracy test run of the continuous emission monitoring system required by the performance specifications in paragraph (n)(11) of this section, mercury, cadmium, lead, hydrogen chloride, and oxygen (or carbon dioxide) data shall be collected concurrently (or within a 30- to 60–minute period) by both the continuous emission monitors and the test methods specified in paragraphs (n)(12)(i) through (n)(12)(iii) of this section.

(i) For mercury, cadmium, and lead, EPA Reference Method 29 or as an alternative ASTM D6784–02 shall be used.

(ii) For hydrogen chloride, EPA Reference Method 26 or 26A shall be used.

(iii) For oxygen (or carbon dioxide), EPA Reference Method 3, 3A, or 3B, as applicable shall be used.

(13) The owner or operator who elects to install, calibrate, maintain, and operate a continuous emission monitoring system for mercury, cadmium, lead, or hydrogen chloride must develop and implement a site-specific monitoring plan as specified in paragraph (o) of this section. The owner or operator who relies on a performance specification may refer to that document in addressing applicable procedures and criteria.

(14) When emissions data are not obtained because of continuous emission monitoring system breakdowns, repairs, calibration checks, and zero and span adjustments, parametric monitoring data shall be obtained by using other monitoring systems as approved by EPA.

(o) The owner or operator who elects to install, calibrate, maintain, and operate a continuous emission monitoring system for mercury, cadmium, lead, or hydrogen chloride must develop and submit for approval by EPA, a site-specific mercury, cadmium, lead, or hydrogen chloride monitoring plan that addresses the elements and requirements in paragraphs (o)(1) through (o)(7) of this section.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(1) Installation of the continuous emission monitoring system sampling probe or other interface at a measurement location relative to each affected process unit such that the measurement is representative of control of the exhaust emissions (e.g., on or downstream of the last control device).

(2) Performance and equipment specifications for the sample interface, the pollutant concentration analyzer, and the data collection and reduction system.

(3) Performance evaluation procedures and acceptance criteria (e.g., calibrations).

(4) Provisions for periods when the continuous emission monitoring system is out of control as described in paragraphs (o)(4)(i) through (o)(4)(iii) of this section.

(i) A continuous emission monitoring system is out of control if either of the conditions in paragraphs (o)(4)(i)(A) or (o)(4)(ii)(B) of this section are met.

(A) The zero (low-level), mid-level (if applicable), or high-level calibration drift exceeds two times the applicable calibration drift specification in the applicable performance specification or in the relevant standard; or

(B) The continuous emission monitoring system fails a performance test audit (e.g., cylinder gas audit), relative accuracy audit, relative accuracy test audit, or linearity test audit.

(ii) When the continuous emission monitoring system is out of control as defined in paragraph (o)(4)(i) of this section, the owner or operator of the affected source shall take the necessary corrective action and shall repeat all necessary tests that indicate that the system is out of control. The owner or operator shall take corrective action and conduct retesting until the performance requirements are below the applicable limits. The beginning of the out-of-control period is the hour the owner or operator conducts a performance check (e.g., calibration drift) that indicates an exceedance of the performance requirements established under this part. The end of the out-of-control period is the hour following the completion of corrective action and successful demonstration that the system is within the allowable limits. During the period the continuous emission monitoring system is out of control, recorded data shall not be used in data averages and calculations or to meet any data availability requirements in paragraph (n)(8) of this section.

(iii) The owner or operator of a continuous emission monitoring system that is out of control as defined in paragraph (o)(4) of this section shall submit all information concerning out-of-control periods, including start and end dates and hours and descriptions of corrective actions taken in the annual or semiannual compliance reports required in § 60.59b(g) or (h).

(5) Ongoing data quality assurance procedures for continuous emission monitoring systems as described in paragraphs (o)(5)(i) and (o)(5)(ii) of this section.

(i) Develop and implement a continuous emission monitoring system quality control program. As part of the quality control program, the owner or operator shall develop and submit to EPA for approval, upon request, a site-specific performance evaluation test plan for the continuous emission monitoring system performance evaluation required in paragraph (o)(5)


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(ii) of this section. In addition, each quality control program shall include, at a minimum, a written protocol that describes procedures for each of the operations described in paragraphs (o)(7)(i)(A) through (o)(7)(i)(F) of this section.

(A) Initial and any subsequent calibration of the continuous emission monitoring system;

(B) Determination and adjustment of the calibration drift of the continuous emission monitoring system;

(C) Preventive maintenance of the continuous emission monitoring system, including spare parts inventory;

(D) Data recording, calculations, and reporting;

(E) Accuracy audit procedures, including sampling and analysis methods; and

(F) Program of corrective action for a malfunctioning continuous emission monitoring system.

(ii) The performance evaluation test plan shall include the evaluation program objectives, an evaluation program summary, the performance evaluation schedule, data quality objectives, and both an internal and external quality assurance program. Data quality objectives are the pre-evaluation expectations of precision, accuracy, and completeness of data. The internal quality assurance program shall include, at a minimum, the activities planned by routine operators and analysts to provide an assessment of continuous emission monitoring system performance, for example, plans for relative accuracy testing using the appropriate reference method in § 60.58b(n)(12) of this section. The external quality assurance program shall include, at a minimum, systems audits that include the opportunity for on-site evaluation by the Administrator of instrument calibration, data validation, sample logging, and documentation of quality control data and field maintenance activities.

(6) Conduct a performance evaluation of each continuous emission monitoring system in accordance with the site-specific monitoring plan.

(7) Operate and maintain the continuous emission monitoring system in continuous operation according to the site-specific monitoring plan.

(p) In place of periodic manual testing of dioxin/furan or mercury with EPA Reference Method 23, 29, or as an alternative ASTM D6784–02 (as applicable), the owner or operator of an affected facility may elect to install, calibrate, maintain, and operate a continuous automated sampling system for determining emissions discharged to the atmosphere. This option takes effect on the date a final performance specification applicable to such continuous automated sampling systems is published in the Federal Register or the date of approval of a site-specific monitoring plan required in paragraphs (p)(10) and (q) of this section. The owner or operator of an affected facility who elects to use a continuous automated sampling system to determine emissions instead of conducting manual performance testing shall install, calibrate, maintain, and operate the sampling system and conduct analyses in compliance with the requirements specified in paragraphs (p)(1) through (p)(12) of this section.

(1) Notify the Administrator one month before starting use of the system.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(2) Notify the Administrator one month before stopping use of the system.

(3) The initial performance evaluation shall be completed no later than 180 days after the date of initial startup of the affected facility, as specified under § 60.8 of subpart A of this part or within 180 days of notification to the Administrator of use of the continuous monitoring system if the owner or operator was previously determining compliance by manual performance testing using Method 23, 29, or as an alternative ASTM D6784–02 (as applicable), whichever is later.

(4) The owner or operator may request that compliance with the emission limits be determined using carbon dioxide measurements corrected to an equivalent of 7 percent oxygen. The relationship between oxygen and carbon dioxide levels for the affected facility shall be established as specified in paragraph (b)(6) of this section.

(5) The owner or operator shall conduct an initial performance test for emissions as required under § 60.8 of subpart A of this part. Compliance with the emission limits shall be determined by using the continuous automated sampling system specified in paragraph (p) of this section to collect integrated samples and analyze emissions for the time period specified in paragraphs (p)(5)(i) and (ii) of this section.

(i) For dioxin/furan, the continuous automated sampling system shall collect an integrated sample over each 2–week period. The collected sample shall be analyzed using Method 23.

(ii) For mercury, the continuous automated sampling system shall collect an integrated sample over each 24–hour daily period and the sample shall be analyzed according to the applicable final performance specification or the approved site-specific monitoring plan required by paragraph (q) of this section.

(6) Compliance with the emission limits shall be determined based on 2–week emission concentrations for dioxin/furan and on the 24–hour daily emission concentrations for mercury using samples collected at the system outlet. The emission concentrations shall be expressed in nanograms per dry standard cubic meter (total mass) for dioxin/furan and micrograms per dry standard cubic meter for mercury, corrected to 7 percent oxygen (dry basis).

(7) Beginning on the date two years after the respective final performance specification for continuous automated sampling systems for dioxin/furan or mercury is published in the Federal Register or two years after approval of a site-specific monitoring plan, the continuous automated sampling system must be operated and collect emissions for at least 90 percent of the operating hours per calendar quarter and 95 percent of the operating hours per calendar year that the affected facility is combusting municipal solid waste.

(8) All valid data shall be used in calculating emission concentrations.

(9) The continuous automated sampling system shall be operated according to the final performance specification in paragraphs (p)(9)(i) or (p)(9)(ii) of this section or the approved site-specific monitoring plan.

(i) [Reserved]


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(ii) [Reserved]

(10) The owner or operator who elects to install, calibrate, maintain, and operate a continuous automated sampling system for dioxin/furan or mercury must develop and implement a site-specific monitoring plan as specified in paragraph (q) of this section. The owner or operator who relies on a performance specification may refer to that document in addressing applicable procedures and criteria.

(11) When emissions data are not obtained because of continuous automated sampling system breakdowns, repairs, quality assurance checks, or adjustments, parametric monitoring data shall be obtained by using other monitoring systems as approved by EPA.

(q) The owner or operator who elects to install, calibrate, maintain, and operate a continuous automated sampling system for dioxin/furan or mercury must develop and submit for approval by EPA, a site-specific monitoring plan that has sufficient detail to assure the validity of the continuous automated sampling system data and that addresses the elements and requirements in paragraphs (q)(1) through (q)(7) of this section.

(1) Installation of the continuous automated sampling system sampling probe or other interface at a measurement location relative to each affected process unit such that the measurement is representative of control of the exhaust emissions (e.g., on or downstream of the last control device).

(2) Performance and equipment specifications for the sample interface, the pollutant concentration analytical method, and the data collection system.

(3) Performance evaluation procedures and acceptance criteria.

(4) Provisions for periods when the continuous automated sampling system is malfunctioning or is out of control as described in paragraphs (q)(4)(i) through (q)(4)(iii) of this section.

(i) The site-specific monitoring plan shall identify criteria for determining that the continuous automated sampling system is out of control. This shall include periods when the sampling system is not collecting a representative sample or is malfunctioning, or when the analytical method does not meet site-specific quality criteria established in paragraph (q)(5) of this section.

(ii) When the continuous automated sampling system is out of control as defined in paragraph (q)(4)(i) of this section, the owner or operator shall take the necessary corrective action and shall repeat all necessary tests that indicate that the system is out of control. The owner or operator shall take corrective action and conduct retesting until the performance requirements are within the applicable limits. The out-of-control period includes all hours that the sampling system was not collecting a representative sample or was malfunctioning, or hours represented by a sample for which the analysis did not meet the relevant quality criteria. Emissions data obtained during an out-of-control period shall not be used in determining compliance with the emission limits or to meet any data availability requirements in paragraph (p)(8) of this section.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(iii) The owner or operator of a continuous automated sampling system that is out of control as defined in paragraph (q)(4) of this section shall submit all information concerning out-of-control periods, including start and end dates and hours and descriptions of corrective actions taken in the annual or semiannual compliance reports required in § 60.59b(g) or (h).

(5) Ongoing data quality assurance procedures for continuous automated sampling systems as described in paragraphs (q)(5)(i) and (q)(5)(ii) of this section.

(i) Develop and implement a continuous automated sampling system and analysis quality control program. As part of the quality control program, the owner or operator shall develop and submit to EPA for approval, upon request, a site-specific performance evaluation test plan for the continuous automated sampling system performance evaluation required in paragraph (q)(5)(ii) of this section. In addition, each quality control program shall include, at a minimum, a written protocol that describes procedures for each of the operations described in paragraphs (q)(7)(i)(A) through (q)(7)(i)(F) of this section.

(A) Correct placement, installation of the continuous automated sampling system such that the system is collecting a representative sample of gas;

(B) Initial and subsequent calibration of flow such that the sample collection rate of the continuous automated sampling system is known and verifiable;

(C) Procedures to assure representative (e.g., proportional or isokinetic) sampling;

(D) Preventive maintenance of the continuous automated sampling system, including spare parts inventory and procedures for cleaning equipment, replacing sample collection media, or other servicing at the end of each sample collection period;

(E) Data recording and reporting, including an automated indicator and recording device to show when the continuous automated monitoring system is operating and collecting data and when it is not collecting data;

(F) Accuracy audit procedures for analytical methods; and

(G) Program of corrective action for a malfunctioning continuous automated sampling system.

(ii) The performance evaluation test plan shall include the evaluation program objectives, an evaluation program summary, the performance evaluation schedule, data quality objectives, and both an internal and external quality assurance program. Data quality objectives are the pre-evaluation expectations of precision, accuracy, and completeness of data. The internal quality assurance program shall include, at a minimum, the activities planned by routine operators and analysts to provide an assessment of continuous automated sampling system performance, for example, plans for relative accuracy testing using the appropriate reference method in 60.58b(p)(3), and an assessment of quality of analysis results. The external quality assurance program shall include, at a minimum, systems audits that include the opportunity for on-site evaluation


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

by the Administrator of instrument calibration, data validation, sample logging, and documentation of quality control data and field maintenance activities.

(6) Conduct a performance evaluation of each continuous automated sampling system in accordance with the site-specific monitoring plan.

(7) Operate and maintain the continuous automated sampling system in continuous operation according to the site-specific monitoring plan.

**Credits**

[62 FR 45126, Aug. 25, 1997; 65 FR 61753, Oct. 17, 2000; 66 FR 57827, Nov. 16, 2001; 71 FR 27337, May 10, 2006]

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 60 FR 65419, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.



© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart VVVV. Standards of Performance for Large Municipal Waste Combustors (Refs & Annos)
Good Combustion Practices: Operating Requirements

40 C.F.R. § 60.5885

# § 60.5885 What happens to the operating requirements during periods of startup, shutdown, and malfunction?

Effective: May 11, 2026

Currentness

The operating requirements under this subpart apply at all times including periods of municipal waste combustor warmup, startup, shutdown, and malfunction. Monitoring data cannot be dismissed or excluded from compliance calculations during periods of startup, shutdown, or malfunction, but must be recorded and reported in accordance with the provisions of § 60.6045(e). The provisions applicable to periods of startup, shutdown, and malfunction of § 60.8(c) of subpart A of this part do not apply.

<Subpart added by 91 FR 11833, effective May 11, 2026.>

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022; 91 FR 11833, March 10, 2026, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart VVVV. Standards of Performance for Large Municipal Waste Combustors (Refs & Annos)
Emission Limits

40 C.F.R. § 60.5900

# § 60.5900 What happens to the emission limits during periods of startup, shutdown, and malfunction?

Effective: May 11, 2026
Currentness

(a) The emission limits of this subpart apply at all times including periods of warmup, startup, shutdown, and malfunction. The provisions applicable to periods of startup, shutdown, and malfunction of § 60.11(c) of subpart A of this part do not apply.

<Subpart added by 91 FR 11833, effective May 11, 2026.>

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022; 91 FR 11833, March 10, 2026, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart VVVV. Standards of Performance for Large Municipal Waste Combustors (Refs & Annos)
Continuous Emission Monitoring

40 C.F.R. § 60.5935

# § 60.5935 What is the minimum amount of monitoring data I must collect with my continuous emission monitoring systems?

Effective: May 11, 2026

Currentness

(a) Where continuous emission monitoring systems are required, obtain 1–hour arithmetic averages. Make sure the averages for sulfur dioxide, nitrogen oxides, and carbon monoxide, and, if you elect to continuously monitor emissions, the averages for particulate matter, cadmium, lead, mercury, or hydrogen chloride, are in the units specified in Tables 1 and 2 to Subpart VVVV at 7 percent oxygen (or the equivalent carbon dioxide level). Use the 1–hour averages of oxygen (or carbon dioxide) data from your continuous emission monitoring system to determine the actual oxygen (or carbon dioxide) level and to calculate emissions at 7 percent oxygen (or the equivalent carbon dioxide level). The 1–hour arithmetic averages shall be calculated using the data points required under § 60.13(e)(2) of subpart A of this part. Do not correct CEMS data during warmup, startup, and shutdown, as defined in this subpart, to 7 percent oxygen. CEMS data during warmup, startup, and shutdown are used as measured.

(b) Obtain at least two data points per hour in order to calculate a valid 1–hour arithmetic average.

(c) Valid continuous monitoring system hourly averages shall be obtained for all times the affected facility is operated except as specified in § 60.13(e).

(d) If you do not obtain the minimum data required in paragraphs (a) through (c) of this section, you must still use all valid data from the continuous emission monitoring systems in calculating emission concentrations in accordance with § 60.5940.

<Subpart added by 91 FR 11833, effective May 11, 2026.>

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022; 91 FR 11833, March 10, 2026, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-1113 Document #2202646 Filed: 11/09/2026 Page 62 of 95

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart VVVV. Standards of Performance for Large Municipal Waste Combustors (Refs & Annos)
Continuous Emission Monitoring

40 C.F.R. § 60.5940

# § 60.5940 How do I convert my 1–hour arithmetic averages into the appropriate averaging times and units?

Effective: May 11, 2026
Currentness

(a) Use equation 1 in § 60.6140(a) to calculate emissions at 7 percent oxygen.

(b) Use the test methods in Table 4 to Subpart VVVV to calculate the 24–hr daily geometric average concentrations and percent reductions of sulfur dioxide emissions and the 24–hr daily arithmetic average for concentrations of nitrogen oxides.

(c) Calculate the 4–hour block or 24–hour daily arithmetic averages specified in Table 1 to Subpart VVVV (as applicable) from 1–hour arithmetic averages expressed in parts per million by volume corrected to 7 percent oxygen (dry basis) for concentrations of carbon monoxide. CEMS data during warmup, startup, and shutdown, as defined in this subpart, are not corrected to 7 percent oxygen, and are used as measured.

(d) If you elect to continuously monitor emissions of particulate matter, mercury, cadmium, lead, or hydrogen chloride, use EPA Reference Method 19, section 12.4.1, in appendix A of this part, to calculate a 24–hour daily block arithmetic average for emission concentrations.

<Subpart added by 91 FR 11833, effective May 11, 2026.>

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022; 91 FR 11833, March 10, 2026, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. § 60.6145

# § 60.6145 What definitions apply to this subpart?

Effective: May 11, 2026
Currentness

Terms used but not defined in this section are defined in the CAA and in subparts A and B of this part.

Administrator means:

(1) For approved and effective state plans, the Director of the state air pollution control agency, or employee of the state air pollution control agency that is delegated the authority to perform the specified task;

(2) For federal plans, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task; and

(3) For NSPS, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task.

Air curtain incinerator means an incinerator that operates by forcefully projecting a curtain of air across an open chamber or pit in which burning occurs. Incinerators of that type can be constructed above or below ground and with or without refractory walls and floor.

Batch municipal waste combustor means a municipal waste combustor designed so it cannot combust municipal solid waste continuously 24 hours per day because the design does not allow waste to be fed to the unit or ash to be removed during combustion.

Bubbling fluidized bed combustor means a fluidized bed combustor in which the majority of the bed material remains in a fluidized state in the primary combustion zone.

Calendar quarter means a consecutive 3–month period (nonoverlapping) beginning on January 1, April 1, July 1, and October 1.

Calendar year means the period including 365 days starting January 1 and ending on December 31.

CEMS means continuous emissions monitoring system.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

CEMS data during warmup, startup, and shutdown means CEMS data collected during periods of operation defined within this subpart as warmup, startup or shutdown.

Chief facility operator means the person in direct charge and control of the operation of a municipal waste combustor and who is responsible for daily onsite supervision, technical direction, management, and overall performance of the facility.

Circulating fluidized bed combustor means a fluidized bed combustor in which the majority of the fluidized bed material is carried out of the primary combustion zone and is transported back to the primary zone through a recirculation loop.

Clean wood means untreated wood or untreated wood products including clean or untreated lumber (as defined in this subpart), tree stumps (whole or chipped), and tree limbs (whole or chipped). Clean wood does not include yard waste, which is defined elsewhere in this section, wood products that have been painted, pigment-stained, or pressure-treated by compounds such as chromate copper arsenate, pentachlorophenol, and creosote, or construction, renovation, and demolition wastes (including but not limited to railroad ties and telephone poles), which are exempt from the definition of municipal solid waste in this section.

Cofired combustor means a unit combusting municipal solid waste with nonmunicipal solid waste fuel (e.g., coal, industrial process waste) and subject to a federally enforceable permit limiting the unit to combusting a fuel feed stream, 30 percent or less of the weight of which is comprised, in aggregate, of municipal solid waste as measured on a calendar quarter basis.

Continuous automated sampling system means the total equipment and procedures for automated sample collection and sample recovery/analysis to determine a pollutant concentration or emission rate by collecting a single or multiple integrated sample(s) of the pollutant (or diluent gas) for subsequent on-or off-site analysis; integrated sample(s) collected are representative of the emissions for the sample time as specified by the applicable requirement.

Continuous emission monitoring system means a monitoring system that continuously measures the emissions of a pollutant from an affected facility.

Digital camera opacity technique conditions mean the following four conditions that must be followed if ASTM D7520–16, “Standard Test Method for Determining the Opacity of a Plume in the Outdoor Ambient Atmosphere” is used as an alternative to EPA Method 9:

(1) During the digital camera opacity technique (DCOT) certification procedure outlined in Section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand).

(2) You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in Section 8.1 of ASTM D7520–16.

(3) You must follow the record keeping procedures outlined in 40 CFR 63.10(b)(1) for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination.

(4) You or the DCOT vendor must have a minimum of 4 independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of anyone reading and the average error must not exceed 7.5 percent opacity.

Dioxins/furans mean tetra- through octa- chlorinated dibenzo-p-dioxins and dibenzofurans. For the purposes of this subpart, dioxins/furans emission limits are expressed on a total mass basis.

EPA means the Administrator of the U.S. EPA or employee of the U.S. EPA who is delegated to perform the specified task.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Federally enforceable means all limitations and conditions that are enforceable by EPA including the requirements of 40 CFR part 60, 40 CFR part 61, and 40 CFR part 63, requirements within any applicable state implementation plan, and any permit requirements established under 40 CFR 52.21 or under 40 CFR 51.165 and 40 CFR 51.166.

First half of the calendar year means the period starting on January 1 and ending on June 30 in any year.

Four-hour block average or 4–hour block average means the average of all hourly emission concentrations when the affected facility is operating and combusting municipal solid waste measured over 4–hour periods from:

(1) 12:00 midnight to 4:00 a.m.

(2) 4:00 a.m. to 8:00 a.m.

(3) 8:00 a.m. to 12:00 noon.

(4) 12:00 noon to 4:00 p.m.

(5) 4:00 p.m. to 8:00 p.m.

(6) 8:00 p.m. to 12:00 midnight.

Mass burn refractory municipal waste combustor means a field-erected combustor that combusts municipal solid waste in a refractory wall furnace. Unless otherwise specified, this includes combustors with a cylindrical rotary refractory wall furnace.

Mass burn rotary waterwall municipal waste combustor means a field-erected combustor that combusts municipal solid waste in a cylindrical rotary waterwall furnace or on a tumbling-tile grate.

Mass burn waterwall municipal waste combustor means a field-erected combustor that combusts municipal solid waste in a waterwall furnace.

Materials separation plan means a plan that identifies both a goal and an approach for separating certain components of municipal solid waste for a given service area in order to make the separated materials available for recycling. A materials separation plan may include elements such as dropoff facilities, buy-back or deposit-return incentives, curbside pickup programs, or centralized mechanical separation systems. A materials separation plan may include different goals or approaches for different subareas in the service area, and may include no materials separation activities for certain subareas or, if warranted, an entire service area.

Maximum demonstrated municipal waste combustor load means the highest 4–hour arithmetic average municipal waste combustor load achieved during four consecutive hours during the most recent dioxins/furans performance test demonstrating compliance with the applicable limit for municipal waste combustor organics specified under § 60.52b.

Maximum demonstrated particulate matter control device temperature means the highest 4–hour arithmetic average flue gas temperature measured at the particulate matter control device inlet during four consecutive hours during the most recent dioxins/furans performance test demonstrating compliance with the applicable limit for municipal waste combustor organics specified under § 60.52b.

Modification or modified municipal waste combustor means a municipal waste combustor you have changed after September 10, 2026 and that meets one of two criteria:


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(1) The cumulative cost of the changes over the life of the unit exceeds 50 percent of the original cost of construction and installation the unit (not including the cost of any land purchased in connection with such construction or installation) updated to current costs.

(2) Any physical change in the municipal waste combustor or change in the method of operating the municipal waste combustor that increases the amount of any air pollutant emitted by the unit for which standards have been established under section 129 or section 111 of the CAA. Increases in the amount of any air pollutant emitted by the municipal waste combustor are determined when the municipal waste combustor operates at 100 percent of its physical load capability and are measured downstream of all air pollution control devices. Load restrictions based on permits or other nonphysical operational restrictions cannot be considered in the determination.

Modular excess-air municipal waste combustor means a combustor that combusts municipal solid waste, is not field-erected, and has multiple combustion chambers, all of which are designed to operate at conditions with combustion air amounts in excess of theoretical air requirements.

Modular starved-air municipal waste combustor means a combustor that combusts municipal solid waste, is not field-erected, and has multiple combustion chambers in which the primary combustion chamber is designed to operate at substoichiometric conditions.

Municipal solid waste or municipal-type solid waste or MSW means household, commercial/retail, or institutional waste. Household waste includes material discarded by single and multiple residential dwellings, hotels, motels, and other similar permanent or temporary housing establishments or facilities. Commercial/retail waste includes material discarded by stores, offices, restaurants, warehouses, nonmanufacturing activities at industrial facilities, and other similar establishments or facilities. Institutional waste includes materials discarded by schools, nonmedical waste discarded by hospitals, material discarded by nonmanufacturing activities at prisons and government facilities, and material discarded by other similar establishments or facilities. Household, commercial/retail, and institutional waste does not include used oil; sewage sludge; wood pallets; construction, renovation, and demolition wastes (which includes but is not limited to railroad ties and telephone poles); clean wood; industrial process or manufacturing wastes; medical waste; or motor vehicles (including motor vehicle parts or vehicle fluff). Household, commercial/retail, and institutional wastes include:

(1) Yard waste;

(2) Refuse-derived fuel; and

(3) Motor vehicle maintenance materials limited to vehicle batteries and tires except as specified in § 60.5700(d).

Municipal waste combustor, or MWC, means any setting or equipment that combusts solid, liquid, or gasified municipal solid waste including, but not limited to, field-erected combustion units (with or without heat recovery), modular incinerators (starved-air or excess-air), boilers (i.e., steam generating units), furnaces (whether suspension-fired, grate-fired, mass-fired, air curtain incinerators, or fluidized bed-fired), and pyrolysis/combustion units. Two criteria further define municipal waste combustors:

(1) Municipal waste combustors do not include pyrolysis or combustion units located at a plastics or rubber recycling unit as specified under Applicability (§ 60.5700(h) and (i)). Municipal waste combustors also do not include cement kilns firing municipal solid waste as specified under Applicability (§ 60.5700(j)). Municipal waste combustors also do not include internal combustion engines, gas turbines, or other combustion devices that combust landfill gases collected by landfill gas collection systems.

(2) The boundaries of a municipal waste combustor are defined as follows. The municipal waste combustor includes, but is not limited to, the municipal solid waste fuel feed system, grate system, flue gas system, bottom ash system, and the combustor


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

water system. The municipal waste combustor boundary starts at the municipal solid waste pit or hopper and extends through three areas:

(i) The combustor flue gas system, which ends immediately following the heat recovery equipment or, if there is no heat recovery equipment, immediately following the combustion chamber.

(ii) The combustor bottom ash system, which ends at the truck loading station or similar ash handling equipment that transfers the ash to final disposal. It includes all ash handling systems connected to the bottom ash handling system.

(iii) The combustor water system, which starts at the feed water pump and ends at the piping that exits the steam drum or superheater.

(3) The municipal waste combustor does not include air pollution control equipment, the stack, water treatment equipment, or the turbine-generator set.

Municipal waste combustor capacity means the maximum charging rate of a municipal waste combustor expressed in tons per day of municipal solid waste combusted, calculated according to the procedures under § 60.6015. Section 60.6015 includes procedures for determining municipal waste combustor capacity for continuous and batch feed municipal waste combustors.

Municipal waste combustor load means the steam load of the municipal waste combustor measured as specified in § 60.5995.

Particulate matter means total particulate matter emitted from municipal waste combustors as measured using EPA Reference Method 5 (see § 60.5975)

Plastics/rubber recycling unit means an integrated processing unit for which plastics, rubber, or rubber tires are the only feed materials (incidental contaminants may be in the feed materials). The feed materials are processed into a chemical plant feedstock or petroleum refinery feedstock, where the feedstock is marketed to and used by a chemical plant or petroleum refinery as input feedstock. The following three criteria further define a plastics/rubber recycling unit:

(1) Each calendar quarter, the combined weight of the chemical plant feedstock and petroleum refinery feedstock that a plastics/rubber recycling unit produces must be more than 70 percent of the combined weight of the plastics, rubber, and rubber tires that the plastics/rubber recycling unit processes.

(2) The plastics, rubber, or rubber tires fed to the plastics/rubber recycling unit may originate from separating or diverting plastics, rubber, or rubber tires from MSW or industrial solid waste. The feed materials may include manufacturing scraps, trimmings, and off-specification plastics, rubber, and rubber tire discards.

(3) The plastics, rubber, and rubber tires fed to the plastics/rubber recycling unit may contain incidental contaminants (e.g., paper labels on plastic bottles, metal rings on plastic bottle caps).

Pulverized coal/refuse-derived fuel mixed fuel-fired combustor means a combustor that fires coal and refuse-derived fuel simultaneously, in which pulverized coal is introduced into an air stream that carries the coal to the combustion chamber of the unit where it is fired in suspension. This includes both conventional pulverized coal and micropulverized coal.

Pyrolysis/combustion unit means a unit that produces gases, liquids, or solids by heating municipal solid waste. The gases, liquids, or solids produced are combusted and the emissions vented to the atmosphere.

Reconstruction means rebuilding a municipal waste combustor for which the reconstruction commenced after September 10, 2026 and the cumulative costs of the construction over the life of the unit exceed 50 percent of the original cost of construction


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

and installation of the unit (not including any cost of land purchased in connection with such construction or installation) updated to current costs (current dollars).

Refractory unit or refractory wall furnace means a combustion unit that has no energy recovery (e.g., via a waterwall) in the furnace (i.e., radiant heat transfer section) of the combustor.

Refuse-derived fuel means a type of municipal solid waste produced by processing municipal solid waste through shredding and size classification. This includes all classes of refuse-derived fuel including two fuels:

(1) Low-density fluff refuse-derived fuel through densified refuse-derived fuel.

(2) Pelletized refuse-derived fuel.

Refuse-derived fuel stoker means a steam generating unit that combusts refuse-derived fuel in a semi suspension firing mode using air-fed distributors.

Same location means the same or contiguous properties under common ownership or control, including those separated only by a street, road, highway, or other public right-of-way. Common ownership or control includes properties that are owned, leased, or operated by the same entity, parent entity, subsidiary, subdivision, or any combination thereof. Entities may include a municipality, other governmental unit, or any quasi-governmental authority (e.g., a public utility district or regional authority for waste disposal).

Second half of the calendar year means the period that starting July 1 and ending on December 31 in any year.

Shift supervisor means the person who is in direct charge and control of operating a municipal waste combustor and who is responsible for onsite supervision, technical direction, management, and overall performance of the municipal waste combustor during an assigned shift.

Shutdown means the period of time following cessation of charging waste to the combustion grate prior to entering a period where the municipal waste combustor is not operating. Shutdown may be claimed for up to three hours of operation per occurrence.

Spreader stoker coal/refuse-derived fuel mixed fuel-fired combustor means a combustor that combusts coal and refuse-derived fuel simultaneously, in which coal is introduced to the combustion zone by a mechanism that throws the fuel onto a grate from above. Combustion takes place both in suspension and on the grate.

Standard conditions means a temperature of 20 °C and a pressure of 101.3 kilopascals.

Startup means the period of time after warmup when waste is introduced to the combustion grate but prior to steady state operation. Startup may be claimed for up to three hours of operation per occurrence.

Total mass dioxins/furans or total mass means the total mass of tetra-through octa- chlorinated dibenzo-p-dioxins and dibenzofurans as determined using EPA Reference Method 23 and the procedures specified in § 60.5975

Tumbling-tile means a grate tile hinged at one end and attached to a ram at the other end. When the ram extends, the grate tile rotates around the hinged end.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Twenty-four hour daily average or 24–hour daily average means either the arithmetic mean or geometric mean (as specified) of all hourly emission concentrations when the affected facility operates and combusts municipal solid waste measured over a 24–hour period between 12:00 midnight and the following midnight.

Untreated lumber or clean lumber means wood or wood products that have been cut or shaped and include wet, air-dried, and kiln-dried wood products. Untreated lumber does not include wood products that have been painted, pigment-stained, or "pressure-treated". Pressure-treating compounds include, but are not limited to, chromate copper arsenate, pentachlorophenol, and creosote.

Warmup means the period of time during the first hours of a municipal waste combustor operation from a cold start until waste is fed to the combustor and has no time constraints. No waste is introduced to the combustion grate during warmup.

Waterwall furnace means a combustion unit having energy (heat) recovery in the furnace (i.e., radiant heat transfer section) of the combustor.

Yard waste means grass, grass clippings, bushes, shrubs, and clippings from bushes and shrubs. They come from residential, commercial/retail, institutional, or industrial sources as part of maintaining yards or other private or public lands. Yard waste does not include two items:

(1) Construction, renovation, and demolition wastes that are exempt from the definition of "municipal solid waste" in this section.

(2) Clean wood that is exempt from the definition of "municipal solid waste" in this section.

<Subpart added by 91 FR 11833, effective May 11, 2026.>

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022; 91 FR 11833, March 10, 2026, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. § 60.6685

# § 60.6685 What definitions apply to this subpart?

Effective: May 11, 2026
Currentness

Terms used but not defined in this section are defined in the CAA and in subparts A and Ba of this part.

Administrator means:

(1) For approved and effective state plans, the Director of the state air pollution control agency, or employee of the state air pollution control agency that is delegated the authority to perform the specified task;

(2) For federal plans, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task; and

(3) For NSPS, the Administrator of the EPA, an employee of the EPA, the Director of the state air pollution control agency, or employee of the state air pollution control agency to whom the authority has been delegated by the Administrator of the EPA to perform the specified task.

Air curtain incinerator means an incinerator that operates by forcefully projecting a curtain of air across an open chamber or pit in which burning occurs. Incinerators of that type can be constructed above or below ground and with or without refractory walls and floor.

Batch municipal waste combustor means a municipal waste combustor designed so it cannot combust municipal solid waste continuously 24 hours per day because the design does not allow waste to be fed to the unit or ash to be removed during combustion.

Bubbling fluidized bed combustor means a fluidized bed combustor in which the majority of the bed material remains in a fluidized state in the primary combustion zone.

Calendar quarter means a consecutive 3–month period (nonoverlapping) beginning on January 1, April 1, July 1, and October 1.

Calendar year means the period including 365 days starting January 1 and ending on December 31.

CEMS means continuous emissions monitoring system.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

CEMS data during warmup, startup, and shutdown means CEMS data collected during periods of operation defined within this subpart as warmup, startup or shutdown.

Chief facility operator means the person in direct charge and control of the operation of a municipal waste combustor and who is responsible for daily onsite supervision, technical direction, management, and overall performance of the facility.

Circulating fluidized bed combustor means a fluidized bed combustor in which the majority of the fluidized bed material is carried out of the primary combustion zone and is transported back to the primary zone through a recirculation loop.

Clean wood means untreated wood or untreated wood products including clean or untreated lumber (as defined in this subpart), tree stumps (whole or chipped), and tree limbs (whole or chipped). Clean wood does not include yard waste, which is defined elsewhere in this section, wood products that have been painted, pigment-stained, or pressure-treated by compounds such as chromate copper arsenate, pentachlorophenol, and creosote, or construction, renovation, and demolition wastes (including but not limited to railroad ties and telephone poles), which are exempt from the definition of municipal solid waste in this section.

Cofired combustor means a unit combusting municipal solid waste with nonmunicipal solid waste fuel (e.g., coal, industrial process waste) and subject to a federally enforceable permit limiting the unit to combusting a fuel feed stream, 30 percent or less of the weight of which is comprised, in aggregate, of municipal solid waste as measured on a calendar quarter basis.

Continuous automated sampling system means the total equipment and procedures for automated sample collection and sample recovery/analysis to determine a pollutant concentration or emission rate by collecting a single or multiple integrated sample(s) of the pollutant (or diluent gas) for subsequent on-or off-site analysis; integrated sample(s) collected are representative of the emissions for the sample time as specified by the applicable requirement.

Continuous emission monitoring system means a monitoring system that continuously measures the emissions of a pollutant from an affected facility.

Dioxins/furans mean tetra- through octa- chlorinated dibenzo-p-dioxins and dibenzofurans. For the purposes of this subpart, dioxins/furans emission limits are expressed on a total mass basis.

Digital camera opacity technique conditions mean the following four conditions that must be followed if ASTM D7520–16, “Standard Test Method for Determining the Opacity of a Plume in the Outdoor Ambient Atmosphere” (incorporated by reference, see § 60.17), is used as an alternative to EPA Method 9:

(1) During the digital camera opacity technique (DCOT) certification procedure outlined in section 9.2 of ASTM D7520–16, you or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand).

(2) You must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in section 8.1 of ASTM D7520–16.

(3) You must follow the record keeping procedures outlined in 40 CFR 63.10(b)(1) for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination.

(4) You or the DCOT vendor must have a minimum of 4 independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of anyone reading and the average error must not exceed 7.5 percent opacity.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

EPA means the Administrator of the U.S. EPA or employee of the U.S. EPA who is delegated to perform the specified task.

Federally enforceable means all limitations and conditions that are enforceable by EPA including the requirements of 40 CFR part 60, 40 CFR part 61, and 40 CFR part 63, requirements within any applicable state implementation plan, and any permit requirements established under 40 CFR 52.21 or under 40 CFR 51.165 and 40 CFR 51.166.

First half of the calendar year means the period starting on January 1 and ending on June 30 in any year.

Four-hour block average or 4–hour block average means the average of all hourly emission concentrations when the affected facility is operating and combusting municipal solid waste measured over 4–hour periods from:

(1) 12:00 midnight to 4:00 a.m.

(2) 4:00 a.m. to 8:00 a.m.

(3) 8:00 a.m. to 12:00 noon.

(4) 12:00 noon to 4:00 p.m.

(5) 4:00 p.m. to 8:00 p.m.

(6) 8:00 p.m. to 12:00 midnight.

Mass burn refractory municipal waste combustor means a field-erected combustor that combusts municipal solid waste in a refractory wall furnace. Unless otherwise specified, this includes combustors with a cylindrical rotary refractory wall furnace.

Mass burn rotary waterwall municipal waste combustor means a field-erected combustor that combusts municipal solid waste in a cylindrical rotary waterwall furnace or on a tumbling-tile grate.

Mass burn waterwall municipal waste combustor means a field-erected combustor that combusts municipal solid waste in a waterwall furnace.

Materials separation plan means a plan that identifies both a goal and an approach for separating certain components of municipal solid waste for a given service area in order to make the separated materials available for recycling. A materials separation plan may include elements such as dropoff facilities, buy-back or deposit-return incentives, curbside pickup programs, or centralized mechanical separation systems. A materials separation plan may include different goals or approaches for different subareas in the service area, and may include no materials separation activities for certain subareas or, if warranted, an entire service area.

Maximum demonstrated municipal waste combustor load means the highest 4–hour arithmetic average municipal waste combustor load achieved during four consecutive hours during the most recent dioxins/furans performance test demonstrating compliance with the applicable limit for municipal waste combustor organics specified under § 60.6450.

Maximum demonstrated particulate matter control device temperature means the highest 4–hour arithmetic average flue gas temperature measured at the particulate matter control device inlet during four consecutive hours during the most recent dioxins/furans performance test demonstrating compliance with the applicable limit for municipal waste combustor organics specified under § 60.6450.

Modification or modified municipal waste combustor means a municipal waste combustor you have changed after September 10, 2026 and that meets one of two criteria:


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(1) The cumulative cost of the changes over the life of the unit exceeds 50 percent of the original cost of construction and installation the unit (not including the cost of any land purchased in connection with such construction or installation) updated to current costs.

(2) Any physical change in the municipal waste combustor or change in the method of operating the municipal waste combustor that increases the amount of any air pollutant emitted by the unit for which standards have been established under section 129 or section 111 of the CAA. Increases in the amount of any air pollutant emitted by the municipal waste combustor are determined when the municipal waste combustor operates at 100 percent of its physical load capability and are measured downstream of all air pollution control devices. Load restrictions based on permits or other nonphysical operational restrictions cannot be considered in the determination.

Modular excess-air municipal waste combustor means a combustor that combusts municipal solid waste, is not field-erected, and has multiple combustion chambers, all of which are designed to operate at conditions with combustion air amounts in excess of theoretical air requirements.

Modular starved-air municipal waste combustor means a combustor that combusts municipal solid waste, is not field-erected, and has multiple combustion chambers in which the primary combustion chamber is designed to operate at substoichiometric conditions.

Municipal solid waste or municipal-type solid waste or MSW means household, commercial/retail, or institutional waste. Household waste includes material discarded by single and multiple residential dwellings, hotels, motels, and other similar permanent or temporary housing establishments or facilities. Commercial/retail waste includes material discarded by stores, offices, restaurants, warehouses, nonmanufacturing activities at industrial facilities, and other similar establishments or facilities. Institutional waste includes materials discarded by schools, nonmedical waste discarded by hospitals, material discarded by nonmanufacturing activities at prisons and government facilities, and material discarded by other similar establishments or facilities. Household, commercial/retail, and institutional waste does not include used oil; sewage sludge; wood pallets; construction, renovation, and demolition wastes (which includes but is not limited to railroad ties and telephone poles); clean wood; industrial process or manufacturing wastes; medical waste; or motor vehicles (including motor vehicle parts or vehicle fluff). Household, commercial/retail, and institutional wastes include:

(1) Yard waste;

(2) Refuse-derived fuel; and

(3) Motor vehicle maintenance materials limited to vehicle batteries and tires except as specified in § 60.6305(d).

Municipal waste combustor, or MWC, means any setting or equipment that combusts solid, liquid, or gasified municipal solid waste including, but not limited to, field-erected combustion units (with or without heat recovery), modular incinerators (starved-air or excess-air), boilers (i.e., steam generating units), furnaces (whether suspension-fired, grate-fired, mass-fired, air curtain incinerators, or fluidized bed-fired), and pyrolysis/combustion units. Two criteria further define municipal waste combustors:

(1) Municipal waste combustors do not include pyrolysis or combustion units located at a plastics or rubber recycling unit as specified under Applicability (§ 60.6305(h) and (i)). Municipal waste combustors also do not include cement kilns firing municipal solid waste as specified under Applicability (§ 60.6305(j)). Municipal waste combustors also do not include internal combustion engines, gas turbines, or other combustion devices that combust landfill gases collected by landfill gas collection systems.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(2) The boundaries of a municipal waste combustor are defined as follows. The municipal waste combustor includes, but is not limited to, the municipal solid waste fuel feed system, grate system, flue gas system, bottom ash system, and the combustor water system. The municipal waste combustor boundary starts at the municipal solid waste pit or hopper and extends through three areas:

(i) The combustor flue gas system, which ends immediately following the heat recovery equipment or, if there is no heat recovery equipment, immediately following the combustion chamber.

(ii) The combustor bottom ash system, which ends at the truck loading station or similar ash handling equipment that transfers the ash to final disposal. It includes all ash handling systems connected to the bottom ash handling system.

(iii) The combustor water system, which starts at the feed water pump and ends at the piping that exits the steam drum or superheater.

(3) The municipal waste combustor does not include air pollution control equipment, the stack, water treatment equipment, or the turbine-generator set.

Municipal waste combustor capacity means the maximum charging rate of a municipal waste combustor expressed in tons per day of municipal solid waste combusted, calculated according to the procedures under § 60.6570. Section 60.6570 includes procedures for determining municipal waste combustor capacity for continuous and batch feed municipal waste combustors.

Municipal waste combustor load means the steam load of the municipal waste combustor measured as specified in § 60.6550.

Particulate matter means total particulate matter emitted from municipal waste combustors as measured using EPA Reference Method 5 (see § 60.6530)

Plastics/rubber recycling unit means an integrated processing unit for which plastics, rubber, or rubber tires are the only feed materials (incidental contaminants may be in the feed materials). The feed materials are processed into a chemical plant feedstock or petroleum refinery feedstock, where the feedstock is marketed to and used by a chemical plant or petroleum refinery as input feedstock. The following three criteria further define a plastics/rubber recycling unit:

(1) Each calendar quarter, the combined weight of the chemical plant feedstock and petroleum refinery feedstock that a plastics/rubber recycling unit produces must be more than 70 percent of the combined weight of the plastics, rubber, and rubber tires that the plastics/rubber recycling unit processes.

(2) The plastics, rubber, or rubber tires fed to the plastics/rubber recycling unit may originate from separating or diverting plastics, rubber, or rubber tires from MSW or industrial solid waste. The feed materials may include manufacturing scraps, trimmings, and off-specification plastics, rubber, and rubber tire discards.

(3) The plastics, rubber, and rubber tires fed to the plastics/rubber recycling unit may contain incidental contaminants (e.g., paper labels on plastic bottles, metal rings on plastic bottle caps).

Pulverized coal/refuse-derived fuel mixed fuel-fired combustor means a combustor that fires coal and refuse-derived fuel simultaneously, in which pulverized coal is introduced into an air stream that carries the coal to the combustion chamber of the unit where it is fired in suspension. This includes both conventional pulverized coal and micropulverized coal.

Pyrolysis/combustion unit means a unit that produces gases, liquids, or solids by heating municipal solid waste. The gases, liquids, or solids produced are combusted and the emissions vented to the atmosphere.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Reconstruction means rebuilding a municipal waste combustor for which the reconstruction commenced after September 10, 2026 and the cumulative costs of the construction over the life of the unit exceed 50 percent of the original cost of construction and installation of the unit (not including any cost of land purchased in connection with such construction or installation) updated to current costs (current dollars).

Refractory unit or refractory wall furnace means a combustion unit that has no energy recovery (e.g., via a waterwall) in the furnace (i.e., radiant heat transfer section) of the combustor.

Refuse-derived fuel means a type of municipal solid waste produced by processing municipal solid waste through shredding and size classification. This includes all classes of refuse-derived fuel including two fuels:

(1) Low-density fluff refuse-derived fuel through densified refuse-derived fuel.

(2) Pelletized refuse-derived fuel.

Refuse-derived fuel stoker means a steam generating unit that combusts refuse-derived fuel in a semisuspension firing mode using air-fed distributors.

Same location means the same or contiguous properties under common ownership or control, including those separated only by a street, road, highway, or other public right-of-way. Common ownership or control includes properties that are owned, leased, or operated by the same entity, parent entity, subsidiary, subdivision, or any combination thereof. Entities may include a municipality, other governmental unit, or any quasi-governmental authority (e.g., a public utility district or regional authority for waste disposal).

Second half of the calendar year means the period starting July 1 and ending on December 31 in any year.

Semi-suspension refuse-derived fuel-fired combustor/wet refuse-derived fuel process conversion means a combustion unit that was converted from a wet refuse-derived fuel process to a dry refuse-derived fuel process, and because of constraints in the design of the system, includes a low furnace height (less than 60 feet between the grate and the roof) and a high waste capacity-to-undergrate air zone ratio (greater than 300 tons of waste per day (tpd) fuel per each undergrate air zone).

Shift supervisor means the person who is in direct charge and control of operating a municipal waste combustor and who is responsible for onsite supervision, technical direction, management, and overall performance of the municipal waste combustor during an assigned shift.

Shutdown means the period of time following cessation of charging waste to the combustion grate prior to entering a period where the municipal waste combustor is not operating. Shutdown may be claimed for up to three hours of operation per occurrence.

Spreader stoker coal/refuse-derived fuel mixed fuel-fired combustor means a combustor that combusts coal and refuse-derived fuel simultaneously, in which coal is introduced to the combustion zone by a mechanism that throws the fuel onto a grate from above. Combustion takes place both in suspension and on the grate.

Spreader stoker fixed floor refuse-derived fuel-fired combustor/100 percent coal capable means a spreader stoker type combustor with a fixed floor grate design that typically fires 100 percent refuse-derived fuel but is equipped to burn 100 percent coal instead of refuse-derived fuel to fulfill 100 percent steam or energy demand.

Standard conditions means a temperature of 20 °C and a pressure of 101.3 kilopascals.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Startup means the period of time after warmup when waste is introduced to the combustion grate but prior to steady state operation. Startup may be claimed for up to three hours of operation per occurrence.

Total mass dioxins/furans or total mass means the total mass of tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans as determined using EPA Reference Method 23 and the procedures specified in § 60.6530.

Tumbling-tile means a grate tile hinged at one end and attached to a ram at the other end. When the ram extends, the grate tile rotates around the hinged end.

Twenty-four hour daily average or 24–hour daily average means either the arithmetic mean or geometric mean (as specified) of all hourly emission concentrations when the affected facility operates and combusts municipal solid waste measured over a 24–hour period between 12:00 midnight and the following midnight.

Untreated lumber or clean lumber means wood or wood products that have been cut or shaped and include wet, air-dried, and kiln-dried wood products. Untreated lumber does not include wood products that have been painted, pigment-stained, or "pressure-treated". Pressure-treating compounds include, but are not limited to, chromate copper arsenate, pentachlorophenol, and creosote.

Warmup means the period of time during the first hours of a municipal waste combustor operation from a cold start until waste is fed to the combustor and has no time constraints. No waste is introduced to the combustion grate during warmup.

Waterwall furnace means a combustion unit having energy (heat) recovery in the furnace (i.e., radiant heat transfer section) of the combustor.

Yard waste means grass, grass clippings, bushes, shrubs, and clippings from bushes and shrubs. They come from residential, commercial/retail, institutional, or industrial sources as part of maintaining yards or other private or public lands. Yard waste does not include two items:

(1) Construction, renovation, and demolition wastes that are exempt from the definition of "municipal solid waste" in this section.

(2) Clean wood that is exempt from the definition of "municipal solid waste" in this section.

**Table 1 to Subpart WWWW of Part 60—Model Rule—Compliance Schedules and Increments of Progress**

| Affected units | Increment 1 (submit final control plan) | Increment 2 (award contracts) | Increment 3 (begin onsite construction) | Increment 4 (complete onsite construction) | Increment 5 (final compliance) |
|---|---|---|---|---|---|


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | | | | |
|---|---|---|---|---|---|
| 1. All municipal waste combustors.[a] | (Dates to be specified in state plan) | (Dates to be specified in state plan) | (Dates to be specified in state plan) | (Dates to be specified in state plan) | (Dates to be specified in state plan).[b] |

**Table 2 to Subpart WWWW—Municipal Waste Combustor Carbon Monoxide Guidelines**

**[Parts per million by volume]**

| Municipal waste combustor technology | The following emission limits and averaging times apply . . . | |
|---|---|---|
| | Carbon monoxide emission limit (parts per million by volume)[b] | Averaging time (hours)[b] |
| Mass burn waterwall | 100 | 4 |
| Mass burn refractory | 100 | 4 |
| Mass burn rotary refractory | 110 | 24 |
| Mass burn rotary waterwall | 110 | 24 |
| Modular starved air | 50 | 4 |
| Modular excess air | 50 | 4 |
| Refuse-derived fuel stoker | 110 | 24 |
| Fluidized bed, mixed fuel (wood/refuse-derived fuel) | 110 | 24 |
| Bubbling fluidized bed combustor | 100 | 4 |
| Circulating fluidized bed combustor | 100 | 4 |
| Pulverized coal/refuse-derived fuel mixed fuel-fired combustor | 110 | 4 |
| Spreader stoker coal/refuse-derived fuel mixed fuel-fired combustor | 110 | 24 |
| Semi-suspension refuse-derived fuel-fired combustor/wet refuse-derived fuel process conversion | 250 | [c] 24 |
| Spreader stoker fixed floor refuse-derived fuel-fired combustor/100 percent coal capable | 250 | [c] 24 |

**Table 3 to Subpart WWWW of Part 60—**


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Model Rule—Emission Limits for Existing Large Municipal Waste Combustors**

| For the air pollutant . . . | For this combustor type . . . | You must meet this emission limit, corrected to 7 percent oxygen[a] |
|---|---|---|
| Particulate matter | All | 20 mg/dscm. |
| Opacity | All | 10 percent opacity (6-minute block average). |
| Cadmium | All | 10 ug/dscm. |
| Lead | All | 68 ug/dscm. |
| Mercury | All | 50 ug/dscm or 85 percent reduction by weight. |
| Sulfur dioxide | All | 22 parts per million by volume dry basis or 75 percent reduction by weight or volume (daily 24-hr geometric average). |
| Nitrogen oxide[b] | Mass burn waterwall | 205 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Mass burn rotary | 150 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Refuse-derived fuel stoker | 160 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Refuse-derived fuel spreader stoker and semi-suspension | 160 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Refuse-derived fuel fluidized bed | 180 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| Hydrogen chloride | All | 10 parts per million by volume dry basis or 96 percent reduction by weight or volume. |
| Dioxins/furans | All | 14 nanograms per dry standard cubic meter (total mass). |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Table 4 to Subpart WWWW of Part 60—Requirements for Continuous Emission Monitoring Systems (CEMS)**

| For the following pollutants | Use the following span values for your CEMS | Use the following performance specifications for your CEMS | During each relative accuracy test run, use the following methods to collect concurrent data |
|---|---|---|---|
| 1. Particulate Matter | | For operation and correlation test, P.S. 11 in appendix B of this part and procedure 2 of appendix F to this part<br><br>For quarterly accuracy determinations, daily calibration drift tests, and each response correlation audit or relative response audit, procedure 2 of appendix F to this part. | Follow the test methods in Table 5 to Subpart WWWW. |
| 2. Nitrogen Oxides | Control device outlet: 125 percent of the maximum estimated hourly nitrogen oxides emissions of the municipal waste combustor | For operation, P.S. 2 in appendix B of this part and procedure 1 in appendix F of this part | Method 7, 7A, 7C, 7D, or 7E in appendix A-4 to part 60 of this chapter. |
| For relative accuracy audit, P.S. 2 in | | | |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| appendix B of this part and procedure 1 of appendix F of this part | | | |
| | | For quarterly accuracy determinations and daily calibration drift tests, procedure 1 in appendix F of this part | |
| 3. Sulfur Dioxide | Control device outlet: 50 percent of the maximum estimated hourly sulfur dioxide emissions of the municipal waste combustor | For operation, P.S. 2 in appendix B of this part | Method 6, 6A, or 6C, in appendix A-4 to part 60 of this chapter. |
| For relative accuracy audit, P.S. 2 in appendix B of this part and procedure 1 of appendix F of this part | | | |
| | | For quarterly accuracy determinations and daily calibration drift tests, procedure 1 in appendix F of this part. | |
| 4. Carbon Monoxide | 125 percent of the maximum estimated hourly carbon with monoxide emissions of the municipal waste combustor | For operation, P.S. 4A in appendix B of this part and procedure 1 of appendix F of this part | Method 10, 10A, or 10B in appendix A-4 to part 60 of this chapter. |
| For relative accuracy audit, P.S. 4A in appendix B of this part and | | | |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| procedure 1 of appendix F of this part | | | |
| | | For quarterly accuracy determinations and daily calibration drift tests, procedure 1 in appendix F of this part. | |
| 5. Oxygen or Carbon Dioxide | 25 percent oxygen or 20 percent carbon dioxide | P.S. 3 in appendix B of this part | Method 3A or 3B in appendix A-2 to part 60 of this chapter, or, as an alternative for oxygen or carbon dioxide correction, the manual method portion of ASME PTC-19-10-1981—part 10. |
| 6. Mercury | Follow the approved site-specific monitoring plan | For operation, P.S. 12A in appendix B of this part and procedure 5 of appendix F of this part or the approved site-specific monitoring plan | Follow the test methods in Table 5 to Subpart WWWW. |
| | | For relative accuracy audit, daily calibration, weekly system integrity check, quarterly audit, procedure 5 of appendix F of this part | |
| 7. Hydrogen chloride | Follow the approved site-specific monitoring plan | For operation, P.S. 18 in appendix B of this part and procedure 6 of appendix F of this part or the approved | Follow the test methods in Table 5 to Subpart WWWW, except you may also use Methods 320 or |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| | | site-specific monitoring plan | 321 of appendix A to part 63. |
| For relative accuracy audit, daily calibration, quarterly audit, and other applicable quality assurance/ quality control checks procedure 6 of appendix F of this part | | | |
| 8. Cadmium or Lead | Follow the approved site-specific monitoring plan | For operation, the approved site-specific monitoring plan | Follow the test methods in Table 5 to Subpart WWWW. |

**Table 5 to Subpart WWWW—Performance Test Requirements for Compliance With Emissions Limits Under § 60.6450**

| To determine compliance with the . . . | You must conduct a performance test to . . . | Using . . . |
|---|---|---|
| Particulate matter emission limits | 1. Select sampling ports location and the number of traverse points . . . | Method 1 in appendix A-1 to part 60 of this chapter. |
| | 2. Determine oxygen and carbon dioxide concentrations of the stack gas . . . | Method 3A or 3B in appendix A-2 to part 60 of this chapter, or as an alternative the manual method portion of ASME PTC-19-10-1981—part 10. |
| | 3. Measure the particulate matter emission concentration to determine compliance with the particulate matter emission limit to part 60 of this chapter . . . | Method 5 in appendix A-3 to part 60 of this chapter. |
| Collect a minimum sample volume of 1.7 cubic meters. The probe | | |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| and filter holder heating systems in the sample train shall be set to provide a gas temperature no greater than 160 °C. An oxygen or carbon dioxide measurement shall be obtained simultaneously with each Method 5 run. | | |
| Opacity emission limits | Determine compliance with the opacity limit in Table 3 to Subpart WWWW . . . | Method 9 of appendix A-4 of part 60 to this chapter, except as provided under § 60.11(e) of subpart A of this part, or as an alternative ASTM D7520-16 provided the digital camera opacity technique conditions, as defined in this subpart, are met. |
| Cadmium or lead emission limits | 1. Select sampling ports location and the number of traverse points | Method 1 in appendix A-1 to part 60 of this chapter. |
| | 2. Determine oxygen and carbon dioxide concentrations of the stack gas for flue gas analysis . . . | Method 3A or 3B in appendix A-2 to part 60 of this chapter, or as an alternative the manual method portion of ASME PTC-19-10-1981—part 10. |
| | 3. Measure the cadmium or lead emission concentration to determine compliance with the emission limits . . . | Method 29 in appendix A-8 to part 60 of this chapter. An oxygen or carbon dioxide measurement shall be obtained simultaneously with each Method 29 test run for cadmium and lead required. |
| Mercury emission limits | 1. Select sampling ports location and the number of traverse points . . . | Method 1 in appendix A-1 to part 60 of this chapter. |
| | 2. Determine oxygen and carbon dioxide concentrations of the stack gas for flue gas analysis . . . | Method 3A or 3B in appendix A-2 to part 60 of this chapter, or as an alternative the manual method portion of ASME PTC-19-10-1981—part 10. |
| | 3. Measure the mercury emission concentration | Method 29 in appendix A-8 to part 60 of this |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| | to determine compliance with the emission limits . . . | chapter or as an alternative ASTM D6784-24. Collect a minimum sample volume of 1.7 cubic meters. |
| An oxygen or carbon dioxide measurement shall be obtained simultaneously with each Method 29 test run for mercury required. | | |
| Sulfur dioxide emission limits | Calculate the 24-hr daily geometric average sulfur dioxide emission concentration . . . | Method 19, section 12.4.3, in appendix A-7 to part 60 of this chapter. |
| Hydrogen chloride emission limits | Measure the hydrogen chloride emission concentration . . . | Method 26 or 26A in appendix A-8 of part 60 to this chapter, as applicable. The minimum sampling time shall be 1 hour. An oxygen (or carbon dioxide) measurement shall be obtained simultaneously with each Method 26 or 26A test run for hydrogen chloride. |
| Dioxins/furans emission limits | 1. Select sampling ports location and the number of traverse points . . . | |
| | 2. Determine oxygen and carbon dioxide concentrations of the stack gas for flue gas analysis . . . | Method 3, 3A or 3B in appendix A-2 to part 60 of this chapter, or as an alternative ASME PTC-19-10-1981—part 10. |
| | 3. Measure the dioxins/furans emission concentration to determine compliance with the emission limits . . . | Method 23 in appendix A-7 to part 60 of this chapter. The minimum sampling time shall be 4 hours. An oxygen (or carbon dioxide) measurement shall be obtained simultaneously with each Method 23 test run for dioxins/furans. |
| Nitrogen oxides emission limits | Determine the daily arithmetic average nitrogen oxides emission concentration. | Method 19, section 12.4.1, in appendix A-7 to part 60 of this chapter. |

| | | |
|---|---|---|
| Fugitive ash emission limits | Measure fugitive ash emissions . . . | Method 22 in appendix A-7 to part 60 of this chapter. The minimum observation time shall be a series of three 1-hour observations. The observation period shall include times when the facility is transferring ash from the municipal waste combustor to the area where ash is stored or loaded into containers or trucks. |
| Opacity limit for air curtain incinerators under § 60.6665 | Determine compliance with the opacity limit in § 60.6665 | Method 9 of appendix A-4 of part 60 to this chapter, or as an alternative ASTM D7520-16 provided the digital camera opacity technique conditions, as defined in this subpart, are met. |

<Subpart added by 91 FR 11860, effective May 11, 2026.>

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022; 91 FR 11860, March 10, 2026, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

Footnotes

a Plant specific schedules can be used at the discretion of the state.

b The date can be no later than 3 years after the effective date of state plan approval or March 10, 2031.

a Measured at the combustor outlet in conjunction with a measurement of oxygen concentration, corrected to 7 percent oxygen (dry basis). Calculated as an arithmetic average. CEMS data during warmup, startup, and shutdown, as defined in this subpart, are not corrected to 7 percent oxygen, and are used as measured. The averaging times are specified in greater detail in § 60.6495(b).

b Averaging times are 4-hour or 24-hour block arithmetic averages.

c 24-hour block average, geometric mean.

a CEMS data during warmup, startup, and shutdown, as defined in this subpart, are not corrected to 7 percent oxygen and are used as measured.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

b Existing mass burn waterwall units equipped with air-to-air heat exchanger flue gas reheat in advance of a selective catalytic reduction control device are subject to a 50 parts per million by volume dry basis emission limit.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart CB. Emissions Guidelines and Compliance Times for Large Municipal Waste Combustors that Are Constructed on or Before September 20, 1994 (Refs & Annos)

40 C.F.R. Pt. 60, Subpt. Cb, Tbl. 1

# Table 1 to Subpart Cb of Part 60—Nitrogen Oxides Guidelines for Designated Facilities

Effective: July 10, 2006

Currentness

| Municipal waste combustor technology | Before April 28, 2009, nitrogen oxides emission limit (parts per million by volume)[a] | On and after April 28, 2009, nitrogen oxides emission limit (parts per million by volume)[a] |
|---|---|---|
| Mass burn waterwall | 205 | 205. |
| Mass burn rotary waterwall | 250 | 210. |
| Refuse-derived fuel combustor | 250 | 250. |
| Fluidized bed combustor | 180 | 180. |
| Mass burn refractory combustors | No limit | No limit. |

**Credits**

[71 FR 27334, May 10, 2006]

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 60 FR 65414, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

Footnotes

a Corrected to 7 percent oxygen, dry basis.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-1113 Document #2202646 Filed: 11/09/2026 Page 88 of 95

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 60. Standards of Performance for New Stationary Sources (Refs & Annos)
Subpart CB. Emissions Guidelines and Compliance Times for Large Municipal Waste Combustors that Are Constructed on or Before September 20, 1994 (Refs & Annos)

40 C.F.R. Pt. 60, Subpt. Cb, Tbl. 2

# Table 2 to Subpart Cb of Part 60—Nitrogen Oxides Limits for Existing Designated Facilities Included in an Emissions Averaging Plan at a Municipal Waste Combustor Plant [b]

Effective: July 10, 2006

Currentness

| Municipal waste combustor technology | Before April 28, 2009, nitrogen oxides emission limit (parts per million by volume)[b] | On and after April 28, 2009, nitrogen oxides emission limit (parts per million by volume)[a] |
|---|---|---|
| Mass burn waterwall................................ | 185 | 185 |
| Mass burn rotary waterwall..................... | 220 | 190 |
| Refuse-derived fuel combustor................ | 230 | 230 |
| Fluidized bed combustor.......................... | 165 | 165 |

**Credits**

[71 FR 27334, May 10, 2006]

SOURCE: 36 FR 24877, Dec. 23, 1971; 50 FR 36834, Sept. 9, 1985; 52 FR 37874, Oct. 9, 1987; 53 FR 2675, Jan. 29, 1988; 57 FR 32338, July 21, 1992; 58 FR 40591, July 29, 1993; 60 FR 65384, Dec. 19, 1995; 60 FR 65414, Dec. 19, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 48379, Sept. 15, 1997; 64 FR 7463, Feb. 12, 1999; 65 FR 78275, Dec. 14, 2000; 72 FR 59204, Oct. 19, 2007; 87 FR 18706, March 31, 2022; 87 FR 32090, May 27, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through November 4, 2026, 91 FR 69505. Some sections may be more current. See credits for details.

Footnotes

b Corrected to 7 percent oxygen, dry basis.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

a Mass burn refractory municipal waste combustors and other MWC technologies not listed above may not be included in an emissions averaging plan.

b Corrected to 7 percent oxygen, dry basis.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

91 FR 11802-01, 2026 WL 661408(F.R.)
RULES and REGULATIONS
ENVIRONMENTAL PROTECTION AGENCY
40 CFR Part 60
[EPA-HQ-OAR-2017-0183; FRL-5120-04-OAR]
RIN 2060-AO18

# Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Large Municipal Waste Combustors Voluntary Remand Response and Five-Year Review

Tuesday, March 10, 2026

AGENCY: Environmental Protection Agency (EPA).

***11802** ACTION: Final rule.

SUMMARY: The U.S. Environmental Protection Agency (EPA) is finalizing new source performance standards (NSPS) and emission guidelines (EG) for the large municipal waste combustion (MWC) source category. This final rule responds to a voluntary remand of the preceding rule for this source category and announces the results of the non-discretionary review at five-year intervals required by Clean Air Act (CAA) section 129(a)(5), fulfilling the requirements of a consent decree for the source category. The final rule revises the remanded emission limits for cadmium, lead, particulate matter, polychlorinated dibenzodioxins and dibenzofurans, mercury, hydrogen chloride, and sulfur dioxide for all sources subject to the NSPS and EG and the remanded emission limits for nitrogen oxides and carbon monoxide for some sources subject to the EG and all sources subject to the NSPS. This final rule also removes certain startup, shutdown, and malfunction (SSM) exclusions and exemptions. In addition, the EPA is taking this opportunity to streamline regulatory language; revise recordkeeping and reporting requirements; establish electronic notification; reestablish new and existing source applicability dates; eliminate title V requirements for air curtain incinerators that burn only wood waste, yard waste, and clean lumber; close a 2007 proposed reconsideration action; and make certain typographical and technical corrections and clarifications. The EPA estimates this final rule will result in 3,269 tpy reduction in regulated pollutants from existing sources through implementation of the final emission limits.

DATES: This final rule is effective on May 11, 2026. The incorporation by reference (IBR) of certain publications listed in the rule is approved by the Director of the Federal Register as of May 11, 2026.

ADDRESSES: The EPA has established a docket for this action under Docket ID No. EPA-HQ-OAR-2017-0183. All documents in the docket are listed at https://www.regulations.gov. Although listed, some information is not publicly available, e.g., Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. The EPA does not place certain other material, such as copyrighted material, on the internet; this material is publicly available only as Portable Document Format (PDF) versions accessible only on the EPA computers in the docket office reading room. The public cannot download certain databases and physical items from the docket but may request these items by contacting the docket office at 202-566-1744. The docket office has 10 business days to respond to such requests. With the exception of such material, publicly available docket materials are available electronically at https://www.regulations.gov.

FOR FURTHER INFORMATION CONTACT: For information about this final rule, contact Ms. Noel Cope, Natural Resources Division, 109 T.W. Alexander Drive, P.O. Box 12055, Research Triangle Park, North Carolina 27711; telephone number: (919) 541-2128; and email address: Cope.Noel@epa.gov.

SUPPLEMENTARY INFORMATION:


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-1113 Document #2202646 Filed: 11/09/2026 Page 92 of 95

differently understood reporting requirements. As a result, the EPA removed the CEMS data for these units from the CEMS pollutant calculations. The removal results in a new NSPS CO limit of 76 ppmvd from the proposed NSPS CO limit of 16 ppmvd and an EG $SO_2$ limit of 22 ppmvd from the proposed EG $SO_2$ limit of 20 ppmvd. Further discussion of this change from proposal is in section IV of this preamble.

Table 4 of this preamble presents the UPL results and the derived final EG and NSPS MACT floor limits for stack test pollutants. Tables 5 and 6 of this preamble summarize the averages and subsequent MACT floor EG and NSPS limits, respectively, for CEMS pollutants. Additional discussion of the methodology, detailed results, and a copy of the UPL template are available in the docket for this rulemaking.[FN48]

**Table 4—Large MWC MACT Floor EG and NSPS Limits for Stack Test Pollutants**

| Pollutant | Units (@7 percent $O^2$) | EG MACT floor calculations | | NSPS MACT floor calculations | |
|---|---|---|---|---|---|
| | | UPL result | MACT floor limit | UPL result | MACT floor limit |
| Cd | µg/dscm | 9.99 | 10 | 0.577 | [1] 2.3 |
| Pb | µg/dscm | 67.86 | 68 | 5.33 | [1] 23 |
| PM | mg/dscm | 19.05 | 20 | 5.06 | 5.1 |
| Hg | µg/dscm | 52.67 | 50 | 31.60 | 32 |
| PCDD/PCDF | ng/dscm | 13.88 | 14 | 10.61 | 11 |
| HCl | Ppmvd | 9.82 | 10 | 7.103 | 7.2 |

**Table 5—Large MWC MACT Floor EG Limits for CEMS Pollutants**

| Pollutant | Units (@7 percent $O^2$) | EG MACT floor calculations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Average of annual peak CEMS data | | | | | MACT floor limit | | | | |
| | | MB/WW | MB/RC | RDF | RDF/SS | RDF/FBC | MB/WW | MB/RC | RDF | RDF/SS | RDF/FBC |
| $SO_2$ | ppmvd (04)21.26 (04)22 | | | | | | | | | | |
| $NO_X$ | ppmvd | 226.52 | 142.25 (01)157.29 | 290.83 | [a] 205 | 150 (01)160 | [1] 180 | | | | |
| CO | ppmvd | 221.44 | 109.92 | 102.14 | 818.90 | 101.40 | [a] 100 | 110 | 110 | [1] 250 | 110 |

**Table 6—Large MWC MACT Floor NSPS Limits for CEMS Pollutants**

| Pollutant | Units | NSPS MACT floor calculations |
|---|---|---|


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-1113 Document #2202646 Filed: 11/09/2026 Page 93 of 95

| | (@7 percent $O^2$) | | | | |
|---|---|---|---|---|---|
| | | Average of annual peak CEMS data | | MACT floor limit | |
| | | [1] MB | [1] RDF | [1] MB | [1] RDF |
| $SO_2$ | ppmvd (01)13.96 (01)14 | | | | |
| $NO_X$ | ppmvd | 130.50 | 154.46 | [2] 140 | [23] 150 |
| CO | ppmvd | 75.71 | 99.03 | 76 | 100 |

**3. Beyond-the-Floor and Five-Year Review Results and Selection of Emission Limits**

Following consideration of comments received on the proposed rule, the EPA is not finalizing the beyond-the-floor and five-year review assessments for the EG as proposed. The final rule uses the MACT floor calculations to establish EG and NSPS limits for existing and new units for all pollutants except for NOx (which reflect the results of the MACT floor calculations for the EG as well as the results of the five-year review for the NSPS).

For its proposed assessment of beyond-the-floor in the reevaluation of the 1995 standards, the EPA assumed that the beyond-the-floor option for existing sources is the new source MACT floor (emissions control achieved in practice by the best controlled similar unit, as required by CAA section 129(a)(2)) which is more stringent than the existing source MACT floor (an average of a broader range of best performing units, also as required by CAA section 129(a)(2)). To assess additional, currently in-use control options as part of the five-year review pursuant to CAA section 129(a)(5), the EPA evaluated the performance of control measures at large MWC sources (including the installed emissions control equipment), and recent developments in practices, processes, and control technologies, including the recently finalized Good Neighbor Plan rulemaking. The EPA proposed $NO_X$ control technologies consistent with those discussed in the Good Neighbor Plan as five-year review options for consideration. For the other covered pollutants, there are some controls that have been demonstrated on non-MWC combustion sources that could potentially be applied to large MWCs; however, the technical feasibility and cost-effectiveness of these controls when used on large MWCs are highly uncertain at this time.

Following its evaluation of these scenarios, the EPA proposed a 110 ppmvd (24-hour) $NO_X$ limit (which was consistent with the $NO_X$ limit finalized under the Good Neighbor Plan), as the five-year review option for existing units based on the application of advanced selective noncatalytic reduction (ASNCR) or Covanta LN$^{TM}$ $NO_X$ technologies. The EPA also proposed a $NO_X$ NSPS limit of 50 ppmvd (24-hour), based on the permitted $NO_X$ limit for the only facility currently using selective catalytic reduction (SCR) technology with an air-to-air heat exchanger providing flue gas reheat prior to entering the SCR reactor to represent the five-year technology review standard for new sources.

Based on the consideration of several factors, including the stay of the Good Neighbor Plan,[FN49] the EPA is not finalizing the five-year review limit for $NO_X$ emissions from existing units as proposed. First, the total compliance costs for existing sources to meet the proposed 110 ppmvd $NO_X$ limit is significantly higher than the EPA's estimate in the proposed rule. At proposal, the EPA excluded units expected to be covered by the Good Neighbor Plan from the $257 million capital cost estimate. Inclusion of the compliance costs for those units significantly increases the total estimated capital cost to $412 million. These large capital expenditures likely will pose a significant challenge to the large MWC industry. The EPA recognizes that this is a unique industry providing essential public services, with many facilities owned and operated by State or local governments. These large capital expenditures could hinder government funded municipalities' ability to continue to utilize large MWCs for the public MSW disposal needs.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | volume)[a] | (hours)[b] |
|---|---|---|
| Mass burn waterwall | 100 | 4 |
| Mass burn refractory | 100 | 4 |
| Mass burn rotary refractory | 110 | 24 |
| Mass burn rotary waterwall | 110 | 24 |
| Modular starved air | 50 | 4 |
| Modular excess air | 50 | 4 |
| Refuse-derived fuel stoker | 110 | 24 |
| Fluidized bed, mixed fuel (wood/refuse-derived fuel) | 110 | 24 |
| Bubbling fluidized bed combustor | 100 | 4 |
| Circulating fluidized bed combustor | 100 | 4 |
| Pulverized coal/refuse-derived fuel mixed fuel-fired combustor | 110 | 4 |
| Spreader stoker coal/refuse-derived fuel mixed fuel-fired combustor | 110 | 24 |
| Semi-suspension refuse-derived fuel-fired combustor/wet refuse-derived fuel process conversion | 250 | [c] 24 |
| Spreader stoker fixed floor refuse-derived fuel-fired combustor/100 percent coal capable | 250 | [c]24 |

**Table 3 to Subpart WWWW of Part 60—Model Rule—Emission Limits for Existing Large Municipal Waste Combustors**

| For the air pollutant . . . | For this combustor type . . . | You must meet this emission limit, corrected to 7 percent oxygen[a] . . . |
|---|---|---|
| Particulate matter | All | 20 mg/dscm. |
| Opacity | All | 10 percent opacity (6-minute block average). |
| Cadmium | All | 10 ug/dscm. |
| Lead | All | 68 ug/dscm. |


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| Mercury | All | 50 ug/dscm or 85 percent reduction by weight. |
| Sulfur dioxide | All | 22 parts per million by volume dry basis or 75 percent reduction by weight or volume (daily 24-hr geometric average). |
| Nitrogen oxide[b] | Mass burn waterwall | 205 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Mass burn rotary | 150 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Refuse-derived fuel stoker | 160 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Refuse-derived fuel spreader stoker and semi-suspension | 160 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| | Refuse-derived fuel fluidized bed | 180 parts per million by volume dry basis (daily 24-hr arithmetic average). |
| Hydrogen chloride | All | 10 parts per million by volume dry basis or 96 percent reduction by weight or volume. |
| Dioxins/furans | All | 14 nanograms per dry standard cubic meter (total mass). |

***11886**

**Table 4 to Subpart WWWW of Part 60—Requirements for Continuous Emission Monitoring Systems (CEMS)**

| For the following pollutants | Use the following span values for your CEMS | Use the following performance specifications for your CEMS | During each relative accuracy test run, use the following methods to collect concurrent data |
|---|---|---|---|
| 1. Particulate Matter | | For operation and correlation test, P.S. 11 in appendix B of this part and procedure 2 of appendix F to this part<br><br>For quarterly accuracy determinations, daily calibration drift tests, and each response correlation audit or relative response audit, procedure 2 of appendix F to this part. | Follow the test methods in Table 5 to Subpart WWWW. |
| 2. Nitrogen Oxides | Control device outlet: 125 percent of the maximum estimated hourly nitrogen | For operation, P.S. 2 in appendix B of this part and procedure 1 in appendix F of this part | Method 7, 7A, 7C, 7D, or 7E in appendix A-4 to part 60 of this chapter. |